No. 25-1131

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

LUCIA URIZAR-MOTA; SERGIO REYES, individually and
p.p.a. of S.R., W.R. and G.R.; DELMY REYES; S.R.; W.R.; G.R.,
Plaintiffs-Appellees,

v.

UNITED STATES,
Defendant-Appellant,

JOHN and/or JANE DOE, M.D.; JOHN DOE CORPORATION,
Defendants.
_____

ON APPEAL FROM ENTRY OF JUDGMENT
BY THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

OPENING BRIEF FOR THE UNITED STATES

SARA MIRON BLOOM
Acting United States Attorney

KEVIN M. BOLAN
LAUREN S. ZURIER
Assistant U.S. Attorneys
One Financial Plaza, 17th Floor
Providence, Rhode Island 02903
(401) 709-5000

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................... iv

JURISDICTIONAL STATEMENT ........................................1

STATEMENT OF THE ISSUES.............................................1

STATEMENT OF THE CASE.................................................2

    Urizar-Mota's administrative claim.............................. 3

    The government's motion in limine ............................. 4

    The district court's findings of fact and conclusions of law ......................... 5

SUMMARY OF ARGUMENT .................................................7

STANDARDS OF REVIEW ..................................................12

ARGUMENT ........................................................................13

I.    The district court erred as a matter of law in denying the government's motion to dismiss the Reyes Plaintiffs for lack of subject-matter jurisdiction. ......................13

    A.    Standard of review specific to FTCA claims. .................................. 13

    B.    District court proceedings. ............................................. 13

        1.    Operative facts. ......................................................13

        2.    The district court's denial of the government's motion to dismiss....................16

    C.    Legal framework. ....................................................... 17

    D.    By failing to present their claims to HHS, the Reyes Plaintiffs failed to exhaust their administrative remedies and deprived the district court of subject-matter jurisdiction. .................. 19

II.    The district court abused its discretion by awarding Urizar-Mota lost-wages damages Plaintiffs did not seek and for which they presented no evidence.......................26

A.   The district court's lost-wages damage award prejudiced the government. ................................................................. 27

B.   The district court's lost-wages award is unsupported by any record evidence .......................................................... 30

III.  The district court's findings on causation and Urizar-Mota's resulting damage awards were clearly erroneous as they contradict the unrebutted testimony of the government's surgical expert. .................. 33

A.   The district court's conclusion that Urizar-Mota could have avoided surgery is contradicted by the record ................................... 34

B.   No competent evidence supports the district court's conclusions about the risks posed by surgery. .................................... 36

C.   The district court abused its discretion by awarding Urizar-Mota the cost of post-diagnosis medical expenses that would have been incurred regardless of any alleged negligence. ................. 38

IV.  The district court's findings about the standard of care were clearly erroneous because they relied exclusively on the inherently implausible, internally inconsistent, and critically impeached opinions of Plaintiff's primary-care expert. .................................... 41

A.   Dr. Phillips applied his purported standard of care inconsistently. ......................................................... 42

B.   The literature on which Dr. Phillips relied does not compel imaging for "any" red flag. ................................. 44

C.   Migraines do not require imaging, and Dr. Phillips recanted clear opinions that Urizar-Mota presented with migraines on three of the nine subject visits. ........................... 46

D.   At deposition, Dr. Phillips failed to identify a red flag in each one of the nine disputed office visits, and did not identify red flags in all nine until trial ................................ 47

E.   Dr. Phillips invented red flags that the relevant medical literature did not recognize and applied red flags where Urizar-Mota's medical records did not support them. ....................... 48

F.    The district court failed to account for years-long gaps in Urizar-Mota's intermittent headache symptoms and thereby erred in finding that her headache symptoms were "constant." ............................................................................... 50

CONCLUSION ..................................................................................... 53

CERTIFICATE OF COMPLIANCE ......................................................... 54

CERTIFICATE OF SERVICE ................................................................. 55

# TABLE OF AUTHORITIES

## Cases

*Adams by Adams v. U.S. Dep't of Hous. & Urb. Dev.*,
    807 F.2d 318 (2d Cir. 1986) ...........................................................23

*Almonte v. Kurl*,
    46 A.3d 1 (R.I. 2012) ...................................................................33

*Alterio v. Biltmore Constr. Corp.*,
    119 R.I. 307, 377 A.2d 237 (1977)...............................................31

*Andrews v. Penna Charcoal Co.*,
    55 R.I. 215, 179 A. 696 (1935)......................................................31

*Atl. Purchasers, Inc. v. Aircraft Sales, Inc.*,
    705 F.2d 712 (4th Cir. 1983) .........................................................28

*Atl. Tubing & Rubber Co. v. Int'l Engraving Co.*,
    528 F.2d 1272 (1st Cir. 1976).......................................................33

*Attallah v. United States*,
    955 F.2d 776 (1st Cir. 1992).........................................................13

*Barber v. Kone, Inc.*,
    118 F. App'x 276 (9th Cir. 2004) (unpublished) ..........................22

*Barrett ex rel. Estate of Barrett v. United States*,
    462 F.3d 28 (1st Cir. 2006)................................................... 17, 22

*Bolduc v. United States*,
    402 F.3d 50 (1st Cir. 2005)...........................................................25

*Cogburn v. United States*,
    717 F. Supp. 958 (D. Mass. 1989)................................................23

*Colligan v. Mary Hitchcock Mem. Hosp.*,
    No. 16-cv-513-JD, 2019 WL 9111931 (D.N.H. Oct. 23, 2019) ...................29

*Collins v United States*,
    996 F.3d 102 (2d Cir. 2021) .........................................................25

*Copen v. United States*,
    3 F.4th 875 (6th Cir. 2021) ...........................................................24

*Corte-Real v. United States*,
    949 F.2d 484 (1st Cir. 1991)..................................................................18

*Coska v. United States*,
    114 F.3d 319 (1st Cir. 1997)................................................ 18, 24, 25

*Dalrymple v. United States*,
    460 F.3d 1318 (11th Cir. 2006) .......................................................19

*Del Valle Rivera v. United States*,
    626 F. Supp. 347 (D.P.R. 1986) ......................................................20

*DiPetrillo v. Dow Chem. Co.*,
    729 A.2d 677 (R.I. 1999)..................................................................33

*Duchnowski v. Cty. of Nassau*,
    416 F. Supp. 3d 179 (E.D.N.Y. 2018)..............................................40

*Dynamic Image Techs., Inc. v. United States*,
    221 F.3d 34 (1st Cir. 2000)..............................................................19

*Felce v. Fiedler*,
    974 F.2d 1484 (7th Cir. 1992) .........................................................28

*Ferguson v. United States*,
    793 F. Supp. 107 (E.D. Pa. 1992).....................................................22

*Fiorenzo v. Lima*,
    982 A.2d 585 (R.I. 2009)..................................................................21

*Flanagan v. Wesselhoeft*,
    712 A.2d 365 (R.I. 1998)..................................................................33

*Glendale Fed. Bank, FSB v. United States*,
    39 Fed. Cl. 422 (1997)......................................................................34

*Haceesa v. United States*,
    309 F.3d 722 (10th Cir. 2002) .........................................................19

*Hatahley v. United States*,
    351 U.S. 173 (1956)..........................................................................30

*Hennessey v. Pyne*,
    694 A.2d 691 (R.I. 1997)..................................................................21

*Hicks v. Craw*,
  No. 17-cv-475, 2022 WL 3593623 (N.D.N.Y. Aug. 22, 2022) ...................40

*Holloway v. United States*,
  845 F.3d 487 (1st Cir. 2017).................................................. passim

*Hornof v. United States*,
  No. 19-cv-00198, 2021 WL 1651193 (D. Me. Apr. 27, 2021) ....................23

*In re Lorazepam & Clorazepate Antitrust Litig.*,
  531 F. Supp. 2d 82 (D.D.C. 2008)..............................................27

*Jackson v. United States*,
  730 F.2d 808 (D.C. Cir. 1984)..................................................23

*Johnson v. United States*,
  704 F.2d 1431 (9th Cir. 1983) .................................................20

*Kaszuk v. Bakery & Confectionary Union & Indus. Int'l Pension Fund*,
  791 F.2d 548 (7th Cir. 1986) ..................................................28

*Kokotis v. U.S. Postal Serv.*,
  223 F.3d 275 (4th Cir. 2000) ..................................................20

*Lopez v. United States*,
  758 F.2d 806 (1st Cir. 1985)...................................................18

*Lopez-De Robinson v. United States*,
  No. 96-1702, 1997 WL 259551 (1st Cir. May 13, 1997)
  (unpublished) ............................................................. 20, 21

*Manko v. United States*,
  830 F.2d 831 (8th Cir. 1987) ..................................................19

*McNeil v. United States*,
  508 U.S. 106 (1993)..................................................... 17, 18, 25

*Mitchell v. United States*,
  141 F.3d 8 (1st Cir. 1998).............................................. 12, 42

*Nat'l Chain Co. v. Campbell*,
  487 A.2d 132 (R.I. 1985).......................................................31

*Normandin v. Levine*,
  621 A.2d 713 (R.I. 1993).................................................. 21, 22

*Peat, Inc. v. Vanguard Research, Inc.*,
   378 F.3d 1154 (11th Cir. 2004) ...................................................39

*Petrone v. Werner Enters., Inc.*,
   42 F.4th 962 (8th Cir. 2022) ................................................ 39, 40

*Pipkin v. U.S. Postal Serv.*,
   951 F.2d 272 (10th Cir. 1991) ...................................................23

*Primus v. United States*,
   389 F.3d 231 (1st Cir. 2004)................................................ 12, 42

*Prob. Ct. of City of Warwick ex rel. Lawton v. Bank of Am., NA*,
   813 F. Supp. 2d 277 (D.R.I. 2011) .............................................34

*Ramirez-Carlo v. United States*,
   496 F.3d 41 (1st Cir. 2007)........................................................18

*Rental Dev. Corp. v. Lavery*,
   304 F.2d 839 (9th Cir. 1962) .....................................................27

*Ribeiro v. R.I. Eye Inst.*,
   138 A.3d 761 (R.I. 2016).............................................................33

*Riley v. Stone*,
   900 A.2d 1087 (R.I. 2006)..........................................................41

*Rogers v. Town of New Hampton*,
   554 F. Supp. 3d 340 (D.N.H. 2021) ..........................................40

*Roman-Cancel v. United States*,
   613 F.3d 37 (1st Cir. 2010)........................................................13

*Romano v. Westinghouse Elec. Co.*,
   114 R.I. 451, 336 A.2d 555 (1975).............................................31

*Rucker v. United States*,
   798 F.2d 891 (6th Cir. 1986) .....................................................19

*Santiago-Ramirez v. Sec'y of Dep't of Def.*,
   984 F.2d 16 (1st Cir. 1993)............................................ 20, 21, 25

*Schenck v. Roger Williams Gen. Hosp.*,
   382 A.2d 514 (R.I. 1977).............................................................33

*Seven Words LLC v. Network Sols.*,
    260 F.3d 1089 (9th Cir. 2001) ........................................................28

*Trindade v. Grove Servs., Inc.*,
    91 F.4th 486 (1st Cir. 2024) ...........................................................12

*Turner ex rel. Turner v. United States*,
    514 F.3d 1194 (11th Cir. 2008) .....................................................24

*United States v. Cortez-Vergara*,
    873 F.3d 390 (1st Cir. 2017) ..........................................................12

*United States v. Marin*,
    651 F.2d 24 (1st Cir. 1981) ............................................................27

*Valentin v. Hosp. Bella Vista*,
    254 F.3d 358 (1st Cir. 2001) ..........................................................13

*Villanueva v. United States*,
    662 F.3d 124 (1st Cir. 2011) ..........................................................12

*Williams v. Poulos*,
    11 F.3d 271 (1st Cir. 1993) ............................................................29

*Wisner v. United States*,
    154 F.R.D. 39 (N.D.N.Y. 1994) ....................................................23

*Wozniak v. United States*,
    701 F. Supp. 259 (D. Mass. 1988) ........................................... 22, 25

**Statutes**

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1331 ...............................................................................1

28 U.S.C. § 1346(b) ..........................................................................1

28 U.S.C. § 2401(b) .................................................................. 13, 17

28 U.S.C. § 2675(a) ................................................................. passim

42 U.S.C. §§ 233(g)-(n) ...................................................................2

9 R.I. Gen. Laws § 9-1-41(b) .........................................................21

9 R.I. Gen. Laws § 9-1-47.............................................................................29

**Rules**

Fed. R. App. P. 4(a)(1)(B)(i)............................................................................1

Fed. R. App. P. 32(a)(5)................................................................................54

Fed. R. App. P. 32(a)(6)................................................................................54

Fed. R. App. P. 32(a)(7)(B)...........................................................................54

Fed. R. App. P. 32(f)....................................................................................54

Fed. R. Civ. P. 12(b)(1).................................................................................13

Fed. R. Civ. P. 26(a)(1)(A)(iii).......................................................................29

Fed. R. Civ. P. 52(a)(6)........................................................................... 12, 41

Fed. R. Civ. P. 54(c)............................................................................... 27, 28

Fed. R. Evid. 801(d)(2)(C).............................................................................34

Fed. R. Evid. 1006.......................................................................................39

**Treatises**

Restatement 2d of Torts § 901......................................................................34

**Regulations**

28 C.F.R. § 14.2(a)................................................................................. 14, 17

## JURISDICTIONAL STATEMENT

The district court (McConnell, C.J.) had jurisdiction over this Federal Tort Claims Act ("FTCA") case, arising under Rhode Island law, against the United States (also the "government") under 28 U.S.C. §§ 1331 and 1346(b). Following a bench trial, the district court entered judgment for Plaintiff Lucia Urizar-Mota and her four children—Delmy Reyes, S.R., W.R., and G.R. (collectively, "the Reyes Plaintiffs"[1])—on December 12, 2024. [G.Add. 41-42]. The United States timely filed a notice of appeal on February 7, 2025. [G.App.1 2400]; Fed. R. App. P. 4(a)(1)(B)(i). Accordingly, this Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Did the district court err in denying the government's motion to dismiss the claims of the Reyes Plaintiffs, who did not present their FTCA claims administratively, and therefore err in awarding them $3.5 million in damages?

2.      Did the district court abuse its discretion in awarding Urizar-Mota $2.92 million for the lost value of her household labor because Plaintiffs neither requested such relief nor submitted evidence supporting it?

---

[1]      In accordance with the Court's Rules, the government has redacted from this brief the names of the Reyes Plaintiffs who are not adults, but has not redacted their names where they have already appeared, unredacted, in public documents included in the government's addendum and public appendix.

The government cites: (a) its addendum as "G.Add."; (b) its appendix as "G.App.1," which comprises five volumes; and (c) its single, provisionally under-seal appendix as "G.App.2." On September 17, 2025, the government filed by Federal Express a motion to seal the appendix paginated "G.App.2."

1

3.     Did the district court clearly err in awarding Urizar-Mota $662,194.02 in post-diagnosis medical expenses and $6,387,500 in post-diagnosis pain and suffering—having concluded surgery might have been avoided and would have been less risky had it been conducted earlier—when all experts testified that surgery was inevitable at any time and when the only surgeon to testify opined that the surgical risks were the same no matter when surgery might have occurred?

4.     Did the district court clearly err in crediting the testimony of Plaintiffs' primary-care expert concerning the standard of care for referring patients presenting with headache symptoms to neuroimaging despite material internal inconsistencies in his trial testimony as well as between his deposition and trial testimony?

## STATEMENT OF THE CASE

Urizar-Mota sought primary, obstetric, optometry, and behavioral-health care from a federally qualified health center, the Providence Community Health Center ("PCHC"),[2] from April 2006 through at least October 2020, when she was between 19 and 34 years old. [G.App.2 1-2, 323]. She visited PCHC more than 100 times in this period. [G.App.2 1-342]. Between November 14, 2012, and June 19, 2019, Urizar-Mota visited PCHC more than 40 times [G.App.2 100-103, 107-113, 118-262, 265-267, 270-277, 282-285, 287-289, 292-295, 299, 301-307], and

---

[2]     As a grant recipient of the Health Resources and Services Administration, PCHC was deemed eligible for FTCA medical malpractice coverage under the Federally Supported Health Centers Assistance Act, 42 U.S.C. §§ 233(g)-(n). As a result, the defendant in any claim for negligence against PCHC is the United States.

complained about headaches during nine primary-care PCHC office visits in that period, [G.App.2 100-103, 108-113, 126-133, 249-251, 265-267, 292-294, 301-303]. Plaintiffs contended that PCHC providers breached the standard of care because, after each of those nine visits, she was not referred to neuroimaging or a neurologist. [G.App.1 2213-2299].

On June 19, 2019, Urizar-Mota traveled to PCHC for care. Upon her arrival, PCHC providers found her unconscious and referred her to the Rhode Island Hospital emergency room. [G.App.2 307]. There, physicians diagnosed her with acute hydrocephalus, identified a brain lesion, and stabilized her. [G.App.2 344-346, 348-349; G.App.1 755-756, 760-762, 765-768, 1035-1036, 1385-1386, 1392-1393, 1409, 1594-1595]. On June 24, 2019, surgeons successfully removed a brain tumor [G.App.2 343], which was determined after surgery to be a classically slow-growing, rare pilocytic astrocytoma, which does not metastasize, [G.App.1 642-644, 816, 1009, 1997-1998, 2003-2006, 2008, 2018, 2025-2027, 2036-2039]. During surgery, Urizar-Mota experienced cerebellar strokes. [G.App. 1 750, 753-755, 998-1000, 1040-1041, 1389, 1395-1396]. Since then, Urizar-Mota has experienced a range of movement disorders. [G.Add. 347, 350; G.App.1 738-739, 750, 753-755, 766-768, 998-1000, 1040-1041, 1365, 1389].

### Urizar-Mota's administrative claim

On October 5, 2020, Urizar-Mota filed an administrative claim with the U.S. Department of Health & Human Services ("HHS") alleging personal-injury claims concerning PCHC's care. [G.App.1 75-76, 78-82]. HHS denied Urizar-Mota's claim on March 15, 2021 [G.App.1 84-85], and she and the Reyes Plaintiffs then

filed an FTCA action against the United States in the U.S. District Court for the District of Rhode Island on April 7, 2021 [G.App.1 12-30]. On June 28, 2021, the government moved to dismiss the Reyes Plaintiffs' claims for failure to exhaust administrative remedies under 28 U.S.C. § 2675(a). [G.App.1 33-47]. The district court denied that motion on August 16, 2021. [G.Add. 1-7]. (Additional facts concerning this issue appear on pages 13-17 below.)

### The government's motion in limine

Before trial, the government unsuccessfully moved to exclude evidence and argument concerning three topics relevant to this appeal. First, the government asked the district court to exclude all evidence and argument (a) from any expert about Urizar-Mota's medical expenses and (b) a summary chart of those expenses, as none of Plaintiffs' experts had made any pretrial disclosures about them. [G.App.1 119-126]. Second, the United States moved to exclude all evidence and argument about any future economic damages because Plaintiffs provided no evidence or expert to testify about them. [G.App.1 127-128]. Third, the United States moved to exclude all evidence and argument about non-surgical interventions as both parties' experts agreed that surgery was Urizar-Mota's only treatment option regardless of when her tumor might have been identified. [G.App.1 128-131]. Plaintiffs opposed the motion [G.App.1 136-156], and the district court denied it in a text order. [G.Add. 8].

## The district court's findings of fact
## and conclusions of law

The district court conducted a bench trial; heard live testimony on January 8 and February 14, 2024; and reviewed expert testimony videorecorded on January 9, 11, 16, and 19, February 28, and March 1, 2024. [G.Add. 10].

The parties' trial testimony substantially featured expert witnesses. The parties jointly submitted the deposition transcript of Dr. Knarik Arkun, Plaintiffs' pathologist. She opined on the diagnosis of Urizar-Mota's tumor, which was not disputed. [G.App.1 1979-2044]. Plaintiffs presented three expert witnesses. A primary-care expert, Dr. Russell Phillips, opined about what symptoms accompanying a headache might cause a primary-care provider to refer a patient to neuroimaging or a neurologist. [G.App.1 326-612, 1058-1205]. Dr. David Caplan, a neurologist who examined Urizar-Mota after her successful surgery, opined about the scope of her injuries and their alleged causes. [G.App.1 613-798]. Finally, a neuro-oncologist, Dr. David Ashley, testified about Urizar-Mota's injuries, causation, and surgical risk. [G.App.1 799-1057]. The government presented two expert witnesses: its own primary-care expert, Dr. Amy Ship, to testify about the standard of care, [G.App.1 1615-1871]; and Dr. Timothy Smith, a brain surgeon, to testify about causation, [G.App.1 1344-1614].

The chief dispute about the applicable standard of care is what a reasonable primary-care provider should do when a patient presents with (a) symptoms of certain headache symptoms (*i.e.*, those for which imaging is not indicated), [G.App.1 362-363, 383, 524-529, 552, 1088-1089, 1143-1149, 1151, 1669, 2098-2107,

2120-2131],[3] and (b) so-called "red flags," [G.App.1 371-372, 378-379, 1151-1152, 1648-1649, 2106, 2109-2119]. Red flags are clinical features that might provide an indication for imaging so as to distinguish nearly ubiquitous primary headaches, where the headache is both the symptom and the diagnosis, from secondary headaches, where the headache is a symptom of some other cause. [G.App.1 362-363, 1367-1369, 2109]. The record evidence shows that reasonable primary-care providers take a wait-and-see approach when patients present headache symptoms and red flags. [G.App.1 1003-1004, 1020-1021, 1025-1026, 1261, 1317, 1648-1649, 1807-1808, 1848-1849, 2047-2052, 2065-2074]. Only Dr. Phillips opined that headache symptoms, with any red flag, compel imaging without exception. [G.App.1 383-384].

The district court, citing only Dr. Phillips's testimony, concluded that the standard of care required a primary-care provider to refer a patient to neuroimaging if she presented "any" red flag, and thereby found that the government had breached that standard. [G.Add. 20-22, 36-38].

The district court also found that Urizar-Mota suffered a cerebellar stroke during surgical removal of her brain tumor, resulting in permanent neurological injuries. [G.Add. 17]. The district court concluded, contrary to all expert testimony from both sides, that if her tumor had been "diagnosed in 2017 or 2018, it is more

---

[3]    [G.App.1 2099 ("Undifferentiated headache usually is of benign etiology, so neuroimaging rarely reveals significant intracranial pathology."); G.App.1 2106 ("In the patient with recurrent episodes of classical visual aura followed by headache, the diagnosis of migraine is relatively straightforward and the patient does not require neuroimaging."); G.App.1 2121 ("Don't perform neuroimaging studies in patients with stable headaches that meet criteria for migraine.").]

likely than not that she would have avoided surgery and doctors could have treated her tumor with medication that became available in 2017." [G.Add. 33]. The district court also concluded that had surgery been performed earlier, it would have been less risky and would have caused less harm. [G.Add. 26-33]. On this basis, the district court awarded Urizar-Mota $662,194.62 in medical expenses following the diagnosis of her brain tumor. [G.Add. 34, 39]. It also awarded Urizar-Mota $6,387,500 in post-diagnosis pain and suffering, and $240,800 in pre-diagnosis pain and suffering. [G.Add. 39].

In addition, the district court awarded Urizar-Mota $2.92 million to compensate for future economic loss related to her inability to perform household tasks. The district court based this figure on its calculation of her remaining life expectancy (50 years, *i.e.*, to age 88) and the court's assumptions about the time she spent working in the home (eight hours a day, every day of the week) and the assumed value of that work ($20/hour). [G.Add. 35, 39].

Concluding that the Reyes Plaintiffs had met "all necessary conditions precedent" for their FTCA claims, the district court awarded them damages for loss of consortium totaling $3.5 million. [G.Add. 10, 35-36, 39].

In total, the district court awarded Plaintiffs' damages of $11,885,494.62. [G.Add. 33-36, 38-40].

## SUMMARY OF ARGUMENT

1.  **Exhaustion of Remedies:** The district court erred as a matter of law by excusing the failure of the Reyes Plaintiffs to exhaust their administrative remedies before filing their loss-of-consortium claims in federal court. The FTCA's

administrative-exhaustion requirement is a necessary component of the government's waiver of sovereign immunity. Here, none of the Reyes Plaintiffs filed an administrative claim with HHS. Urizar-Mota filed her claim in only her name. The documentation supporting her claim only vaguely alluded to her family and did not set forth a sum certain concerning any of the Reyes Plaintiffs' alleged damages. In rejecting her claim, HHS understood that the only claimant was Urizar-Mota.

A bedrock principle in FTCA cases is that each individual seeking redress must individually satisfy the FTCA's administrative exhaustion requirement by identifying herself, presenting the basis of her claim, and seeking a sum certain. The overwhelming weight of authority from other circuit courts as well as district courts within this circuit has expressly applied this principle to loss-of-consortium claims.

The district court nevertheless excused the Reyes Plaintiffs' failure to satisfy the FTCA's requirements by reasoning that, because a child's loss-of-consortium claim "derive[s] from th[e] [losses] of the injured family member," Urizar-Mota's own claim sufficiently notified HHS that her minor children were pursuing separate consortium claims. [G.Add. 5]. The district court thereby confused the lenient approach used to evaluate the *content* of Urizar-Mota's notice to HHS with the requirement that *each* claimant must present to the agency the essential information that the statute requires.

No relevant legal authority supports the district court's analysis. The district court lacked subject-matter jurisdiction to consider the Reyes Plaintiffs'

consortium claims, and the government therefore asks this Court to vacate loss-of-consortium damages awarded to the Reyes Plaintiffs in the amount of $3.5 million.

**2.** **Lost-Wages Damages:** The district court abused its discretion in awarding lost-wages damages to Urizar-Mota of $2.92 million. Plaintiffs never claimed such damages before trial. They expressly disclaimed them after trial. And they did not present any evidence of the value of Urizar-Mota's labor. Federal Rule of Civil Procedure 54(c) authorizes the federal courts to "grant the relief to which each party is entitled," but not if that relief substantially prejudices the defendant.

The district court's surprise award of damages clearly prejudiced the government. Not only did the unexpected award substantially expand the government's liability, it also required the government to disprove the plaintiffs' economic damages even though Plaintiffs had never raised the issue. The only way the government could have avoided or mitigated the damage award would have been to introduce evidence on an issue Plaintiffs never raised to show why such an award would be improper, or if proper, what the appropriate valuation should have been. The district court's unexpected burden-shifting was plainly improper: it relieved Plaintiffs of carrying their exclusive burden of proof and persuasion on all elements of their claims.

Even aside from the prejudice it created, the lost-damages award was not supported by the evidence. The district court plucked a daily wage from thin air. The court then assumed that Urizar-Mota worked for eight hours a day in her own home and that she would continue to do so for every remaining day of her life, well into her late 80s. Because the record evidence supports none of these findings, this

Court should hold that the district court abused its discretion in calculating and awarding these damages and vacate this $2.92 million award.

**3.** **Causation:** The district court clearly erred in its causation findings and its resulting awards to Urizar-Mota of post-diagnosis medical expenses of $662,194.62 and post-diagnosis pain and suffering of $6,387,500. All of the parties' experts who testified about Urizar-Mota's treatment options concluded that surgery was necessary regardless of when her tumor might have been identified. The only record evidence about non-surgical treatments established that they were not approved until the year when Urizar-Mota's tumor was identified (2019), and were approved only for children whose tumors could not be fully removed by surgery. Urizar-Mota met none of those criteria. Thus, the district court clearly erred by finding that Urizar-Mota might have avoided surgery, and that her injuries from 2017 on resulted from her allegedly delayed diagnosis.

In addition, the case's only testifying surgeon opined that the risk of surgical complications was the same regardless of when the tumor might have removed and that Urizar-Mota's operation, after her hydrocephalus, did not change the risk of surgery. The district court clearly erred when it found that the alleged delay in her surgery, and her surgery five days after her hydrocephalus, made the surgery both riskier and more damaging than it would have been had it been conducted sooner. The court erred further by finding, on the preceding grounds, that injuries resulting from her surgery were compensable as post-diagnosis medical expenses and post-diagnosis pain and suffering.

For these reasons, the Court should find each of these factual findings clearly erroneous and vacate the awards of post-diagnosis medical expenses $662,194.62 and post-diagnosis pain and suffering of $6,387,500.

**4.     <u>Standard of Care:</u>** The district court clearly erred by finding Plaintiffs' primary-care expert, Dr. Phillips, credible and crediting his testimony that the standard of care compels a primary-care provider to refer a patient to neuroimaging or a neurologist whenever a patient complains of headache symptoms and exhibits "any" red flag. Dr. Phillips himself misapplied this purported standard to the record of Urizar-Mota's symptoms—applying this standard to the nine, intermittent office visits subject to Urizar-Mota's claims, but not to three other office visits that preceded them even though they included what Dr. Phillips identified as headache symptoms and red flags. None of the medical literature on which Dr. Phillips relied, moreover, sets forth the bright-line standard that he invented—that any red flag compels a referral to neuroimaging. Nor does the literature he cited recognize as red flags all of the symptoms that Dr. Phillips (and, thus, the district court) characterized as red flags. At trial, Dr. Phillips also recanted critical sections of his deposition testimony.

The district court could reach its conclusion that Dr. Phillips's testimony was "the most credible" only by ignoring its myriad, material inconsistences—none of which the district court bothered to note or reconcile. Dr. Phillips's contradictory testimony should have led the district court to discount it entirely, conclude that the Plaintiffs failed to establish a standard of care to apply, and dismiss Plaintiffs' claims. Instead, the district court cherry-picked Dr. Phillips's testimony to set

forth an applicable standard of care and to find that the government breached it. This was clear error, and this Court should vacate the district court's findings on the standard of care and the government's breach and enter judgment for the United States.

## STANDARDS OF REVIEW

This Court reviews a district court's legal conclusions *de novo*, *Villanueva v. United States*, 662 F.3d 124, 126 (1st Cir. 2011), and "findings of fact for clear error," *United States v. Cortez-Vergara*, 873 F.3d 390, 393 (1st Cir. 2017). The Court "deem[s] a finding clearly erroneous only when, after reviewing the entire record, [it is] left with the definite and firm conviction that a mistake has been committed." *Primus v. United States*, 389 F.3d 231, 237 (1st Cir. 2004) (internal quotation marks and citation omitted).

This Court reviews a trial court's damage calculations for abuse of discretion. *Trindade v. Grove Servs., Inc.*, 91 F.4th 486, 493 (1st Cir. 2024).

Federal Rule of Civil Procedure 52(a)(6) provides in part that, when assessing trials conducted without a jury (as here), this Court "must give due regard to the trial court's opportunity to judge the witnesses' credibility." But the Court may find that a district court's credibility determinations were clearly erroneous when those findings were "based on testimony" that satisfies any one of three, disjunctive criteria—namely, that the testimony was "inherently implausible, internally inconsistent, or critically impeached." *Mitchell v. United States*, 141 F.3d 8, 17 (1st Cir. 1998).

## ARGUMENT

I.  **The district court erred as a matter of law in denying the government's motion to dismiss the Reyes Plaintiffs for lack of subject-matter jurisdiction.**

### A.  Standard of review specific to FTCA claims.

Under the FTCA, before suing the United States, a plaintiff must exhaust administrative remedies by filing an administrative claim with the appropriate federal agency within two years of the claim's accrual. 28 U.S.C. §§ 2401(b), 2675(a). Waiting for the agency to deny the claim, or for six months to elapse after filing the claim, is another jurisdictional prerequisite to bringing a lawsuit under the FTCA in federal court. *Attallah v. United States*, 955 F.2d 776, 779 (1st Cir. 1992).

The district court's disposition of a challenge to the sufficiency of its subject-matter jurisdiction, Fed. R. Civ. P. 12(b)(1), takes plaintiff's well-pleaded facts as true and draws all reasonable inferences in plaintiff's favor. *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 365 (1st Cir. 2001). Because the facts in this case concerning subject-matter jurisdiction are undisputed, this Court's review is *de novo*. *Id.*; *Roman-Cancel v. United States*, 613 F.3d 37, 41 (1st Cir. 2010).

### B.  District court proceedings.

#### 1.  Operative facts.

On October 5, 2020, HHS received a written submission (the "Administrative Claim") consisting of two documents: a five-page letter from Urizar-Mota's attorney ("Attorney Letter"), [G.App.1 78-81],[4] and a two-page Standard Form 95

---

4    The district court described the letter as six pages long. [G.Add. 6]. It consists of only five. [G.App.1 78-82].

claim form ("SF-95"). [G.Add. 75-76]. The Attorney Letter identified Urizar-Mota as the claimant and provided notice that counsel "represents Lucia Urizar-Mota in her claims against the Providence Community Health Center." [G.App.1 78].

Neither the Attorney Letter nor the SF-95 identified by name any of the Reyes Plaintiffs, nor did either document indicate that the Reyes Plaintiffs also were pursuing administrative claims. [G.App.1 75-76, 78-82]. The instructions for the SF-95 informed claimants that a parent making a claim on behalf of minor children must specify that the children were claimants and that the parent was signing on their behalf in a representative capacity. [G.App.1 76].[5] But Urizar-Mota signed the letter only for herself without providing additional clarification, and the Attorney Letter did not supply the missing information. [G.App.1 75]. The Administrative Claim did not identify or describe any claims or damages associated with the Reyes Plaintiffs. [G.App.1 75-76, 78-82]. And while the SF-95 boldfaced that each claimant seeking damages "should submit a separate claim form," [G.App.1 76], the Reyes Plaintiffs did not do so.

The Administrative Claim detailed the alleged damages that Urizar-Mota suffered individually. [G.App.1 75-76, 78-82]. It made only veiled references to

---

[5]     The SF-95's instructions provided in relevant part:

> A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as . . . parent, guardian or other representative.

[G.App.1 76]. *See also* 28 C.F.R. § 14.2(a).

the impact of her injuries on her family. First, the SF-95 noted that she was married. [G.App.1 75]. Second, the SF-95 stated that she had suffered " 'permanent life-altering disabilities.' " [G.App.1 75]. Third, the Attorney Letter noted that Urizar-Mota's "family" had observed twitching in her left leg and that, when she was discharged from rehabilitation in December 2019, she had "returned home with her family." [G.App.1 81]. Finally, the Attorney Letter stated that Urizar-Mota "is no longer able to manage the household as she used to and do things such as cooking, cleaning and laundry," and that "[h]er ability to care for her younger children is also impacted." [G.App.1 81].

Both the SF-95 and the Attorney Letter claimed $20 million in damages for Urizar-Mota's injuries. [G.App.1 75, 82]. Neither the SF-95 nor the Attorney Letter set forth any sum certain (or any other monetary damages whatsoever) pertaining to the Reyes Plaintiffs. [G.App.1 75-76. 78-82].

HHS denied the Administrative Claim in a letter signed on March 15, 2021. [G.App.1 84-85]. HHS's letter showed HHS's understanding that Urizar-Mota was the only claimant: "[O]n behalf of your client, Lucia Urizar-Mota, you filed an administrative tort claim . . . . The administrative tort claim of Lucia Urizar-Mota is denied." [G.App.1 84]. The record lacks any information that the Reyes Plaintiffs or their counsel took additional steps after receiving HHS's letter to clarify to HHS that they, too, were claimants.

**2.    The district court's denial of the government's motion to dismiss.**

Because the Reyes Plaintiffs had failed to present their administrative claims to HHS individually,[6] the government moved to dismiss their claims before trial for lack of subject-matter jurisdiction. [G.App.1 33-48]. In denying the government's motion, the district court acknowledged that the Administrative Claim did not identify the Reyes Plaintiffs as claimants. [G.Add. 6]. The court nevertheless concluded that it had jurisdiction over the Reyes Plaintiffs' claims because, under Rhode Island law, the children's loss of consortium claims "solely derive from those of the injured family member." [G.Add. 5].

The district court juxtaposed that state law principle with the First Circuit's instruction "to apply the [FTCA's] notice requirement leniently and flexibly in a pragmatic and not 'woodenly' way, without imposing technical barriers to injured parties seeking redress in court." [G.Add. 5]. Blending the two principles together, the district court concluded that Urizar-Mota's Administrative Claim provided sufficient information to notify the government about "the types and extent of the claims" that the Reyes Plaintiffs would raise. [G.Add. 6]. The court explained:

> Ms. Urizar-Mota stated in her [SF-95] that she was married and suffered "permanent, life-altering disabilities." . . . In her letter accompanying the [SF-95], Ms. Urizar-Mota notes that she "returned home with her family[.]" She also states that she "is no longer able to manage the household as she used to and do things such as cooking,

---

[6]    Urizar-Mota's husband, Sergio Reyes, brought a claim for lack of consortium in district court, [G.App.1 16], that the government also sought to dismiss. [G.App.1 33-48]. The district court ultimately concluded that Mr. Reyes was not entitled to any damages, [G.Add. 39], and Plaintiffs have not cross-appealed that ruling.

16

cleaning, and laundry. Her ability to care for her younger children is
also impacted."

[G.Add. 6 (court's record citations omitted)]. At the conclusion of trial, the court

entered judgment for the Reyes Plaintiffs in the aggregate amount of $3.5 million.

[G.Add. 35-36, 39-42].

### C.    Legal framework.

"A key FTCA requirement is that a person cannot sue under it unless he first

presents his 'claim' to the relevant administrative agency 'within two years after

such claim accrues'—failure to present a claim within that period 'forever bar[s]'

the claim." *Holloway v. United States*, 845 F.3d 487, 489 (1st Cir. 2017) (quoting

28 U.S.C. § 2401(b)) (brackets in opinion); *see also* 28 U.S.C. § 2675(a) ("An ac-

tion shall not be instituted [against the federal government] . . . unless the claimant

shall have first presented the claim to the appropriate Federal agency . . . ."). A

claim is deemed presented to an agency when an SF-95 "or other written notifica-

tion of an incident, accompanied by a claim for money damages in a sum certain,"

is executed and presented to the appropriate federal agency. 28 C.F.R. § 14.2(a).

The FTCA's administrative exhaustion requirement is jurisdictional and

"bars claimants from bringing suit in federal court until they have exhausted their

administrative remedies." *McNeil v. United States*, 508 U.S. 106, 113 (1993); *see

also, e.g.*, *Barrett ex rel. Estate of Barrett v. United States*, 462 F.3d 28, 36 (1st

Cir. 2006). As the Supreme Court made clear in *McNeil*, the purpose of the admin-

istrative exhaustion requirement is to have the claim first considered by the federal

agency that would have the best information concerning the alleged injury, and that

would therefore be able to settle meritorious claims " 'more quickly without the

need for filing suit and possible expensive and time-consuming litigation.' " 508 U.S. at 112 n.7 (quoting legislative history). Congress designed the exhaustion requirement to reduce litigation burdens on both the federal courts and the Department of Justice, which defends FTCA suits in court. *Id.* at 112 & nn.7-8; *see also, e.g.*, *Corte-Real v. United States*, 949 F.2d 484, 485-86 (1st Cir. 1991) (citing *Lopez v. United States*, 758 F.2d 806, 809 (1st Cir. 1985)); *Holloway*, 845 F.3d at 489-90. To serve its intended purpose, an administrative claim must therefore put the federal agency on notice that the agency should investigate the claim. *Ramirez-Carlo v. United States*, 496 F.3d 41, 46 (1st Cir. 2007).

Because the exhaustion statute, 28 U.S.C. § 2675(a), "governs the processing of a vast multitude of claims[,] [t]he interest in orderly administration" of FTCA litigation is "best served by adherence to the straightforward statutory command." *McNeil*, 508 U.S. at 112. This Court applies some leniency to the notice requirement by recognizing that, although prospective claimants "must comply with the details of the law," the law itself "was not intended to put up a barrier of technicalities to defeat their claims." *Holloway*, 845 F.3d at 490 (citation and internal quotation marks omitted). But while "[i]t is the information available [in the claim] rather than the form in which it is presented that is crucial[,]" the fact remains that the "essential information" cannot be "missing" altogether. *Coska v. United States*, 114 F.3d 319, 323 (1st Cir. 1997).

**D.  By failing to present their claims to HHS, the Reyes Plaintiffs failed to exhaust their administrative remedies and deprived the district court of subject-matter jurisdiction.**

The district court's reason for excusing the Reyes Plaintiffs from the FTCA's straightforward exhaustion requirements contravenes federal law because the plain language of § 2675(a) demands that *each* claimant present a claim before invoking the judicial process. An individual with a loss-of-consortium claim is, in both fact and law, a separate claimant from an individual like Urizar-Mota, who presented a claim for personal injury. The district court mistakenly conflated this Court's lenient approach to the *content* of the notice that an actual claimant must supply to an agency under § 2675(a) with the wholly separate requirement that *each* claimant must still satisfy the FTCA's requirements. The district court's assumption of jurisdiction on the facts of this case resulted from an unjustifiably expansive view of the FTCA's sovereign-immunity waiver, which must be strictly construed. *See, e.g.*, *Holloway*, 845 F.3d at 489; *Dynamic Image Techs., Inc. v. United States*, 221 F.3d 34, 39 (1st Cir. 2000).

Where multiple claimants are involved, each claimant must separately satisfy the FTCA's administrative claim requirement.[7] "Allowing one claimant's

---

[7]     *See, e.g.*, *Dalrymple v. United States*, 460 F.3d 1318, 1325 (11th Cir. 2006) ("The FTCA requires that *each* claim and *each* claimant meet the prerequisites for maintaining a suit against the government.") (emphasis in opinion); *Haceesa v. United States*, 309 F.3d 722, 734 (10th Cir. 2002) ("If there are multiple claimants in an FTCA case, each claimant must individually satisfy the jurisdictional prerequisite of filing a proper claim.") (internal quotation marks and citation omitted); *Manko v. United States*, 830 F.2d 831, 840 (8th Cir. 1987) (wife's loss-of-consortium claim not exhausted by husband's claim that failed to notify agency that wife was also claimant); *Rucker v. United States*, 798 F.2d 891, 893 (6th Cir. 1986) (husband's identification of wife on claim form insufficient for wife to satisfy

19

exhaustion of her administrative remedies to satisfy the exhaustion requirement for other possible claimants would make it extremely difficult for the agency to know the value of the suit, thus making settlement less likely." *Lopez-De Robinson v. United States*, No. 96-1702, 1997 WL 259551, at *3 (1st Cir. May 13, 1997) (unpublished) (citing *Del Valle Rivera v. United States*, 626 F. Supp. 347, 348-49 (D.P.R. 1986)); *cf. Holloway*, 845 F.3d at 490 (The omission of a sum certain from an administrative claim "obviously makes it harder for the government to determine the claim's value and to handle the claim efficiently.") (quoting *Kokotis v. U.S. Postal Serv.*, 223 F.3d 275, 279 (4th Cir. 2000)) (cleaned up).

This Court's precedent fully accords with the well-established principle that *each* claimant must satisfy the requirements of 28 U.S.C. § 2675(a). In *Santiago-Ramirez v. Secretary of Department of Defense*, the Court held that the plaintiff's administrative claim provided "sufficient information to allow the agency to investigate" because, *inter alia*, "it state[d] the identity of [the claimant]," the date and location of the incident, the type of injury alleged, and the amount of damages that the plaintiff was requesting. 984 F.2d 16, 20 (1st Cir. 1993). By the same token, however, the plaintiff's administrative claim was *not* sufficient to allow her husband to recover damages. Her administrative claim had neither named him as a claimant nor provided the agency with details about his claim:

> [Plaintiff's] claim is limited to the information she included in the letter [to the agency]. In other words, she alone, *and not her husband or the conjugal partnership*, may bring a claim for damages up to

presentment requirement); *Johnson v. United States*, 704 F.2d 1431, 1442 (9th Cir. 1983) (same).

> $50,000. . . . The [plaintiff's] claim is limited to the information in-
> cluded in the letter which gave the agency notice of her claim.

*Id.* (emphasis added); *see also Lopez-De Robinson*, 1997 WL 259551, at *3 (agree-

ing that "each person seeking personal damages under the FTCA must file an indi-

vidual claim," which "must put the agency on notice of who was actually pursuing

the claim and the amount of the claim").

Contrary to the district court's view of Rhode Island law, [G.Add. 5], the ex-

haustion rules do not change simply because the Reyes Plaintiffs' consortium

claims derived from Urizar-Mota's allegedly injuries. Under Rhode Island law,

"unemancipated minor[s are] entitled to recover damages" for loss of consortium.

9 R.I. Gen. Laws § 9-1-41(b). Although the *basis* of such a claim is derivative, *see,*

*e.g., Fiorenzo v. Lima*, 982 A.2d 585, 591 (R.I. 2009), the claim itself still consti-

tutes a separate cause of action that must be raised by the separately injured spouse

or minor child—just like the administrative claims in the case at bar. *See, e.g., Nor-*

*mandin v. Levine*, 621 A.2d 713, 716 (R.I. 1993); *Hennessey v. Pyne*, 694 A.2d

691, 696-97 (R.I. 1997).

*Normandin* illustrates the relevant distinction. There, the plaintiff filed a

timely personal-injury claim arising out of a car accident. 621 A.2d at 714. After

the three-year statute of limitations had expired, the spouse and minor children of

the injured plaintiff sought to amend the complaint to add a loss-of-consortium

claim. *Id.* They reasoned that because the defendant's liability for consortium dam-

ages derived from for the original plaintiff's injuries, the defendant "was effec-

tively put on notice of [the consortium] claim as of the date of the original

21

pleading[,]" and that the claim therefore "related back" to the original tort claim.

*Id.* at 715-16. The Rhode Island Supreme Court rejected plaintiffs' argument:

> First and foremost it is of paramount import that we recognize that a claim for loss of consortium is a separate and distinct cause of action. . . . Although the claim is derivative in nature and inextricably linked to the injured spouse's action, . . . each spouse maintains an entirely unique cause of action under the law and the assertion of one spouse's right within the statutory period of limitations will not excuse the failure of the other spouse to assert within the statute of limitations his or her own separate right.

*Id.* at 716 (citations omitted). In other words, the derivative nature of a consortium claim under Rhode Island law cannot by itself provide sufficient notice to the defending party to avoid the prejudice created by the claimant's untimely filing of the claim. *See Barrett*, 462 F.3d at 41 n.11 (discussing purposes of exhaustion requirement and statute of limitations).

As *Normandin* demonstrates, and contrary to the district court's conclusion in this case, Rhode Island law is consistent with the government's view of the FTCA's exhaustion requirement. *See also, e.g.*, *Ferguson v. United States*, 793 F. Supp. 107, 110 (E.D. Pa. 1992) (rejecting argument that derivative nature of loss-of-consortium claim obviates need for claimant to separately exhaust); *Wozniak v. United States*, 701 F. Supp. 259, 262 (D. Mass. 1988) (collecting cases on "well[-]settled" principle "that, where loss of consortium is a separate and independent claim under the applicable state law, it must be expressly raised in an administrative claim to satisfy the jurisdictional requirements" of the FTCA).[8] A federal

---

[8]    A plethora of circuit and district court cases hold that consortium claimants must present their claims to the federal agency to satisfy § 2675(a)'s exhaustion requirement. *See, e.g.*, n.7 *supra*; *Barber v. Kone, Inc.*, 118 F. App'x 276, 278 (9th Cir. 2004) (unpublished) ("[The plaintiff's spouse's] claim was properly dismissed,

agency's ability to resolve a tort claim short of the courthouse is critically impeded by a claimant's failure to provide the agency with information about the number and identity of *all* claimants, the nature of their injuries, or the amount they believe their case is worth.

Notwithstanding the SF-95's clear instructions that claims presented by parents on behalf of their children must be presented in the name of the claimants (the minor children), [G.App.1 76], Urizar-Mota signed the SF-95 solely for herself. Neither she nor her counsel disclosed to HHS that she was *also* bringing administrative claims on behalf of her children. *See Jackson v. United States*, 730 F.2d 808, 809-10 (D.C. Cir. 1984) (decedent's parents' administrative claim on their own behalf listing decedent's widow by name did not satisfy widow's obligation

---

as she did not exhaust her administrative remedies. . . . That the merits of her loss of consortium claim are derivative of the merits of [the plaintiff's] claim, . . . did not relieve her of the responsibility to assert her own claim.") (citations omitted); *Pipkin v. U.S. Postal Serv.*, 951 F.2d 272, 273 (10th Cir. 1991) (dismissing wife's loss-of-consortium claim because wife failed to present and exhaust an administrative claim and her husband's administrative claim failed to mention any claim on her behalf); *Adams by Adams v. U.S. Dep't of Hous. & Urb. Dev.*, 807 F.2d 318, 320 (2d Cir. 1986) (dismissing mother's claim for loss of daughter's services because mother did not present and exhaust her administrative remedies); *Hornof v. United States*, No. 19-cv-00198, 2021 WL 1651193, at *3 (D. Me. Apr. 27, 2021) ("[M]any courts have held that a claimant must independently satisfy the [exhaustion] requirement in order to bring her FTCA claims in court even where they are based on an injury suffered by her spouse and her spouse has filed an administrative claim.") (collecting cases); *Wisner v. United States*, 154 F.R.D. 39, 42, 43 (N.D.N.Y. 1994) (holding that failure of claimant's husband to file separate administrative claim for loss of services required dismissal; "mere mention of his name [as a witness] within his wife's administrative claim" was insufficient); *Cogburn v. United States*, 717 F. Supp. 958, 963 (D. Mass. 1989) (dismissing daughter's consortium claim because she was not named separately as claimant in her father's administrative claim and never filed her own claim).

under § 2675(a) to file administrative claims on behalf of herself and/or her husband's estate).

Even after HHS specified that it had construed the Administrative Claim as one solely on behalf of Urizar-Mota, [G.App.1 84], neither she nor her counsel took any steps to correct HHS's understanding. *Cf. Copen v. United States*, 3 F.4th 875, 883 (6th Cir. 2021) (where neither plaintiff nor her attorney provided a total for personal-injury damages even after the agency advised them that a dollar figure was necessary to process the claim, plaintiff failed to administratively exhaust her claim); *Coska*, 114 F.3d at 323 ("Had the plaintiff included that amount [of damages] in any of the correspondence [with the agency,] . . . the situation may have produced a different outcome.").

Similarly, nothing in the Administrative Claim indicated that the $20 million Urizar-Mota had demanded was the aggregate of compensation for both her own alleged injuries and the related, alleged injuries of various family members. The Administrative Claim therefore provided no viable means for HHS to assign discrete values to Urizar-Mota's tort claims versus those of her children. A single sum certain, without any suggestion as to what it represented and no backup documentation that might help the agency to break the figure down, fails to give HHS sufficient notice. *See Holloway*, 845 F.3d at 491-92; *Coska*, 114 F.3d at 322-23; *see also, e.g.*, *Turner ex rel. Turner v. United States*, 514 F.3d 1194, 1201 (11th Cir. 2008) ("Even if the Turners intended their original SF-95 to present each of their claims, and an aggregate sum certain for those claims, that form was deficient

because it neither listed Mr. and Mrs. Turner as claimants nor specified the individual amounts of their claims.").

Although the law of the place where the injury occurred controls resolution of claims brought under the FTCA, *Bolduc v. United States*, 402 F.3d 50, 56 (1st Cir. 2005), this should not require a federal agency to go spelunking in a state's case law to determine whether the agency should investigate the possibility of additional unnamed plaintiffs lurking in the shadows. *See Wozniak*, 701 F. Supp. at 263 n.5 (stating "burden of deciphering" an "opaque [administrative] claim" should fall on claimant); *id*. ("[T]he agency cannot be expected to ponder what it does not know."). That this Court has adopted a "lenient" approach to the *form* in which a claimant presents the required notice does not relieve the claimant of her burden to present the "essential information" *altogether*. *See Coska*, 114 F.3d at 323; *Holloway*, 845 F.3d at 491 ("[W]hat matters is *whether* the plaintiff timely specified a sum certain on the SF 95 or otherwise timely provided documents from which a sum certain could be ascertained.") (emphasis added); *accord Santiago-Ramirez*, 984 F.2d at 20.

The whole point of the administrative exhaustion requirement is to foster the quick and efficient resolution of tort claims at the agency level. The clear and strict requirements of 28 U.S.C. § 2675(a) and its accompanying regulations should not be watered down by forcing the agency to assume the claimant's burden of presentment. *See, e.g.*, *Collins v United States*, 996 F.3d 102, 118-19 (2d Cir. 2021) ("[T]he claimant's presentment burden is one of notice, not proof. Presentment requires more than a conclusory statement of claim . . . ."); *McNeil*, 508 U.S. at 113

25

("[G]iven the clarity of the statutory text [of § 2675(a)], it is certainly not a 'trap for the unwary.' . . . '[I]n the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of even-handed administration of the law.' ") (citation omitted).

Because the Reyes Plaintiffs did not exhaust their administrative remedies, the district court lacked jurisdiction to entertain the merits of their consortium claims. Accordingly, the $3.5 million judgment against the United States must be vacated.

## II. The district court abused its discretion by awarding Urizar-Mota lost-wages damages Plaintiffs did not seek and for which they presented no evidence.

The only economic damages Plaintiffs sought in the district court were for medical expenses. [G.App.1 2363-2365]. Moreover, Plaintiffs expressly disclaimed that they were seeking economic damages tied to Urizar-Mota's household labor: "Plaintiffs did not make a claim for loss of earning capacity." [G.App.1 2363]. Nor did they present any evidence of lost-earning capacity at trial.

Given the lack of both a relevant claim and evidence supporting it, the district court abused its discretion by awarding lost-wages damages. Because no claim had been made and no evidence was presented, the government had no reason to present evidence in rebuttal. The district court's unexpected award of lost-wages damages thus prejudiced the government, substantially increasing its liability. Moreover, lacking any evidence, the district court calculated these damages on its own initiative and derived the award from unsubstantiated and erroneous

assumptions. This Court should therefore vacate the district court's award to Urizar-Mota of $2.92 million.

### A.   The district court's lost-wages damage award prejudiced the government.

Federal Rule of Civil Procedure 54(c) authorizes the federal courts to "grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." But Rule 54(c) does not apply when, as here, awarding such relief substantially prejudices the defendant. Such prejudice exists given Plaintiffs' express waiver and the government's reasonable reliance on that waiver. The district court's findings, moreover, do not cite Rule 54(c) and are silent as to why its award does not substantially prejudice the government.

This Court has recognized in dicta that, despite Rule 54(c), "there may be cases where the failure to ask for particular relief so prejudiced the opposing party that it would be unjust to grant such relief." *United States v. Marin*, 651 F.2d 24, 31 (1st Cir. 1981) (citing *Rental Dev. Corp. v. Lavery*, 304 F.2d 839, 842 (9th Cir. 1962), but finding case before it was "not such a case"). Other circuit courts, however, have announced three relevant propositions that compel vacatur of the district court's lost-wages award to Urizar-Mota.

First, "Rule 54(c) does not sanction the granting of relief" that—as here— was never requested. *Rental Dev. Corp*, 304 F.2d at 842; *see also In re Lorazepam & Clorazepate Antitrust Litig.*, 531 F. Supp. 2d 82, 100-01 (D.D.C. 2008); *accord Marin*, 651 F.3d at 31.

Second, even if the prejudice to the defendant resulting from a plaintiff's si-
lence were not dispositive, the Ninth Circuit also has clarified that a defendant is
"prejudiced" under Rule 54(c) when a claimant, like Urizar-Mota, expressly disa-
vows a claim for damages. *Seven Words LLC v. Network Sols.*, 260 F.3d 1089,
1096 (9th Cir. 2001); *id.* (When "[o]ver and over again, throughout the various le-
gal maneuvers, [the plaintiff] consistently represented that it was seeking only" a
particular form of relief, the court should "not second-guess [the plaintiff's] tacti-
cal decisions and now conjure up a damages claim where none exists.").

Third, a defendant is also prejudiced by relief granted under Rule 54(c) that
"substantially increases" the defendant's liability. *See, e.g.*, *Felce v. Fiedler*, 974
F.2d 1484, 1501 (7th Cir. 1992) (substantial increase in potential liability "can con-
stitute specific prejudice barring additional relief under Rule 54(c)"); *Kaszuk v.
Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 559
(7th Cir. 1986) (" 'In particular, a substantial increase in the defendant's potential
ultimate liability can constitute specific prejudice barring additional relief under
Rule 54(c).' ") (quoting *Atl. Purchasers, Inc. v. Aircraft Sales, Inc.*, 705 F.2d 712,
716-17 (4th Cir. 1983)).

All three propositions apply to the district court's lost-wages damage award
and explain why this Court should vacate it. Plaintiffs did not seek lost wages at
any phase of the underlying proceeding. During multiple, pretrial phases, Plaintiffs
remained silent about such damages. They did not allege any lost wages in their
complaint or identify them in their prayer for relief. [G.App.1 12-30]. Their inter-
rogatory responses identified as economic damages only the medical expenses that

Urizar-Mota had already incurred. [G.App.1 2092-2093]. In pretrial correspond-ence, Plaintiffs reaffirmed that, in terms of economic damages, they were seeking only medical expenses. [G.App.1 134-135]. Moreover, in their final pretrial memo-randum, Plaintiffs characterized Urizar-Mota's inability to perform household tasks as "caus[ing] suffering, mental anguish, and loss of enjoyment of life"—not economic loss. [G.App.1 109].

At trial, Plaintiffs presented no evidence or argument about any alleged eco-nomic loss other than medical expenses. And after trial, as already noted, Plaintiffs expressly disclaimed and thus waive irrevocably lost-wage damages: "Plaintiffs did not make a claim for loss of earning capacity." [G.App.1 2363].[9] *Cf. Williams v. Poulos*, 11 F.3d 271, 291 (1st Cir. 1993) ("[W]hen plaintiffs amended their com-plaint so as to drop their claim for statutory damages, they irrevocably waived their right thereto."); *Colligan v. Mary Hitchcock Mem. Hosp.*, No. 16-cv-513-JD, 2019 WL 9111931, at *3 (D.N.H. Oct. 23, 2019) (precluding evidence of alleged future economic damages; rejecting past expenses as a basis to infer future expenses; not-ing that expert described future treatment needs but not costs and thereby failed to comply with Fed. R. Civ. P. 26(a)(1)(A)(iii)).

The government was clearly prejudiced—both by the substantial award itself and because the government decided not to present evidence or argument on an

---

[9]    Consistent with that disclaimer, Plaintiffs never cited in any filing or even alluded during district court proceedings to a Rhode Island statute that allows a homemaker to "recover the fair value of homemaker services provided to the home and those living therein" as a remedy in a personal-injury lawsuit. 9 R.I. Gen. Laws § 9-1-47.

issue based on its reasonable reliance on Plaintiffs' failure to raise that issue. Had the government even suspected the possibility of lost-wages damages, moreover, its pretrial motion in limine would have pointed out that Plaintiffs had failed to produce any information concerning the alleged value of Urizar-Mota's household labor or its present value.

Lulled by Plaintiffs' silence about lost wages, the government's pretrial motion instead focused its economic-damages arguments on Urizar-Mota's possible, future medical expenses. [G.App.1 127-128]. In response to that motion, Plaintiffs represented, yet again, not only that they did "not intend to elicit testimony from [their] experts on future medical expenses" but also that Urizar-Mota's life expectancy was relevant solely to their request for non-economic damages. [G.App.1 48]. The district court denied the government's motion by a terse text order stating in part, "[L]ife table is admissible with expert testimony to show life expectancy." [G.Add. 8].[10]

### B.    The district court's lost-wages award is unsupported by any record evidence.

Even if Urizar-Mota were entitled to a lost-damages award, the trial record lacked any evidence to support it. Under the FTCA, compensatory damages are determined by the law of the state where the tortious act was committed. *Hatahley v. United States,* 351 U.S. 173, 182 (1956). Because Rhode Island law applies, "proof of actual damages is an essential part of a plaintiff's case in a negligence action."

---

[10]    The United States renewed its objections to any future economic losses in its proposed findings of fact and conclusions of law. [G.App.1 2137, 2201].

*Romano v. Westinghouse Elec. Co.*, 114 R.I. 451, 458, 336 A.2d 555, 559 (1975). "A plaintiff should be compensated for all his damages of which the defendants' negligence was the proximate cause, but no claim for damages should be allowed to stand where such claim is not supported by the required degree of proof, or is speculative, or imaginary, or is clearly attributable to other causes." *Andrews v. Penna Charcoal Co.,* 55 R.I. 215, 222, 179 A. 696, 700 (1935); *see also Nat'l Chain Co. v. Campbell*, 487 A.2d 132, 134 (R.I. 1985); *Alterio v. Biltmore Constr. Corp.*, 119 R.I. 307, 314, 377 A.2d 237, 240-41 (1977).

Plaintiffs made neither of two contentions that the district court found as fact. First, the district court found that Urizar-Mota's "duties such as manager of household tasks such as cleaning, cooking, organizing and caring for her family . . . . have economic value and represent economic loss to her." [G.Add. 35]. Plaintiffs did not present evidence of either the economic value or the economic loss related to these services. Second, the district court then calculated the value of that loss as $2.92 million—that is, $20/hour for eight hours a day for 18,250 days (*i.e.*, 50 years). [G.Add. 35, 39]. Because Plaintiffs presented no evidence concerning the value of these services, the court created the value itself.

The district court made up the daily wage, assumed how many hours Uriza-Mota worked every day, assumed that Uriza-Mota worked that number of hours every day of the year, and then extrapolated those assumptions based on the court's independent estimation of her remaining life expectancy: 50 years (*i.e.*, through age 88). Compounding these errors, the district court's findings fail to

account, for instance, for the need to calculate the present value of that earning stream or for any mitigation of loss.

And the district court's calculation of Urizar-Mota's remaining life expectancy—and its further assumptions about the consistency of Urizar-Mota's labor over the expected, remaining decades her life—was both erroneous and unsubstantiated. National Vital Statistics Reports published in 2022, and entered into the trial record, calculated average remaining life expectancy for individuals who had reached various ages as of 2020 by race and sex. [G.App.1 1959]. Relying on those forecasts, Plaintiffs rounded Urizar-Mota's age in 2020 up by five years (to age 40), reducing her remaining life expectancy from 47.4 years (for someone aged 35 in 2020) to 42.6 years (for someone aged 40 in 2020). [G.App.1 2397].

The district court determined, however, that Urizar-Mota's remaining life expectancy would be 50 years (*i.e.*, that she will live to age 88)—exceeding Plaintiffs' own calculation by more than seven years and deviating from the only two potentially applicable averages in the National Vital Statistics Reports (*i.e.*, Hispanic females aged 35 or 40 as of 2020). Beyond this unexplained calculation, there is the district court's further, unsubstantiated assumption about Urizar-Mota's enduring health and stamina: that she would still be doing household labor, eight hours a day, seven days of week, well into her 80s.

On this record, this Court should find that the district court abused its discretion in awarding $2.92 million to Urizar-Mota for waived, unsubstantiated lost wages and vacate that award.

**III.    The district court's findings on causation and Urizar-Mota's resulting damage awards were clearly erroneous as they contradict the unrebutted testimony of the government's surgical expert.**

In this FTCA medical malpractice case, it was Plaintiffs' burden to prove that PCHC's allegedly delayed diagnosis of Urizar-Mota's brain tumor—separate from the treatment that the brain tumor necessarily required—"proximately caused" her injuries. *See Flanagan v. Wesselhoeft*, 712 A.2d 365, 371 (R.I. 1998) (citing *Atl. Tubing & Rubber Co. v. Int'l Engraving Co.*, 528 F.2d 1272 (1st Cir. 1976)); *Schenck v. Roger Williams Gen. Hosp.*, 382 A.2d 514, 516-517 (R.I. 1977). The district court committed three clear errors concerning causation and, as a result, by awarding Urizar-Mota post-diagnosis medical expenses totaling $662,194.62, and post-diagnosis pain and suffering damages totaling $6,387,500.

All three errors resulted from the district court overlooking the most basic tenets of the law of causation under Rhode Island law. To prove that the alleged delay diagnosing her brain tumor caused injuries she would not have otherwise suffered, Plaintiffs had to prove that PCHC's alleged deviation from the standard of care "set in motion the 'natural, unbroken and continuous sequence' that eventually resulted in the patient's [injury]." *See Ribeiro v. R.I. Eye Inst.*, 138 A.3d 761, 772 (R.I. 2016) (quoting *DiPetrillo v. Dow Chem. Co.*, 729 A.2d 677, 692 (R.I. 1999)). To meet that burden, Plaintiffs required expert testimony proving that injuries attributable to the allegedly delayed diagnosis were the probable result of PCHC's negligence, not merely a possibility, and not attributable to some other cause. *See Almonte v. Kurl*, 46 A.3d 1, 21 (R.I. 2012). Moreover, compensatory damages for such injuries, if proven, have a substantive limitation: they are

intended to place a person in the position she would have occupied only if the tort had not occurred. *See Prob. Ct. of City of Warwick ex rel. Lawton v. Bank of Am., NA*, 813 F. Supp. 2d 277, 323 (D.R.I. 2011) (citing Restatement 2d of Torts § 901).

### A. The district court's conclusion that Urizar-Mota could have avoided surgery is contradicted by the record.

The first causation error concerns the district court's unsupported conclusion that Urizar-Mota could have avoided surgery. All the experts who testified about Urizar-Mota's treatment options, as well as the parties themselves, agreed that surgery to remove her tumor was inevitable regardless of when the tumor might have been discovered. [G.App.1 739-740, 830, 989-990, 992, 1017, 1520, 2122, 2319, 2363]. Given this undisputed record evidence, the district court clearly erred by finding that, had Urizar-Mota been diagnosed—

> in 2017 or 2018 it is more likely than not that she would have avoided surgery and doctors could have treated her tumor with medication that became available in 2017, such as MEK inhibitors and BRAF inhibitors. She would more likely than not have avoided the damage she incurred after 2017.

[G.Add. 33].

This finding is contrary to the record. Neither Plaintiffs' expert Dr. Ashley—the only witness to have opined about this unlikely treatment option—nor Plaintiffs themselves claimed that this non-surgical option was either the standard of care or a treatment more probable than surgery. [G.App.1 2352]. Instead, Dr. Ashley, in his written disclosure,[11] opined that had Urizar-Mota been diagnosed with a

---

[11]    *Cf. Glendale Fed. Bank, FSB v. United States*, 39 Fed. Cl. 422, 424-25 (1997) (applying Fed. R. Evid. 801(d)(2)(C)):

pilocytic astrocytoma "in 2012, ***or anytime thereafter***, it is more likely than not that her treatment would have consisted of a surgical resection of the tumor." [G.App.1 1967 (emphasis added)].[12] Before trial, the government had pointed out that the non-surgical treatment options cited by the district court were, before 2019, merely experimental and limited in application to children. [G.App.1 130]. Plaintiffs' expert Dr. Ashley agreed with the government at trial. He testified these that these non-surgical treatments were not FDA approved at any time before Urizar-Mota's 2019 surgery; that, when eventually approved, the FDA authorized them only for children; and that they are now used to treat tumors that—unlike Urizar-Mota's—cannot be fully resected. [G.App.1 830, 840-842, 989-990, 1017-1020]. Plaintiffs accordingly stipulated that Urizar-Mota would have needed . . . [s]urgery to resect the tumor" Regardless of the government's alleged negligence. [G.App.1 2363].

The district court's causation conclusion contradicts both the available evidence and Plaintiffs' stipulation, establishing a clear and obvious error. The district

---

By the time the trial begins, we may assume that those experts who have not been withdrawn are those whose testimony reflects the position of the party who retains them. At the beginning of trial we may hold the parties to a final understanding of their case and hence an authorization of their expert witnesses who have not been withdrawn. At this point when an expert is put forward for trial it is reasonable and fair to presume they have been authorized. This of necessity includes prior deposition testimony of that expert. . . . When an expert witness is put forward as a testifying expert at the beginning of trial, the prior deposition testimony of that expert in the same case is an admission against the party that retained him.

[12]     It was partly on this basis that the United States, unsuccessfully, moved to exclude testimony about non-surgical options before trial. [G.App.1 128-131].

court compounded that error by basing its post-diagnosis medical-expenses and pain-and-suffering damages award on its unsubstantiated assumption that Urizar-Mota thereby would have avoided all the harm she experienced from that surgery. [G.Add. 33].

### B. No competent evidence supports the district court's conclusions about the risks posed by surgery.

The second causation error results from the district court's misunderstanding of the evidence concerning surgical risk. Plaintiffs' experts, none of whom were surgeons, essentially conceded that they lacked expertise in assessing surgical risks. [G.App.1 732, 784-787, 792-793, 986-987, 1047-1048]. The testimony of the only surgeon to testify in this case—defense expert Dr. Smith—was not rebutted by any competent expert. Yet the district court made a series of findings in Plaintiffs' favor that lacked citation to any expert testimony and contradicted the testimony of Dr. Smith, the only witness competent to opine on those issues. [G.Add. 26-32].

Dr. Smith opined that the risks of Urizar-Mota's surgery as well as the complications she developed were all to be expected given the location of her tumor and irrespective of the tumor's size or of when Urizar-Mota's tumor had been diagnosed and resected. [G.App.1 1388-1389, 1413, 1416-1418, 1423-1426]. Dr. Smith also opined that, regardless of when the surgery had been performed, no surgery is ever bloodless, and that the presence of blood did not increase the risks from surgery. [G.App.1 1426-1427]. He further opined that waiting to conduct surgery— which is essentially what happened in Urizar-Mota's case—would have lowered

the risk of having to cut through healthy brain tissue; conversely, surgery performed earlier—which is what Plaintiffs contend should have happened—would have increased the risk of damage in cutting through healthy brain tissue. [G.App.1 1531-1532]. Finally, both Dr. Smith and Plaintiffs' expert neurologist, Dr. Caplan agreed unequivocally that the emergency caused by Urizar-Mota's acute obstructive hydrocephalus that was diagnosed on June 19, 2019, had been resolved before Urizar-Mota's June 24, 2019, surgery. [G.App.1 756, 766-768, 1396-1397, 1401-1402, 1525]. As a result, Dr. Smith opined, Urizar-Mota's hydrocephalus did not increase her surgical risk. [G.App.1 1428, 1512-1513].[13] Yet the district court entered findings contradicting the preceding evidence—including that surgery would have been less risky had the tumor been smaller and had there been less blood during the procedure. [G.Add. 27-29].

The district court compounded its already clear errors by concluding, "*No evidence* suggests the brainstem injuries occurred during the surgery." [G.Add. 31 (emphasis added)]. That conclusion is perplexing because both parties' experts opined (a) that Urizar-Mota experienced cerebellar strokes during surgery and (b) that those strokes caused all of her movement disorders. [G.App.1 738-739, 750, 753-755, 998-1000, 1040-1041, 1365, 1389, 1395, 1401-1402, 1406-1409,

---

[13]    Dr. Smith opined that Urizar-Mota's partial left sixth cranial nerve palsy did not resolve before her June 24, 2019, surgery. He also opined that, post-surgery, injuries to that nerve were bilateral (subsuming the pre-surgical injury to only the left nerve), were among the surgery's known risks, and resulted from the surgery. [G.App.1 1406-1409, 1559-1560].

1413, 1416-1418]. Moreover, the court's "no-evidence" conclusion contradicts its
own conclusion stated earlier in the same opinion:

> During the tumor resection surgery, Ms. Urizar-Mota *suffered a cerebellar stroke, which resulted in permanent neurological injuries*, including permanent injuries to her cerebellum (the back of the head, which controls balance, coordination, and other motor functions) that manifests in tremors and movement disorders in her left hand, arm, and leg.

[G.Add. 17 (emphasis added)]. Because the district court itself concluded that a
surgical stroke caused Urizar-Mota's injuries, it cannot also conclude that the government's alleged delayed diagnosis caused those same injuries. Moreover, the district court's own findings do not ascribe these strokes to any delayed diagnosis,
consistent with the lack of record evidence on that issue.

### C. The district court abused its discretion by awarding Urizar-Mota the cost of post-diagnosis medical expenses that would have been incurred regardless of any alleged negligence.

Third, even if the district court had not erred in concluding that something
other than undisputedly necessary surgery caused Urizar-Mota's injuries, its award
of post-diagnosis medical expenses still constituted an abuse of discretion. Plaintiffs called no witness at trial to testify about any of Urizar-Mota's medical bills or
about the creation of a summary chart, [G.App.1 1872-1878], which set forth calculations concerning the amount of the expenses that Plaintiffs sought as their sole
economic damages. Plaintiffs later stipulated to the deduction of certain medical
expenses as inevitable regardless of the government's alleged negligence.
[G.App.1 2363]. The district court substantially adopted those deductions except
for an unexplained, further deduction of $10. [G.Add. 34, 39].

One problem with the court's award for medical expenses is that it included expenses that were unrelated to the government's alleged negligence, expenses that, like the deductions to which Plaintiffs stipulated, were either inevitable or unrelated to the government's alleged negligence. For example, the court necessarily included the cost of removing of skin tags from Urizar-Mota's eyelid, [G.App.1 1875, 1951 (Feb. 17, 2021)], for which there was no testimony connecting those expenses to any allegedly delayed brain-tumor diagnosis. The district court ordered that the Plaintiffs be reimbursed for the costs of imaging Urizar-Mota's spine tumor, [G.App.1 1872, 1916 (Apr. 21, 2020)] which Plaintiffs' own pathologist opined (and Urizar-Mota herself admitted) was unrelated to her brain tumor. [G.App.1 2025-2027, 2036-2039; G.App.1 321]. Finally, the district court awarded expenses for services performed the same day as Urizar-Mota's June 24, 2019, surgery, [G.App.1 1872, 1936-1937], even though Plaintiffs offered no testimony that these services were somehow distinct from Urizar-Mota's inevitable surgery.

Aside from the lack of record evidence attributing any of these medical expenses to the allegedly delayed diagnosis of Urizar-Mota's brain tumor, the district court should never have considered Plaintiffs' medical-expense submissions in the first place because they were in the form of a summary chart rather than being supported by the required expert testimony. *See Petrone v. Werner Enters., Inc*., 42 F.4th 962, 969 (8th Cir. 2022) (affirming district court finding that summary chart to prove damages was inadmissible under Fed. R. Evid. 1006 without accompanying expert testimony; vacating and remanding on other grounds); *Peat, Inc. v. Vanguard Research, Inc*., 378 F.3d 1154, 1160 (11th Cir. 2004) (Federal Rule of

Evidence 1006 "is not a back-door vehicle for the introduction of evidence which is otherwise inadmissible.").

The government had moved to exclude Plaintiffs' medical-expense evidence before trial for this very reason: Plaintiffs had produced no expert testimony connecting those expenses to Plaintiffs' sole theory of harm—a delayed diagnosis. [G.App.1 119-123]; *see, e.g.*, *Petrone*, 42 F.4th at 969; *Hicks v. Craw*, No. 17-cv-475, 2022 WL 3593623, at *7 (N.D.N.Y. Aug. 22, 2022) ("Courts have determined that medical records that contain diagnoses which require 'specialized skill and knowledge' to interpret should not be admitted without an expert to explain them."); *Rogers v. Town of New Hampton*, 554 F. Supp. 3d 340, 346 (D.N.H. 2021) (collecting cases holding that "[w]ithout an expert witness, the medical records and bills are not relevant to [plaintiff's] damages," and prohibiting plaintiff from introducing those records as evidence because he has "not timely disclosed an expert witness and will not present expert opinion testimony at trial to causally connect his [] medical condition and need for medical care to [the allegedly negligent conduct]"); *Duchnowski v. Cty. of Nassau*, 416 F. Supp. 3d 179, 183 (E.D.N.Y. 2018) (excluding medical records from evidence because "many of the alleged injuries at issue here are complex in nature" and the plaintiff could not testify about those injuries absent an expert witness).

The record establishes that Urizar-Mota's need for surgery was beyond dispute. The only competent expert testimony established that, given the tumor's location and regardless of its size, such surgery posed known risks and an anticipated range of likely negative outcomes, which Urizar-Mota unfortunately experienced.

The basis of the district court's conclusion that a delayed diagnosis harmed Urizar-Mota both contradicted the court's own findings concerning the stroke that caused her injuries and the causation evidence of both parties' experts. For these reasons, the district court's causation findings were clearly erroneous, and all post-diagnosis damages based on them, an award exceeding $7 million, represents an abuse of discretion. This Court should therefore vacate that damage award.

## IV. The district court's findings about the standard of care were clearly erroneous because they relied exclusively on the inherently implausible, internally inconsistent, and critically impeached opinions of Plaintiff's primary-care expert.

To make out a "claim of medical malpractice, the plaintiff must establish a standard of care and prove, by a preponderance of the evidence, that the defendant deviated from that standard of care." *Riley v. Stone*, 900 A.2d 1087, 1095 (R.I. 2006). The district court's factual findings concerning the standard of care for primary-care providers' evaluation of headaches were clearly erroneous because the expert testimony of Plaintiffs' standard-of-care expert on which those findings were based was demonstrably and utterly incredible.

This Court must give "due regard" to the district court's credibility determination. Fed. R. Civ. P. 52(a)(6) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."). And, again, this Court "deem[s] a finding clearly erroneous only when, after reviewing the entire record, [it is] left with the definite and firm conviction

41

that a mistake has been committed." *Primus v. United States*, 389 F.3d 231, 237 (1st Cir. 2004) (internal quotation marks and citation omitted).

Here, perhaps recognizing that Dr. Phillips' testimony was unsupportable, the district court did not attempt to justify its reliance on the expert's testimony. Instead, the court offered an unexplained, curt conclusion that it found Dr. Phillips's testimony "the most credible" and that the court therefore "relie[d] in large part on his expert testimony to support these findings." [G.Add. 20].

A district court's credibility determinations are clearly erroneous when they are "based on testimony" that satisfies any one of three, disjunctive criteria— namely, the testimony was "inherently implausible, internally inconsistent, or critically impeached." *Mitchell v. United States*, 141 F.3d 8, 17 (1st Cir. 1998). A review of the entire record shows that all three criteria apply to Dr. Phillips's testimony for at least the six reasons that follow. This Court should therefore vacate the district court's liability judgment in full and enter judgment for the United States.

## A. Dr. Phillips applied his purported standard of care inconsistently.

First, most significantly, the district court clearly erred when it found that,

> The standard of care, in 2012 through 2019, for a reasonably competent primary care nurse practitioner or physician treating a patient with headaches requires that the primary care nurse practitioner or physician order neuroimaging of the patient if the patient has any "red flags." The patient's headache needs only be accompanied by or associated with one "red flag" to call for neuroimaging.

[G.Add. 22]. The only witness who offered testimony consistent with this finding was Dr. Phillips. [G.App.1 383-384]. Otherwise, the trial testimony reflects that the rest of the parties' experts shared the opinion that red flags do ***not*** mandate

imaging and that a reasonable response by a primary-care provider would be to monitor the headache symptoms over time. [G.App.1 1003-1004, 1020-1021, 1025-1026, 1261. 1317, 1648-1649, 1807-1808 1848-1849, 2046-2052, 2064-2074]. Even if Plaintiffs' own experts had not contradicted Dr. Phillips's bright-line opinion that any red flag compels imaging, the district court's standard-of-care finding would still be mistaken because Dr. Phillips did not apply his own standard consistently.

Pregnancy was one of the 15 symptoms that the district court identified as a red flag. [G.Add. 22].[14] During one of her pregnancies, Urizar-Mota visited PCHC twice reporting of headache—on January 20 and February 10, 2010. [G.App.2 47, 339]. Dr. Phillips's Rule 26 disclosure omitted both visits, [G.App.1 1194, 1970-1978] and Plaintiffs' counsel did not ask him about either one during his direct trial examination. Confronted with those visits on cross-examination, Dr. Phillips opined that, despite his own bright-line rule about red flags, neuroimaging was ***not*** required in either instance, even though Urizar-Mota had reported headaches and presented an undisputed red flag (again, pregnancy). [G.App.1 1187-1195, 1199-1201].

Dr. Phillips contradicted of his own bright-line rule in connection these same two pre-2012 visits as well as a third on August 2, 2007. During those visits, Urizar-Mota reported headache as well as various other symptoms that Dr. Phillips

---

[14]    The only medical literature that the district court mentioned in its findings was a list of 15 symptoms that the district court concluded comprised red flags and that derived from a single article that Dr. Phillips deemed reliable. [G.Add. 22; G.App.1 371-372, 378-379, 2109, 2111].

characterized as red flags—dizziness, vomiting, blurry vision, and nausea. [G.App.2 31-32, 47-48, 339-340, 1185-1193]. *See also* page 48 *infra*. At trial, Dr. Phillips opined that *none* of those symptoms, when accompanied by headache, mandated imaging in any of these three pre-2012 visits. But when Urizar-Mota reported those same symptoms in at least three of her nine PCHC office visits from 2012-2019, Dr. Phillips opined at trial that they *did* mandate imaging, *e.g.*, on November 14, 2012 (nausea, vomiting), [G.App.1 393-394; G.App.2 100], and July 20, 2016 (dizziness), [G.App.1 468-471, 1095-1096; G.App.2 249]. Without explanation, the district court erroneously excused Dr. Phillips's contradiction of his own bright-line red flag rule. [G.Add. 23, 26].

The district court's conclusion that the standard of care requires imaging for "any" red flag is clearly erroneous when the sole expert on which that finding relied contradicted this very proposition at trial multiple times.

### B. The literature on which Dr. Phillips relied does not compel imaging for "any" red flag.

Second, the bright-line proposition that "any" red flag compels imaging also contradicts the literature on which both Dr. Phillips and the district court relied. The 15-point list that the district court presented derives from an article titled "Red and orange flags for secondary headaches in clinical practice" (hereafter, "Red and Orange Flags"). [G.App.1 2109-2119]. Red and Orange Flags specified that the presence of only one of the 15 red flags compelled imaging when a patient presented that red flag with a headache: "neoplasm in history"—that is, when a patient already has a cancer diagnosis. [G.App.1 369-370, 1134-1137, 1863-1865, 2112-

44

2113]. But those circumstances did not apply to Urizar-Mota, whose benign spine and shoulder tumors were diagnosed only after her June 2019 brain surgery. [G.App.1 2008, 2025-2027, 2036-2039, 2041-2042].

The authors of Red and Orange Flags included no other statement urging primary-care providers to refer a patient to imaging based on any other red flag. They otherwise temporized about whether the presence of any red flag compelled imaging by noting at the beginning and end of their article that red flags are ***not*** a validated screening tool for imaging. [G.App.1 1130-1133, 2109, 2117].

Contradicting his own bright-line opinion that any red flag mandates imaging, Dr. Phillips similarly temporized, four different times during his trial testimony about the significance of a red flag. Again contradicting the purported bright-line opinion he was offering, Dr. Phillips admitted that red flags should only inform reasonable clinicians' judgment about whether to refer a patient to imaging and *should not* dictate imaging. [G.App.1 1130-1133]. Dr. Phillips testified that red flags might increase the likelihood of imaging, but not compel it. [G.App.1 379-380]. He testified that red flags should "prompt consideration of imaging," not require it. [G.App.1 371-373]. And he testified that the suspicion that a secondary headache might be causing a patient's headache symptoms "generally" but does not always "require[ ] imaging." [G.App.1 398-399].

This testimony—contradicting the supposed, bright-line proposition that any red flag compels imaging and the relevant medical literature—further exposes the clear error of the district court's conclusion that this unsupported proposition,

embraced only by Dr. Phillips and contradicted by his own deposition testimony, proved any standard of care.

### C. Migraines do not require imaging, and Dr. Phillips recanted clear opinions that Urizar-Mota presented with migraines on three of the nine subject visits.

Third, the district court—agreeing with every expert, the medical literature in evidence, and even Dr. Phillips—found that migraine symptoms do not mandate neuroimaging. [G.Add. 22; G.App.1 362-363, 524-529, 552, 1088-1089, 1144-1149, 1151, 1174-1176, 1669, 2106, 2121].

Yet the district court did not credit Urizar-Mota's medical records showing that she presented with migraine symptoms during six of her nine contested PCHC office visits. [G.App.2 108-109, 111, 130-132, 292-293, 301-302]. At deposition, Dr. Phillips agreed that Urizar-Mota described presented with migraine symptoms or actual migraines during three of those visits: in February and March 2013, [G.App.1 1073-1077, 2056-2058], and July 2014, [G.App.1 1082-1084, 2059]. Plaintiffs' expert neuro-oncologist, Dr. Ashley, also agreed that Urizar-Mota presented with migraine symptoms during her March 2013 PCHC office visit. [G.App.1 1031-1032]. But, at trial, Dr. Phillips contradicted himself, repudiating both his own deposition testimony and disputing for the first time the medical records characterizing these presentations as migraines. [G.App.1 414-416, 418, 422-423, 533-534, 539-540, 1073-1076, 2058].

The district court ignored the contradictions between Dr. Phillips's deposition and trial testimony about migraines, and concluded that Urizar-Mota's headaches "did not meet the criteria for" them. [G.Add. 23]. The district court justified

its conclusion about the February 1, 2013, headache by criticizing the documenta-

tion of that office visit. [G.Add. 24]. Yet it was this very same documentation that

had led Dr. Phillips to testify in his deposition that, "[T]here's no question I agree

that it's a clinical migraine . . . ." [G.App.1 1073-1074, 2058].

### D.    At deposition, Dr. Phillips failed to identify a red flag in each one of the nine disputed office visits, and did not identify red flags in all nine until trial.

Fourth, it also was only at trial that Dr. Phillips opined that there was a red

flag in each of the nine PCHC visits that formed the bases of Plaintiffs' negligence

claims. For instance, at deposition, Dr. Phillips had testified that neither

Urizar-Mota's July 20, 2016, nor November 1, 2018, PCHC office visits presented

any red flag or breach of the standard of care. [G.App.1 1097, 1101-1106, 2060-

2062; G.App.2 249-251, 260-262]. At deposition, Dr. Phillips also testified that a

third PCHC office visit—on August 23, 2018, more than two years after the

July 20, 2016, visit—presented no breach of the standard of care because of the

long gap during which Urizar-Mota did not seek care at PCHC for any headache

symptoms. [G.App.1 1101-1104, 2060-2062; G.App.2 260].

But, at trial, Dr. Phillips opined that all three of the preceding visits featured

red flags that mandated imaging. [G.App.1 468-471, 1095-1096, 1101-1102]. In

presenting its factual findings, the district court did not even acknowledge these

contradictions—or even the August or November 2018 office visits when address-

ing the standard of care. [G.Add. 21-26]. And in concluding that there *was* a red

flag during the July 20, 2016, office visit, the district court identified "dizziness" as

the red flag "because it is a neurological symptom." [G.Add. 26]. But this was the

same red-flag symptom that Urizar-Mota presented, with headache, during her August 2, 2007, office visit, [G.App.2 31], which neither the district court nor Dr. Phillips concluded required imaging—contradicting further their conclusions that the standard of care requires imaging for *every* red flag.

### E. Dr. Phillips invented red flags that the relevant medical literature did not recognize and applied red flags where Urizar-Mota's medical records did not support them.

Fifth, the district court clearly erred by endorsing symptoms that Dr. Phillips alone identified as red flags, even though the medical literature on which he relied did not consider them as such and despite record evidence contradicting the red-flag symptoms that Dr. Phillips claimed to have found. Here are four examples.

**i.    "New" headache.** The district court adopted Dr. Phillips's testimony that Urizar-Mota's November 2012 headache symptoms were "new," [G.Add. 23], a conclusion it could reach only by ignoring the same three pre-2012 headaches that Dr. Phillips had overlooked, at least one of which also was "new" and yet did not support a breach of the purported, bright-line standard of care either for Dr. Phillips or the district court.

The district court's further conclusion that it was the "duration" of the November 2012 headache with nausea and vomiting that distinguished it from the pre-2012 headaches, moreover, lacks any support as a red flag in the 15-item list on which the district court relied. [G.Add. 22-24, 33; G.App.1 2109, 2111]. That list omits nausea, vomiting, or enduring headaches are red flags.

**ii.    Posttraumatic stress.** The district court credited "posttraumatic onset of headaches" without tying that conclusion to any particular visit. [G.Add. 23].

Dr. Phillips identified this as a red flag during at least two visits: November 14, 2012, [G.App.1 393-397, 424-428, 605], and February 1, 2023, [G.App.1 416-417, 432-433]. And the district court credited this testimony in a blanket statement about the presence of this red flag during Urizar-Mota's "many visits" to PCHC. [G.Add. 23].

But Dr. Phillips's opinion contradicted the record of the November 2012 visit, which noted that Urizar-Mota was "back with her husband" and "feels safe." [G.App.2 100]. His opinion about her February 2013 visit was, on its face, pure speculation. [G.App.1 432-433]. And Dr. Phillips conceded that Urizar-Mota's husband, Sergio Reyes, testified that he had not hit Urizar-Mota in the head. [G.App.1 607]. Urizar-Mota herself testified that her husband struck her on only two occasions (in 2012 and 2013). [G.App.1 2079-2083]. And her medical records, as of June 2014, reflected her view that these issues were in her past. [G.App.2 125].

**iii.    Pattern change.** While "Red and Orange Flags" identified pattern change as a red flag, it also noted that "limited data" support it as a red flag and, even then, concerning symptoms reported within only a three-month span, not intermittently over seven years. [G.App.1 1138-1140, 1862-1863, 2114].

Yet the district court cited pattern change as a red flag concerning Urizar-Mota's allegedly "new" November 2012 headache, [G.Add. 23], which logically could not have established a pattern given that no headache had recently preceded that visit. The court also pointed to Urizar-Mota's June 26 and July 10, 2014, office visits, [G.Add. 25], even as there had been a 15-month gap between

her March 13, 2013, and June 26, 2014, office visits. The district court similarly discerned a pattern change between Urizar-Mota's July 10, 2014, office visit and next headache presentation on July 20, 2016, [G.Add. 26]—when there had been *no* visits in the intervening two years in which Urizar-Mota reported a headache. The data supporting pattern change as a red flag, moreover, pertained to changing headaches within three months—not to intermittent headaches separated by four times that period. [G.App.1 2114].

### F. The district court failed to account for years-long gaps in Urizar-Mota's intermittent headache symptoms and thereby erred in finding that her headache symptoms were "constant."

Sixth, the district court erroneously found that Urizar-Mota's intermittent headaches over this seven-year period were "constant." On this basis, the court further erred by awarding pain-and-suffering damages for every day between her allegedly first headache presentation on November 14, 2012, through her emergency-room visit on June 19, 2019. [G.Add. 15, 33, 39]. The district court made this clearly erroneous finding despite three significant gaps during which Urizar-Mota did not seek care from any provider for headaches—15.5 months between her March 2013 and June 2014 PCHC office visits, [G.App.2 112-113, 126-129]; two years between her July 2014 and July 2016 PCHC office visits, [G.App.2 130-133, 249-251]; and two years and nearly four months between here July 2016 and November 2018 PCHC visits, [G.App.2 249-251, 265-267].

The district court could reach this conclusion only by ignoring record evidence proving that her headaches were neither "constant" nor established any pattern. Given the chronology, Urizar-Mota's presentation of headaches was

50

intermittent. For instance, only five months before Urizar-Mota's acute hydroceph-alus (in June 2019), she visited PCHC twice in January 2019—once for umbilical pain, a second time for a rash. On both occasions, she denied having any headache. [G.App.2 283-285, 287-289]. The district court's silence on these gaps is all the more troubling because they excused another, fatal contradiction in Dr. Phillips's testimony that further highlights his fundamental unreliability.

During this last, two-year-and-four-month gap, Urizar-Mota visited PCHC three times: (1) for an annual visit on February 16, 2018, [G.App.2 252-254]; (2) an OB/GYN follow-up on March 2, 2018, [G.App.2 258-259]; and (3) an ap-pointment with primary-care provider Dr. Vinod Thomas on August 23, 2018, [G.App.2 260-262]. Urizar-Mota did not report headaches at any of these visits, the most recent of which was about 10 months before her emergency-room visit on June 19, 2019. When Urizar-Mota consulted Dr. Thomas on August 23, 2018, her chief complaint was right upper quadrant and stomach pain. [G.App.2 260]. She reported no dizziness nor any headache.

At trial, Plaintiffs did not elicit testimony about this visit from Dr. Phillips. The government introduced this August 23, 2018, visit in cross-examining Dr. Phillips, and established three critical facts: (1) Urizar-Mota did not experience daily headaches and, apparently, did not experience headaches for long stretches of time; (2) Dr. Phillips agreed that the lack of reported headache symptoms over a period of years made imaging unnecessary; and (3) Dr. Thomas did not breach any standard of care by not referring Urizar-Mota to imaging on August 23, 2018. As Dr. Phillips's own deposition testimony established:

> The fact that she's not having headaches now obviously makes that [*i.e.*, a referral to imaging], you know, probably less critical at this point because I think now in the absence of headaches, I wouldn't necessarily hold Dr. Thomas responsible at this point for not getting imaging because now we're like four years—you know, multiple years out from admission, you know, from her initial headaches, and it doesn't sound like she's having them at present and complaining of them.

[G.App.1 1101-1104, 2060-2062]. Thus, during his deposition, Dr. Phillips effectively absolved PCHC of liability through August 2018—ten months from the actual discovery of her tumor.

In a vain attempt at trial to explain away his contrary deposition testimony, Dr. Phillips implausibly characterized his earlier testimony—which was about an actual office visit that Urizar-Mota had on a specific date—as pertaining to "an isolated visit for a hypothetical patient" for whom there would be "no reason . . . for imaging." [G.App.1 1101-1102]. Further contradicting his deposition testimony, he further claimed at trial, for the first time, that Urizar-Mota "should have had imaging at this visit" given "the context of [her] medical history and ongoing symptoms." [G.App.1 1101-1102].

But there was nothing "ongoing" about Urizar-Mota's symptoms. Since July 2016—a period exceeding two years—she had visited PCHC multiple times but had ***not*** complained about headache symptoms. And Dr. Phillips had admitted at deposition that he *had* considered that context and history in concluding then (unlike at trial) that he would not have faulted Dr. Thomas for declining to refer Urizar-Mota to imaging. [G.App.1 1104-1106, 2060-2062].

* * * *

Dr. Phillips's trial testimony was ever-shifting, contradictory, implausible, and critically impeached. His approach to identifying red flags was Procrustean. He recanted unequivocal, adverse admissions he made at deposition. He invented red flags and identified them where the evidence did not support them.

This Court, therefore, should conclude that the district court could not rely on Dr. Phillips's testimony as it was critically impeached; that the Plaintiffs thus failed to prove by a preponderance of evidence the standard of care that the district court adopted; and that the Plaintiffs necessarily failed to prove a breach of a standard of care. This Court, furthermore, should reverse the district court's finding of liability, enter judgment for the United States, and dismiss Plaintiffs' complaint with prejudice.

## CONCLUSION

For the foregoing reasons, the Court should: (1) vacate the $3.5 million award to the Reyes Plaintiffs, as they never administratively exhausted their claims necessary to establish a waiver of sovereign immunity and give the district court subject-matter jurisdiction over their claims; (2) vacate the $2.92 million award to Urizar-Mota for lost wages that Plaintiffs never sought and that no record evidence supported; (3) vacate the district court's clearly erroneous findings on causation and, in turn, the awards to Urizar-Mota based on post-diagnosis medical records (in the amount of $662,194.62) and post-diagnosis pain and suffering (in the amount of $6,387,500) that depended solely on those erroneous causation findings; and (4) vacate the district court's clearly erroneous standard-of-care findings and thereby enter judgment in full for the United States.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation in Fed. R. App. P. 32(a)(7)(B) because it comprises 14,174 words excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and the Court, on September 25, 2025, issued an order granting the government's motion for leave to file an oversized brief containing no more than 18,000 words. This brief also complies with the typeface size and style rules in, respectively, Fed. R. App. P. 32(a)(5) and (a)(6) by using a proportionally spaced, serif, 14-point typeface (*i.e.*, Times New Roman).

Dated: September 18, 2025

*/s/ Kevin M. Bolan*
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that, on September 18, 2025, I caused the foregoing document to be filed electronically and that it is available for viewing and downloading from the ECF system. The ECF system will serve a copy of the foregoing document on plaintiffs' appellate counsel:

Amato A. DeLuca, Esq.
Katelyn M. Revens, Esq.
DeLuca, Weizenbaum, Barry & Revens, Ltd.
199 North Main St.
Providence, RI 02903
bud@dwbrlaw.com
kate@dwbrlaw.com

Dated: September 18, 2025                    */s/ Kevin M. Bolan*
                                            Assistant United States Attorney

**ADDENDUM**

# TABLE OF CONTENTS

*Urizar-Mota v. United States*,
    556 F. Supp. 3d (D.R.I. 2021)
    (order denying government's motion to dismiss)................................G.Add.1

Text Order (Jan. 3, 2024)...............................................................G.Add.8

Findings of Fact, Conclusions of Law, and Verdict (Dec. 9, 2024)
    (ECF 49) ...................................................................................G.Add.9

Final Judgment (Dec. 12, 2024) (ECF 51)....................................G.Add.41

**64**        556 FEDERAL SUPPLEMENT, 3d SERIES

Criminal Procedure 16. (Docket No. 76 at p. 12) They rely exclusively on United States v. Zaragoza-Moreira, 780 F.3d 971 (9th Cir. 2015), for the proposition that the United States "likely runs afoul of its discovery disclosure requirements under Fed. R. Crim. 16" when it "fails to comply with preservation requests and allows evidence to be destroyed." Generalizations from the Ninth Circuit Court of Appeals are an insufficient basis for imposing Rule 16 sanctions. Consequently, the defendants' motion to dismiss the indictment pursuant to Rule 16 is **DENIED**.

### IV. The Evidentiary Hearing

[15–18]  The defendants request an evidentiary hearing because "a multitude of factual issues remain unclear." (Docket No. 76 at p. 12) Criminal defendants "have no presumptive right to an evidentiary hearing." United States v. Cintrón, 724 F.3d 32, 36 (1st Cir. 2013). "[T]he decision of whether to conduct an evidentiary hearing [on a motion to suppress] is left to the sound discretion of the district court." United States v. Brown, 621 F.3d 48, 57 (1st Cir. 2010). To obtain an evidentiary hearing, the proponent shoulders the burden of " 'mak[ing] a sufficient threshold showing that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record.' " Cintrón, 724 F.3d at 36 (quoting United States v. Francois, 715 F.3d 21, 32 (1st Cir. 2013)).

The defendants' request attempts to accomplish what their motion fails to do: demonstrate that the United States acted in bad faith. The pertinent facts are not in dispute: the defendant's vessel capsized, FURA officers declined to test the vessel for the presence of cocaine, the Assistant United States Attorney agreed to preserve the vessel, but the USCG subsequently destroyed this evidence. They intend to ask putative witnesses:

What steps were taken by the government to 'maintain and preserve' the evidence after Mr. Berroa's initial requests? When exactly did the government destroy the evidence? How did it destroy the evidence? What was the case agent's role in the destruction of the evidence? Why was the defense not immediately informed?

(Docket No. 76 at pp. 12-13) The minutiae of how the USCG disposed of the vessel is irrelevant. The Court will not entertain a fishing expedition. Accordingly, the motion for an evidentiary hearing is **DENIED**.

### V. Conclusion

For the reasons set forth above, the defendants' motion to dismiss the indictment, and their request for an evidentiary hearing are **DENIED**. (Docket No. 76)

**IT IS SO ORDERED.**



**Lucia URIZAR-MOTA; Sergio Reyes, Individually and p.p.a. Delmy Reyes, Sergio Reyes, Wilmer Reyes, and Gerson Reyes, Minors, Plaintiffs,**

**v.**

**UNITED STATES of America; John and/or Jane Doe, M.D., Alias; and John Doe Corporation, Alias, Defendants.**

**C.A. No. 21-cv-155-JJM-PAS**

United States District Court, D. Rhode Island.

Signed 08/16/2021

**Background:** Patient, who complained of headaches while at federally qualified

health center and suffered cerebral stroke, brought action under Federal Tort Claims Act (FTCA) against United States alleging medical negligence. Patient's husband and children brought action against United States for loss of consortium. United States filed motion to dismiss for lack of subject matter jurisdiction.

**Holdings:** The District Court, John J. McConnell, Jr., Chief Judge, held that:

(1) patient's letter to United States was sufficient under FTCA to put United States on notice of loss of consortium claims of patient's husband and children, and

(2) patient's letter was sufficient under FTCA to put United States on notice of claims alleging lack of informed consent and corporate liability.

Motion denied.

**1. United States ⟸421**

　Government and its agencies enjoy sovereign immunity from lawsuits.

**2. United States ⟸959(4)**

　Plaintiff has satisfied statutory notice requirement of Federal Tort Claims Act (FTCA) when her notice to government includes (1) sufficient information for the agency to investigate the claims, and (2) the amount of damages sought. 28 U.S.C.A. § 2675(a).

**3. United States ⟸959(1)**

　Purpose of Federal Tort Claims Act (FTCA) notice requirement is to encourage administrative settlement of claims against United States and to prevent unnecessary burdening of courts. 28 U.S.C.A. § 2675(a).

**4. United States ⟸959(1)**

　Federal Tort Claims Act (FTCA) notice requirement is designed to give notice to the Government sufficient to allow it to

investigate the alleged negligent episode to determine if settlement would be in the best interests of all. 28 U.S.C.A. § 2675(a).

**5. Marriage and Cohabitation ⟸1076(3)**
**　Parent and Child ⟸354**

　In Rhode Island, spouse's and children's causes of action for loss of consortium solely derive from those of the injured family member. R.I. Gen. Laws Ann. § 9-1-41.

**6. United States ⟸959(4)**

　First Circuit commands courts to apply Federal Tort Claims Act (FTCA) notice requirement leniently and flexibly in a pragmatic and not "woodenly" way, without imposing technical barriers to injured parties seeking redress in court. 28 U.S.C.A. § 2675(a).

**7. United States ⟸959(4)**

　Six-page letter sent by patient, who complained of headaches while at federally qualified health center and suffered cerebral stroke, to United States was sufficient under Federal Tort Claims Act (FTCA) to put United States on notice of loss of consortium claims of patient's husband and children, although letter did not specifically name patient's spouse and children as claimants; patent stated that she was married and incurred "permanent, life-altering disabilities," patient noted that she "returned home with her family," patent stated that she was "no longer able to manage the household as she used to and do things such as cooking, cleaning, and laundry," and patient stated that her ability to care for her younger children was impacted. 28 U.S.C.A. § 2675(a); R.I. Gen. Laws Ann. § 9-1-41.

**8. United States ⟸959(4)**

　Six-page letter sent by patient, who complained of headaches while at federally qualified health center and suffered cere-

**G.Add.2**

bral stroke, to United States was sufficient under Federal Tort Claims Act (FTCA) to put United States on notice of claims alleging lack of informed consent and corporate liability; both claims were intertwined with details, facts, and claims made by patient, corporate liability claim was inherent in negligence claim, and lack of informed consent was implied in claim of negligent diagnosis. 28 U.S.C.A. § 2675(a).

———

Katelyn M. Revens, Amato A. DeLuca, DeLuca & Associates, Ltd., Providence, RI, for Plaintiffs.

Kevin Love Hubbard, United States Attorney's Office, Providence, RI, for Defendants.

### MEMORANDUM AND ORDER

JOHN J. McCONNELL, JR., United States District Chief Judge.

Lucia Urizar-Mota was a patient of the Providence Community Health Center ("PCHC"). Since 2012, Ms. Urizar-Mota complained of headaches "several times," but PCHC did not order any brain imaging. In June 2019, Ms. Urizar-Mota collapsed, was rushed to the hospital, and suffered a cerebral stroke. She and her husband and children sued the United States ("the Government").[1] ECF No. 1. The Government moved to dismiss (ECF No. 8), claiming that Ms. Urizar-Mota's husband and children did not properly file administrative claims under the Federal Tort Claims Act ("FTCA") and therefore this Court lacks subject matter jurisdic-

tion. Because Rhode Island law defines the spouse's and children's claims as purely derivative, the FTCA administrative claims requirement is to be flexibly and leniently applied, and the Plaintiffs fulfilled the purpose of the notice requirement in this case, the Court DENIES the Government's Motion to Dismiss. ECF No. 8.

### I. FACTS [2]

Ms. Urizar-Mota alleges in her Complaint that because the PCHC did not give her proper medical care for seven years, it did not timely diagnose a brain tumor, which has caused her severe and permanent injuries.[3] She also named her husband and their four children as Plaintiffs in this suit, asserting their claims for loss of consortium and companionship.

Ms. Urizar-Mota timely sent the United State Department of Health and Human Services a six-page letter detailing her medical negligence claim. Her husband and children were not specifically named in the letter. The Government denied the claim. ECF No. 10-4.

### II. ANALYSIS

The Government has moved to dismiss under Fed. R. Civ. P. 12(b)(1), claiming the Court lacks subject matter jurisdiction over this suit, and 12(b)(6), arguing that Plaintiffs have failed to state a claim upon which relief can be granted.

### A. LACK OF SUBJECT MATTER JURISDICTION

The question posed by the Government's Motion to Dismiss under Fed. R. Civ. P. 12(b)(1) is whether Ms. Urizar-Mota's let-

---

**1.** The PCHC is a Federally Qualified Health Center in Providence, Rhode Island.

**2.** The Court will set forth only abbreviated facts relevant to the "notice of administrative claim" defense raised by the Government.

**3.** "She is no longer able to manage her household and her activities of daily living." ECF No. 1 at 4, ¶ 18.

ter put the Government on proper notice of the claims that include those for loss of consortium and society by her husband and children. Such notice is required for this Court to have subject matter jurisdiction over Plaintiffs' claims. The Court will review the statutory requirements for administrative claims and the purpose of the requirement, review the state-based claims of Ms. Urizar-Mota's family members, and then apply the law to the facts to decide the whether the notice provided was sufficient.

### 1. Statutory Requirement of Administrative Notice-of-Claim

**[1]** The Government and its agencies enjoy sovereign immunity from lawsuits. *FDIC v. Meyer*, 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). The FTCA waives the Government's sovereign immunity when a federal employee, acting within the scope of their employment, commits a tortious or wrongful act and injures another. 28 U.S.C. § 2674. Before suing, administrative remedies must be exhausted. 28 U.S.C. § 2675(a) ("[T]he claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied . . .").

**[2]** A plaintiff has satisfied the statutory notice requirement when her notice to the Government "includes (1) sufficient information for the agency to investigate the claims, and (2) the amount of damages sought." *Santiago-Ramirez v. Sec'y of Dep't of Def.*, 984 F.2d 16, 19 (1st Cir. 1993) (citations omitted) (citing *López v. United States*, 758 F.2d 806, 809–10 (1st Cir. 1985) and the standard in *Adams v. United States*, 615 F.2d 284, 289 (5th Cir. 1980) with approval). The First Circuit has held:

The test is an eminently pragmatic one: as long as the language of an administrative claim serves due notice that the

agency should investigate the possibility of particular (potentially tortious) conduct and includes a specification of the damages sought, it fulfills the notice-of-claim requirement.

*Dynamic Image Techs., Inc. v. United States*, 221 F.3d 34, 40 (1st Cir. 2000).

**[3, 4]** The purpose of the FTCA notice requirement is to encourage the administrative settlement of claims against the United States and to prevent the unnecessary burdening of the courts. The requirement is designed to "give notice to the Government 'sufficient to allow it to investigate the alleged negligent episode to determine if settlement would be in the best interests of all.'" *Corte-Real v. United States*, 949 F.2d 484, 486 (1st Cir. 1991) (quoting *Lopez v. United States*, 758 F.2d 806, 809 (1st Cir. 1985) and citing *Reilly v. United States*, 863 F.2d 149, 172 (1st Cir. 1988)).

### 2. The Plaintiffs' State-Based Claims

Ms. Urizar-Mota's husband, Sergio Reyes sues for loss of consortium proximately caused by the Defendants' alleged negligence in treating and caring for Ms. Urizar-Mota. He also sues on their minor children's behalf for the loss of the society of their mother. They sue claiming that they are entitled to damages because their wife and mother "is no longer able to manage her household and her activities of daily living." ECF No. 1 at 4, ¶ 18. Specifically, they claim:

Sergio Reyes has suffered and will continue to suffer the loss of services, companionship, society and comfort of his wife Lucia Urizar-Mota and Delmy Reyes, Sergio Reyes, Wilmer Reyes and Gerson Reyes, have been and will continue to be deprived of parental society and companionship of their mother Lucia Urizar-Mota.

# G.Add.4

ECF No. 1 at 5 ¶ 7; at 6 ¶ 7; at 8 ¶ 6; at 9 ¶ 6; at 10–11 ¶ 7; at 12, ¶ 7; at 14 ¶ 7; at 15 ¶ 7; at 17 ¶ 6; and at 18 ¶ 6.[4]

A spouse and children have a claim for loss of consortium and society against the tortfeasor of their injured spouse and parent. *See* R.I. Gen. Laws § 9–1–41 ("(a) A married person is entitled to recover damages for loss of consortium caused by tortious injury to his or her spouse. (b) An unemancipated minor is entitled to recover damages for the loss of parental society and companionship caused by tortious injury to his or her parent.").

**[5]** In Rhode Island, the spouse's and children's causes of action solely derive from those of the injured family member. *Desjarlais v. USAA Ins. Co.*, 824 A.2d 1272, 1280 (R.I. 2003) ("[P]laintiff's loss-of-consortium claim is strictly derivative and inextricably tied to the resolution of the impaired party's claims"); *see also Sama v. Cardi Corp.*, 569 A.2d 432, 433 (R.I. 1990) ("[A]n action for loss of consortium . . . is not an independent action but a derivative one that is attached to the claim of the injured spouse. It arises from the injured spouse's physical injury and is dependent upon the success of the underlying tort claim.").

*3. Application of the Law to These Facts*

The First Circuit has set forth the following guidance, which governs the Court's analysis:

This circuit approaches the notice requirement leniently, "recognizing that individuals wishing to sue the government must comply with the details of the law, but also keeping in mind that the law was not intended to put up a barrier of technicalities to defeat their claims." A flexible approach to the notice requirement is in keeping with the original purpose behind the filing of an administrative claim: that of allowing the efficient investigation of a claim by the agency without sacrificing the entitlement of a claimant to his or her cause of action against the government. This approach to the notice requirement recognizes that Congress intended to leave the ultimate choice between settlement and suit in the hands of the claimant. In the context of section 2675, the emphasis is on the agency's receipt of information: it must have enough information that it may reasonably begin an investigation of the claim. "Our decision in *Corte-Real* supports saving a claim that is flawed, when the government's investigatory needs are satisfied."

*Santiago-Ramirez*, 984 F.2d at 19 (citations and footnote omitted).

**[6]** In sum, the First Circuit commands courts to apply the notice requirement leniently and flexibly in a pragmatic and not "woodenly" way, without imposing technical barriers to injured parties seeking redress in court. *Dynamic Image Tech., Inc.*, 221 F.3d at 40.[5]

---

**4.** The Complaint does not set forth any separate counts for Mr. Reyes and the children. Each count in the Complaint merely has a paragraph pointing out that the alleged actions of the Government in each cause of action also caused injury to Ms. Urizar-Mota's husband and her children.

**5.** The Government points to the language in *Carroll v. United States*, 661 F.3d 87, 94 (1st Cir. 2011) that the FTCA must be "construed

strictly in favor of the federal government." That case, however, was ruling on the discretion function exception to the FTCA, and the court said that the waiver of sovereign immunity on that issue had to be "strictly construed." In contrast, when the First Circuit ruled on the *notice* requirement of the FTCA, it mandated that Courts leniently and flexibly apply that provision. *Santiago-Ramirez*, 984 F.2d at 19.

[7] Here, Ms. Urizar-Mota sent a detailed 6-page letter to the Government with details of her claims and injuries. While the Plaintiffs acknowledge that the letter did not name her spouse and children as claimants, the letter gave the Government notice of the types and extent of the claims that her spouse and children would raise. For example, Ms. Urizar-Mota stated in her Standard Form 95 that she was married and suffered "permanent, life-altering disabilities." ECF No. 10-2 at 2. In her letter accompanying the Form 95, Ms. Urizar-Mota notes that she "returned home with her family," ECF No. 10-3 at 4. She also states that she "is no longer able to manage the household as she used to and do things such as cooking, cleaning, and laundry. Her ability to care for her younger children is also impacted." *Id.*

[8] The Government also seeks the dismissal of Counts II (lack of informed consent) and III (corporate liability) of Plaintiffs' Complaint, claiming that the pre-suit notice to the Government did not explicitly state the potential causes of action of informed consent and corporate liability. Again, the Court looks to the purpose of the notice requirement in evaluating its sufficiency: to provide notice and information sufficient to assess whether to settle. Both claims are inextricably intertwined with the details, facts, and claims made by Ms. Urizar-Mota in her notice to the Government. The corporate liability claims are inherent in the negligence claim, and lack of informed consent is implied in her claim

of negligent diagnosis. ECF No. 10-1 at 12 ("Ms. Urizar-Mota did not give informed consent to receive this treatment that lacked complete neurological exams, physical exams, and imaging of her head.").[6]

Considering the leniency to be afforded in the First Circuit to the notice requirement of the FTCA, as well as the purpose of the notice requirement (to put the Government on notice of a claim so that they can consider settlement), the Court finds that the Government was on notice of the claims of Ms. Urizar-Mota and her family. The language of the administrative claim served due notice that the Government should investigate the possibility of specific conduct (the medical negligence of PCHC) and it included a specification of the damages sought ($20 million dollars); it therefore fulfills the notice-of-claim requirement. *Dynamic Image Techs., Inc.*, 221 F.3d at 40. A practical and reasonable read of the six-page detailed notice to the Government is that the medical negligence of PCHC injured Ms. Urizar-Mota and her family.

**B. FAILURE TO STATE A CLAIM**

The Government also asserts that the Court should dismiss Counts II (lack of informed consent), III (corporate liability), and IV (vicarious liability) because the Plaintiffs have not asserted plausible claims upon which relief can be granted. The Court need not spend much time addressing this issue, other than to find that each of these claims in the Complaint, affording all reasonable inferences re-

---

**6.** The Government cites a district court order in *Cobb v. United States*, 09-cv-388-ML, 2010 WL 2232255 (D.R.I. June 2, 2010), in which the Court found that the plaintiff's administrative claim letter failed to provide sufficient notice of the lack of informed consent and vicarious liability claims stemming from their allegations of negligence. But while the First Circuit has not explicitly addressed this ques-

tion, this Court believes that the Seventh, Ninth, and Eleventh Circuits are correct in their holdings, which have found the administrative claims before them sufficient for inferences of claims for lack of consent. *Goodman v. United States*, 298 F.3d 1048, 1055 (9th Cir. 2002); *Murrey v. United States*, 73 F.3d 1448, 1453 (7th Cir. 1996); *Bush v. United States*, 703 F.2d 491, 495 (11th Cir. 1983).

# G.Add.6

quired at the pleading stage of litigation, sets forth plausible facts that establish a legal duty and a breach that state claims upon which relief can be granted.

### III.  CONCLUSION

The Court DENIES the Government's Motion to Dismiss. ECF No. 8.

IT IS SO ORDERED.



**Anika HUNTE, as administratrix of the estate of Aries Peterson, et al., Plaintiffs,**

v.

**ABBOTT LABORATORIES, INC., Defendant.**

**No. 3:20-cv-1626 (SRU)**

United States District Court, D. Connecticut.

Signed 08/19/2021

**Background:** Mother and administratrix of infant's estate brought action against manufacturer of infant formulas for premature infants that contained cow's milk, asserting claims for violations of the Connecticut Product Liability Act (CPLA), the Connecticut Unfair Trade Practices Act (CUTPA), intentional misrepresentation, and loss of filial consortium. Manufacturer moved to dismiss.

**Holdings:** The District Court, Stefan R. Underhill, Chief Judge, held that:

(1) allegations were sufficient to state strict liability claim;

(2) allegations were sufficient to state claim for negligent failure to warn post-sale;

(3) mother failed to state claim for negligent misrepresentation;

(4) mother failed to state claim for breach of express warranty;

(5) mother failed to state claim for intentional misrepresentation; and

(6) CPLA precluded claim for violation of CUTPA.

Motion granted in part and denied in part.

**1. Federal Civil Procedure ⬤1832, 2533.1**

In deciding a motion to dismiss for failure to state a claim, district court must be mindful not to violate the conversion rule, which requires that, if matters outside the pleadings are presented to and not excluded by the court, motion must be treated as one for summary judgment. Fed. R. Civ. P. 12(b)(6), 56.

**2. Federal Civil Procedure ⬤1832, 2533.1**

Major harm of considering extrinsic materials on a motion to dismiss for failure to state a claim is the lack of notice that the material may be considered; thus, when plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint, the necessity of translating a motion to dismiss into one for summary judgment is largely dissipated. Fed. R. Civ. P. 12(b)(6), 56.

**3. Federal Civil Procedure ⬤1832, 2533.1**

Court may consider extrinsic materials on a motion to dismiss for failure to state a claim without converting it to a motion for summary judgment if the materials are either (1) integral to the complaint, or (2) facts appropriate for judicial notice. Fed. R. Civ. P. 12(b)(6), 56.

**G.Add.7**

| | | at 4:58.) (Saucier, Martha) (Entered: 12/12/2023) |
|---|---|---|
| 12/15/2023 | 29 | AFFIDAVIT by All Plaintiffs. (Attachments: # 1 Exhibit, # 2 Exhibit)(DeLuca, Amato) (Entered: 12/15/2023) |
| 12/15/2023 | 30 | PRETRIAL MEMORANDUM by Delmy Reyes, Gerson Reyes, Sergio Reyes, Wilmer Reyes, Lucia Urizar-Mota. (DeLuca, Amato) (Entered: 12/15/2023) |
| 12/15/2023 | 31 | PRETRIAL MEMORANDUM by United States of America. (Hubbard, Kevin) (Entered: 12/15/2023) |
| 12/19/2023 | | Minute Entry for proceedings held before Chief Judge John J. McConnell, Jr.: Final Pretrial Conference held (in chambers) on 12/19/2023. Counsel present: A. DeLuca, K. Revens; K. Bolan, K. Hubbard (Jackson, Ryan) (Entered: 12/19/2023) |
| 12/24/2023 | 32 | MOTION in Limine filed by All Plaintiffs. **Responses due by 1/2/2024.** (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit) (DeLuca, Amato) (Entered: 12/24/2023) |
| 12/25/2023 | 33 | MOTION in Limine filed by United States of America. **Responses due by 1/2/2024.** (Attachments: # 1 Exhibit A -- Excerpt of Medical Records, # 2 Exhibit B -- Excerpt of Medical Records, # 3 Exhibit C -- Excerpt of Medical Records, # 4 Exhibit D -- Excerpt of Medical Records, # 5 Exhibit E -- Excerpt of Medical Records, # 6 Exhibit F -- Excerpt of Medical Records, # 7 Exhibit G -- Excerpt of Medical Records, # 8 Exhibit H -- Excerpt of Medical Records, # 9 Exhibit I -- Letter from Pls.' Counsel (Oct. 27, 2023), # 10 Exhibit J -- Caplan Dep. Excerpts, # 11 Exhibit K -- Phillips Dep. Excerpt, # 12 Exhibit L -- Ashley Report Excerpt, # 13 Exhibit M -- Ashley Dep. Excerpts)(Bolan, Kevin) (Entered: 12/25/2023) |
| 12/29/2023 | 34 | RESPONSE In Opposition to 32 MOTION in Limine filed by United States of America. **Replies due by 1/5/2024.** (Attachments: # 1 Exhibit Ex. A -- Phillips Dep. Excerpt, # 2 Exhibit Ex. B -- Caplan Dep. Excerpts, # 3 Exhibit Ex. C -- Ashley Dep. Excerpts, # 4 Exhibit Ex. D -- Ashley Report Excerpt, # 5 Exhibit Ex. E -- Smith Dep. Excerpts)(Bolan, Kevin) (Entered: 12/29/2023) |
| 01/01/2024 | 35 | RESPONSE In Opposition to 33 MOTION in Limine filed by All Plaintiffs. **Replies due by 1/8/2024.** (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit)(DeLuca, Amato) (Entered: 01/01/2024) |
| 01/02/2024 | 36 | NOTICE by United States of America *of Joint Proposed Exhibit List* (Hubbard, Kevin) (Entered: 01/02/2024) |
| 01/03/2024 | | TEXT ORDER denying 32 Motion in Limine: The Motion in Limine filed by the Plaintiffs 32 is DENIED. Based on the testimony and opinions highlighted in the briefs and considering his extensive credentials, Dr. Smith is qualified to give relevant expert testimony. Ms. Urizar-Mota's objections to his testimony can be made on cross-examination. So Ordered by Chief Judge John J. McConnell, Jr. on 1/3/2024. (Jackson, Ryan) (Entered: 01/03/2024) |
| 01/03/2024 | | TEXT ORDER denying 33 Motion in Limine: The Motion in Limine filed by the Defendant 33 is DENIED. (1) the Court will make a credibility determination about whether the post-surgery medical issues are supported by expert opinion; (2) Fed R. Evid. 1006 allows the introduction of summary exhibits to assist the trier of fact in reviewing voluminous information; (3) life table is admissible with expert testimony to show life expectancy; and (4) assuming the standards of care and methods raised in the articles were available/in use during her treatment time frame they can be used and the Defendant can cross examine the experts on their reliance on these articles. So Ordered by Chief Judge John J. McConnell, Jr. on 1/3/2024. (Jackson, Ryan) (Entered: 01/03/2024) |

G. Add. 8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                                )
LUCIA URIZAR-MOTA; SERGIO       )
REYES, SR., Individually and p.p.a.,  )
DELMY REYES, SERGIO REYES,      )
JR., WILMER REYES, and GERSON   )
REYES, Minors,                  )
        Plaintiffs,             )
                                )
                                )          C.A. No. 21-cv-155-JJM-PAS
        v.                      )
                                )
UNITED STATES OF AMERICA;       )
JOHN and/or JANE DOE, M.D., Alias;   )
and JOHN DOE CORPORATION,       )
Alias,                          )
        Defendants.             )
                                )
_____
```

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND VERDICT

JOHN J. MCCONNELL, JR., United States District Chief Judge.

## I.    INTRODUCTION

Lucia Urizar-Mota was a patient at the Providence Community Health Center ("PCHC"). She reported severe headaches several times over many years, but PCHC never ordered brain imaging or referred her to a neurologist. Years later, Ms. Urizar-Mota collapsed and was rushed to the hospital where brain imaging revealed a brain tumor, which had been growing for years. She later suffered a cerebral stroke and now has severe and permanent neurological injuries.

Ms. Urizar-Mota, her husband, and four children sued the United States under the Federal Tort Claims Act ("FTCA"). 28 U.S.C. §§ 1346(b), 1402(b), 2401(b), and

# G.Add.9

2671-2680.[1]  ECF No. 1.  The Court conducted a bench trial, admitted additional evidence, received briefing and proposed findings of fact, and heard closing arguments.[2]  The key questions to be answered in this dispute are:  (1) what is the standard of care for a general practitioner in this situation and was it breached; (2) if there was a breach, did the breach cause Ms. Urizar-Mota's injuries; and (3) if there was a breach and it proximately caused her injuries, what are Ms. Urizar-Mota's and her family's damages?

Based on all the evidence, reasonable inferences drawn from it, and evaluating witness credibility, the Court makes the following determination of the facts, followed by its conclusions of law, and verdict.

## II.  FINDINGS OF FACT

### A. PCHC Treatment

1.  Beginning in 2006, Ms. Urizar-Mota began receiving her medical care from physicians and nurse practitioners at the PCHC, a federally funded health care center in Providence, Rhode Island,

2.  Ellen Brosofsky, N.P., Jeffrey Harris, M.D., and Vinod Thomas, M.D. ("PCHC Medical Providers") were PCHC health care providers licensed and authorized to practice medicine as nurse practitioner and primary care physicians

---

[1] Plaintiffs have met all necessary conditions precedent for the filing of this FTCA action.

[2] The Court sat as the factfinder during live testimony in this case.  The parties agreed to submit their expert witnesses' testimony via transcript and video.  The Court read each of the transcripts and watched all the videos submitted.

and were acting on PCHC's behalf within the scope of their employment with the United States.

3.    On November 14, 2012, February 1, 2013, and March 13, 2013, Ms. Urizar-Mota consulted with NP Brosofsky at the PCHC office in Providence, Rhode Island.

4.    On November 14, 2012, Ms. Urizar-Mota went to PCHC with the chief complaint of headaches, nausea, and vomiting for fifteen days.

> "*Chief Complaint:*" "Ha,'s [headaches] n/v [nausea and vomiting] x15 days"

> "*History of her Present Illness:*" "Nausea with vomiting.  She vomits every am.  She also has [nausea and vomiting that] waxes and wanes but lasts for two days.  She is back with her husband.  And is concerned that she may be pregnant.  She feels safe.  Nonbilious vomiting and food."

5.    Ms. Urizar-Mota told the medical providers at PCHC that she began experiencing headaches, nausea, and vomiting in the weeks before the November 14, 2012 visit, and that she had never had headaches like that before, nor had she ever had headaches with nausea and vomiting.  Ms. Urizar-Mota's records show that she had reported headaches to PCHC personnel on three prior occasions from 2007-2012.

6.    NP Brosofsky ordered and performed a pregnancy test, which was negative.  She made the following assessment: "Gastroenteritis? stress related, Urinary tract infection, and Benign headache syndromes."  NP Brosofsky's plan included a referral to gastroenterology and a prescription of Omeprazole for gastroenteritis, a prescription of Cipro for a urinary tract infection, and a prescription

# G.Add.11

of Amitriptyline (an anti-depressant) for benign headache syndrome. NP Brosofsky gave Ms. Urizar-Mota information on intimate partner violence.

7.     Despite unexplained nausea and vomiting along with fifteen days of unexplained headaches, NP Brosofsky did not order any brain scans and did not refer Ms. Urizar-Mota to a neurologist for a consult.

8.     NP Brosofsky did not take appropriate actions to rule out intercranial abnormalities.

9.     Ms. Urizar-Mota next visited the PCHC two and one-half months later, on February 1, 2013.  She again saw NP Brosofsky.

   "*Chief Complaint:*" "Follow up on migraines; not taking migraine meds daily; feels stabbing, pulling sensation."

   "*History of Present Illness:*" "Frontal headache and over right side of head with pulling sensation upon awakening from sleep.  Which is throbbing or pounding.  Lasting for a few hours.  Accompanied by Nausea.  By vomiting.  When she takes medications, she has no headache but when she doesn't take it, she has very bad headache with nausea, vomiting and fatigue.  Wants to know why the headaches came back.  She had taken medication x 1 week and she was feeling tired and drunk."

   "*Assessment:*" "Migraine headache with elevated BP."

   "*Plan:*" "Given information re: Migraines from AFP will try to avoid triggers and monitor BP."

10.     NP Brosofsky still did not order a neurological consult or brain imaging.

11.     A month and a half later, on March 13, 2013, Ms. Urizar-Mota saw NP Brosofsky for the third time with the chief complaint of: "C/o daily, constant migraines, worse," and NP Brosofsky noted the following:

# G.Add.12

4

"*History of Present Illness:*" "Temporal headache with pulling sensation on the sides. Which is steady. Proceeded by seeing dark spot with a bright jagged outline. Accompanied by nausea. Headache not accompanied by vomiting. Not by diarrhea. No new medications prescribed. Pt comes in for f/u. Cont with headaches. She did not take any medications since last visit. Her BP is in much better control. She has had a severe HA [headaches] for the last 3 days. After much interviewing, Pt revealed that she is being emotionally and physically abused. Pt is planning to move in April and has a plan in place but she feels unsafe."

"*Active Problem List:*" Chronic Daily Headache.

"*Assessment:*" "Chronic Daily Headache, Adult physical abuse by spouse/partner."

"*Plan:*" prescription of Fluoxetine for headache and notes that Ms. Urizar-Mota was given information about domestic violence shelters. Ms. Urizar-Mota was instructed to return to the clinic if her condition worsened or if new symptoms arose.

12.     Despite continued headaches of an unknown etiology accompanied by nausea, NP Brosofsky again did not order any brain imaging or refer her for a neurological consult. She did not take appropriate steps to rule out intercranial abnormalities.

13.     Ms. Urizar-Mota continued to have headaches throughout 2013 and 2014.

14.     At her next PCHC visit on June 26, 2014, Ms. Urizar-Mota saw primary care physician Dr. Jeffrey E. Harris. She once again complained of headaches and said she thought her birth control medication, Depo-Provera, may have been the cause of her headaches.

"*History of Present Illness:*" "Neurological symptoms in the mornings, reports headaches, facial sweating, and sensation of chest tightness that resolves during the day. Accompanied by tiredness."

# G.Add.13

"*Assessment:*" "Headache syndromes. Her exam is negative. Patient has decided to stop Depo after discussing with Dr. Hosmer the possibility that her sx [symptoms] are side effects of the injection. I note that E. Brosofsky had diagnosed depression and tried Fluoxetine."

"*Plan:*" order lab work, a CBC (complete blood count) and CMP (comprehensive metabolic panel).

15.     Two weeks later, on July 10, 2014, Ms. Urizar-Mota saw Dr. Harris again for unrelenting headaches.

"*History of Present Illness:*" "Cardiovascular symptoms Reports palpitations and 'weakness' with her headaches, but no SOB [shortness of breath] or dizziness. Gastrointestinal symptoms Low grade nausea without vomiting, but bitter taste in mouth in a.m. Neurological symptoms patient continues to report daily headaches, especially arising in the a.m., relates these to her Depo injection. She has declined a repeat Depo injection which was due in June. She is currently using no contraceptives."

"*Active Problems:*" Victim partner abuse and chronic daily headaches noted.

"*Assessment:*" "GERD. Difficult to sort out sx. Both her GI sx and headache might be attributable to the Depo injection, but she has not had this med for 6+ months. Empirically trial of Omeprazole 20 mg hs. Migraine headache. Ibuprofen insufficient. We'll try beta blocker empirically for both headache and palpitations. Patient referred to family planning."

"*Plan:*" Prescription of Atenolol [beta blocker] for headaches and heart palpitations, and Omeprazole for GERD and nausea.

16.     Dr. Harris never ordered any brain imaging or referred her for a neurological consult despite almost two years of unrelieved daily headaches.

17.     Because she became pregnant, Ms. Urizar-Mota treated with PCHC Obstetrician and Gynecologist Jennifer Hosmer, M.D. for the next 10 months, from November 3, 2014, to August 21, 2015. Dr. Hosmer's "*List of Active Problems*" during

# G.Add.14

her 22 appointments with Ms. Urizar-Mota included chronic daily headaches and partner abuse.

18.   Dr. Hosmer never ordered any brain imaging or referred her for a neurological consult.

19.   For the next few years, from the end of 2015 until mid-2019, Ms. Urizar-Mota treated with primary care physician Dr. Vinod Thomas.

> "*Chief Complaint:*" "New to PCP [primary care physician].  Pt c/o dizziness, sore throat, and body aches x 3 weeks," was diagnosed with "Aviral pharyngitis," and prescribed Acetaminophen, Ibuprofen, and Cepacol Sore Throat & Cough for her pharyngitis.
>
> At her next visit:
>
> "*Chief Complaint:*" "Pt c/o dizziness, feeling lightheaded since this morning."
>
> "*History of Present Illness:*" "Headache–dizziness, lightheadedness since this AM, no fever, no chills, does have some nausea."
>
> "*Active Problem:*" Victim Partner Abuse.
>
> "*Assessment:*" "Acute gastritis, Benign paroxysmal positional vertigo–basic labs ordered."
>
> "*Plan:*" "Other headache syndrome," for which he prescribed Acetaminophen; "Impacted cerumen, unspecified ear," for which Debrox was prescribed; "Nausea," for which Promethazine and "RaNITidine" was prescribed; "Dizziness and giddiness," for which Meclizine was prescribed; and "Chronic fatigue, unspecified," for which labs were ordered to test TSH, CBC, Vitamin D., Lipid 1 profile, and [CMP].

20.   Despite the now long history of constant headaches, dizziness, lightheadedness, all without definitive cause, Dr. Thomas never ordered any brain imaging or referred her for a neurological consult.

# G.Add.15

21.    Ms. Urizar-Mota's headaches continued in 2016, 2017, and 2018, but she did not go to the PCHC during most of this time because "they wouldn't give [her] anything else but Tylenol, [she] just continued to take Tylenol."

22.    In June 2019, seven years after first telling NP Brosofsky that she had experienced 15-days of intense headaches with nausea and vomiting, the headaches had gotten so bad, Ms. Urizar-Mota made an appointment at the PCHC's express clinic for June 19, 2019, because it was the only available prompt appointment. When she arrived with her husband in the parking lot of the PCHC clinic, Ms. Urizar-Mota lost consciousness. Her husband went inside to get help; an ambulance took her to Rhode Island Hospital ("RIH"). Ms. Urizar-Mota was 32 years old.

**B. Hospitalizations & Diagnosis**

23.    RIH performed a brain CT that showed obstructive hydrocephalus ("HCP") (abnormal buildup of cerebral fluid) and a mass in the fourth ventricle of her brain.

24.    Neurosurgeon Dr. Tohaid Ali examined Ms. Urizar-Mota. He placed an external ventricular drain due to the "life threatening nature of patient's neurological examination and imaging," and the "life threatening HCP secondary to 3rd vent mass/bleed." Ms. Urizar-Mota was then admitted to the Neurocritical Care Unit at RIH for further management.

25.    Five days after being admitted to RIH, Ms. Urizar-Mota underwent tumor resection surgery to cut out the tumor.

# G.Add.16

26. The brain tumor was a pilocytic astrocytoma, Grade 1, non-metastatic, slow growing tumor.

27. Neurosurgeon Dr. Steven A. Toms performed an endoscopic removal of a "fibrinous debris/blood clot" that was blocking the aqueduct of Sylvius, created a by-pass for cerebral spinal fluid in the brain, and replaced the right frontal external ventricular drain. The doctors removed the external ventricular drain the next day.

28. During the tumor resection surgery, Ms. Urizar-Mota suffered a cerebellar stroke, which resulted in permanent neurological injuries, including permanent injuries to her cerebellum (the back of the head, which controls balance, coordination, and other motor functions) that manifests in tremors and movement disorders in her left hand, arm, and leg.

29. A month after she was admitted to the hospital, RIH's Neurosurgery Unit discharged Ms. Urizar-Mota to RIH's Inpatient Rehabilitation Unit and then eventually to the Elmwood Nursing and Rehabilitation Center.

30. At Elmwood, Ms. Urizar-Mota received speech, occupational, and physical therapy.

31. Ms. Urizar-Mota was readmitted to RIH for an episode of left shoulder twitching and changes in her eye.

32. Six months after being admitted to RIH and diagnosed with the brain tumor, Ms. Urizar-Mota was discharged home from the Elmwood Nursing and Rehabilitation.

# G.Add.17

33.     Ms. Urizar-Mota saw ophthalmologist Dr. Melissa Simon, who documented: "Sixth nerve palsy of both eyes—likely due to initial elevated [intracranial pressure] on presentation in 2019." Dr. Simon noted that Ms. Urizar-Mota will "need multiple strabismus [cross-eyed] surgeries" because of her visual injuries and impairments.

34.     Ms. Urizar-Mota underwent surgery of the oblique muscle of the eye.

35.     During a follow-up examination with Dr. Simon, Ms. Urizar-Mota reported burning sensation and dryness in both eyes since the eye surgery. Dr. Simon's examination revealed that the diplopia (double vision) and torsion (twisting) had resolved, but that she still had residual vertical misalignment.

36.     Four months after her first brain surgery, Ms. Urizar-Mota underwent a follow-up brain MRI that showed "persistent findings of hypertrophic olivary degeneration [enlarged part of the brain controlling motor and sensory information]."

37.     Ms. Urizar-Mota treated with a movement disorder specialist Dr. Saud Alhusaini at RIH for her left-sided tremors. Dr. Alhusaini noted that treatment options for tremors are limited, and are linked to significant side effects, including drowsiness and cognitive adverse effects. Dr. Alhusaini noted Ms. Urizar-Mota's tremor remained unchanged, and that she continued to suffer from difficulty ambulating, imbalance, diplopia, and blurry vision.

38.     Ms. Urizar-Mota has sustained severe and permanent neurological injuries, including: (a) movement abnormalities and impaired motor function on the left side, including her left arm, hand, and leg, which manifests in tremors and

G.Add.18

shakiness; (b) abnormal and uncoordinated eye movements when she looks up, down, and laterally, causing blurry and unsteady vision; (c) tremors on the side of her mouth and lips; and (d) balance and gait issues that prevent her from walking without the use of mobility aides.

39. Because of her neurological injuries, Ms. Urizar-Mota: has blurry and unsteady vision; cannot perform standard ballistic movements smoothly and effectively, such as buttoning a shirt, tying a shoe, putting on socks, zipping a coat, removing her eyeglasses, slicing or chopping food, and buttering toast; cannot drive a motor vehicle, and so must rely on her daughter and husband to drive her three young sons to and from school, appointments, and other events; cannot clean, cook meals for herself and her family, or perform other types of housework, and thus must rely on her daughter to perform these tasks; cannot walk without the help of a walker, or when inside the home, cannot walk without holding onto furniture to maintain her balance; cannot care for her children the way she used to; cannot drive them to and from school and appointments, and cannot go to their school functions; cannot independently perform activities of daily living and cannot be left home alone, and therefore requires daily assistance from her family members.

40. Mr. Urizar-Mota experienced prolonged and unnecessary pain and suffering and economic damage because of her undiagnosed tumor.

C. Internist/NP Expert Testimony

41. Russell Phillips, M.D. is a licensed physician board-certified in Internal Medicine, and the Director for the Center for Primary Care, the Applebaum Professor

# G.Add.19

of Medicine, and a Professor of Global Health and Social Medicine at Harvard Medical School. He received his undergraduate degree from the Massachusetts Institute of Technology and his medical degree from Stanford University Medical School. Dr. Phillips has been a primary care physician at Beth Israel Hospital, now Beth Israel Deaconess Medical Center ("Beth Israel"), since 1985.

42. As the Director for the Center for Primary Care at Harvard Medical School, Dr Phillips oversees the development of a primary care track at Harvard Medical School, as well as a primary care focused research program.

43. Dr. Phillips served as the Chief of the Division of General Medicine and Primary Care at Beth Israel from 2002 to 2012, where he teaches, trains, and supervises in taking a history, reviewing physical exam findings, and creating differential diagnoses.

44. Dr. Phillips has published approximately three hundred peer-reviewed publications as a primary care physician, and his work has been cited around 45,000 times by other researchers and publishers.

45. Based on Dr. Phillips' education, training, research, teaching, and experience, the Court finds Dr. Phillips to be a highly qualified expert in Internal Medicine, found his testimony to be the most credible, and relies in large part on his expert testimony to support these findings.

46. Dr. Amy Ship testified on behalf of PCHC. She is board certified in Internal Medicine and has practiced for over thirty years. She directs the primary care residency program at Brigham and Women's Hospital. While Dr. Ship's

# G.Add.20

credentials are impressive, her testimony was less credible than Dr. Phillips. Her testimony was not as consistent with much of the evidence in the case and was not as supported by the medical literature as was Dr. Phillips' testimony.

**D. <u>Standard Of Care</u>**

47.     There are distinct types of and different causes of headaches. Headaches can be broken into two broad categories: primary headaches and secondary headaches. Primary headaches include tension headaches, cluster headaches, and migraine headaches. Secondary headaches include other non-benign causes of a headache, including, trauma or structural changes due to vascular abnormalities or tumors.

48.     To decide whether a patient has a primary headache or secondary headache, and what is causing the headache, the primary care nurse practitioner or physician must take a detailed history from the patient. This is especially important in diagnosing the cause of the patient's headaches and any accompanying signs and symptoms.

49.     In the first meeting, the standard of care requires the medical provider to be aware of, document, and follow-up on "red flags" that could lead to the need for further study.

50.     "Red flags" are the signs or symptoms associated with or accompanying a headache that trigger the need for neuroimaging. Credible peer-reviewed medical literature supports this.

# G.Add.21

51. "Red flags" were and are a valid tool for clinicians to use when deciding whether a patient with headaches requires neuroimaging. Focusing on "red flags" prevents clinicians treating patients with headaches from missing secondary causes of a patient's headache.

52. The standard of care, in 2012 through 2019, for a reasonably competent primary care nurse practitioner or physician treating a patient with headaches requires that the primary care nurse practitioner or physician order neuroimaging of the patient if the patient has any "red flags." The patient's headache needs only be accompanied by or associated with one "red flag" to call for neuroimaging.

53. The following is a list of "red flags" that require neuroimaging or referral to a neurologist of a patient with headaches:

   a) Systemic symptoms, including fever.
   b) Neoplasm.
   c) Neurological deficit or dysfunction.
   d) Onset of headache if sudden or abrupt.
   e) Older age after 50.
   f) Pattern change or recent onset of headache.
   g) Positional change.
   h) Headache precipitated by sneezing, coughing, or exercise.
   i) Papilledema (swelling of the optic discs).
   j) Progressive headache in atypical presentations.
   k) Pregnancy.
   l) Painful eye with autonomic features.
   m) Posttraumatic onset of headache.
   n) Pathology of immune system such as HIV.
   o) Painkiller overuse or new drug at onset of headache.

54. If there is a change in the severity, frequency, or character of the chronic headaches, and the headaches are not clearly migraine or tension headaches, this is a red flag requiring neuroimaging or referral.

# G.Add.22

55. During Ms. Urizar-Mota's many visits to the PCHC medical providers between 2012 and 2019, she had several "red flags" and therefore the standard of care required the PCHC providers, including NP Brosofsky, Dr. Harris, and Dr. Thomas, to order neuroimaging to evaluate her headaches or make a referral for a complete neurological examination. The "red flags" present included: progressive headache in atypical presentations, pattern change or recent onset of headache, neurological deficit or dysfunction, and posttraumatic onset of headaches.

56. The purpose of ordering neuroimaging would be to rule in or rule out secondary causes of the patient's headaches.

57. Mr. Urizar-Mota presented with chronic headaches that were not stable and did not meet the criteria for migraines. Her headaches were changing in pattern, severity, characteristics, and frequency.

58. NP Brosofsky violated the standard of care on November 14, 2012, February 1, 2013, and March 13, 2013, when, despite the presence of "red flags," she did not order neuroimaging or a complete neurological examination to evaluate the cause of Ms. Urizar-Mota's headaches.

59. On November 14, 2012, Ms. Urizar-Mota presented with a headache and "red flags." She had a new onset headache and/or change in the pattern of her headaches. Ms. Urizar-Mota reported she had never previously experienced headaches of this nature and of this duration—a headache with nausea and vomiting for fifteen days. The duration of Ms. Urizar-Mota's headache with nausea and vomiting removes her headache from the benign and primary headache disorder

# G.Add.23

category, and thus required imaging. Neither migraines nor tension headaches present in this fashion.

60. Despite these "red flags," NP Brosofsky did not order neuroimaging or refer Ms. Urizar-Mota to a neurologist to evaluate the cause of her headaches, and failing to do so violated the standard of care.

61. "Red flags" were also present on February 1, 2013, because there had been a change in the pattern of Ms. Urizar-Mota's headaches. Her headaches were then "awaking [her] from sleep," and were noted to coincide with a pulling sensation and throbbing or pounding.

62. The standard of care required NP Brosofsky to order neuroimaging or make a referral to a neurologist.

63. Writing-off the headaches to migraines also violated the standard of care. The medical providers at PCHC misdiagnosed Ms. Urizar-Mota's headaches as migraines. Migraine headaches are defined by a recurring pattern of the same type of headache. There is no clear documentation in Ms. Urizar-Mota's medical records of a recurring pattern of the same type of headache. Her headaches, documented as both a "chronic daily headache" and an "Active Problem," were not consistent with a migraine headache or any type of benign headache syndrome because migraines and benign headache syndromes do not generally present as daily and persistent headaches.

64. Moreover, Ms. Urizar-Mota's headache history that NP Brosofsky documented in the November 14, 2012 medical record does not contain the detail and

G.Add.24

necessary information that it should contain as the standard of care required, including the location of the headache, the nature of the headache, what medications the patient was on, what medications the patient had tried to alleviate the headaches, whether the patient had experienced any relief, what that patient's social and home circumstances were, and what the patient's concerns were.

65. Ms. Urizar-Mota again presented with "red flags" on March 13, 2013, in that her headaches were continuing to change in pattern and came with a new symptom: headaches "proceeded by seeing dark spot with a bright jagged outline." As of that date, she had had four months of chronic daily headaches that were not of a stable pattern but were changing in pattern—a "red flag."

66. The standard of care for the treatment of Ms. Urizar-Mota's headaches required neuroimaging, and NP Brosofsky's failure again to order neuroimaging on March 13, 2013, despite the "red flags" violated the standard of care.

67. Dr. Jeffrey Harris also violated the standard of care on June 26, 2014, and July 10, 2014, when, despite the presence of "red flags," he did not order neuroimaging or make a referral to a neurologist to evaluate the cause of Ms. Urizar-Mota's headaches. She presented with "red flags" in that she had a change in the pattern of her headaches and her headaches had unique features over time.

68. Ms. Urizar-Mota's headaches were now arising "[i]n the morning, [accompanied by] facial sweating and a sensation of chest tightness that resolve[d] during the day" after she had been awake and up and about. Positional headaches

G.Add.25

are a "red flag," yet Dr. Harris did not take any steps to rule in or rule out whether her headaches were truly positional, and therefore he violated the standard of care.

69.     Ms. Urizar-Mota's symptom pattern was consistent with raised intracranial pressure: early morning headache that resolves on standing over a period, nausea, sweatiness, or diaphoresis, also consistent. As she had not had Depo-Provera for six months it would have been out of her system; so not a probable cause of headache.

70.     Dr. Harris violated the standard of care when he diagnosed Ms. Urizar-Mota with migraine headaches despite the absence of information necessary to support the diagnosis documented in her medical records.

71.     When Ms. Urizar-Mota saw Dr. Vinod Thomas on July 20, 2016, she again presented with a red flag, in that there was a change in the pattern of her headaches because her headaches were newly associated with "dizziness," a new neurological symptom or sign. Her dizziness was a "red flag" because it is a neurological symptom.

72.     Despite the presence of this "red flag," Dr. Thomas did not order neuroimaging to evaluate the cause of Ms. Urizar-Mota's headaches, and his failure to do so violated the standard of care.

### E. Causation

73.     As outlined below, if Ms. Urizar-Mota had been treated consistent with the standard of care, she would have had a CT scan that would have revealed the tumor. She would not have suffered the damages she now endures because, more

likely than not, she would have had surgery sooner and an earlier surgery would have been less risky and caused less damage. It is more likely than not that the neurological damage the stroke caused would not have happened, non-surgical intervention would have been available, and her eye injuries would not have occurred.

   *a.   If Surgery Had Been Done Earlier–Less Risk*

74. Earlier diagnosis and surgical resection would have resulted in better outcomes for Ms. Urizar-Mota and prevented her from sustaining permanent neurological injuries.

75. Ms. Urizar-Mota's most likely course of care and treatment would have involved a multidisciplinary board review and evaluation of her and her tumor to decide the safest treatment plan and would not have ended with her suffering a medical emergency on June 19, 2019.

76. If medical providers diagnosed Ms. Urizar-Mota's tumor in November 2012, surgical resection would have had a high likelihood of success and a minimal risk of injury.

77. A smaller tumor would take less time to resect, therefore minimizing the time the surgeon is operating on the patient's brain once the tumor is found, and there would not have been any blood or byproducts of blood in the surgical field because the tumor would have been diagnosed and resected before it hemorrhaged and bled.

78. In addition, if it had been detected earlier, the tumor would have been smaller and further away from the floor of the fourth ventricle and thus less likely to

# G.Add.27

result in brainstem injury, there would be no hemorrhage and excessive blood in the brain, and the brain would not have been swollen from the prolonged and severe obstructive hydrocephalus.

79.     Ninety percent of patients with pilocytic astrocytoma do not have permanent injuries after surgery to resect the tumor. Most patients who have tumors in the same region of the brain as Ms. Urizar-Mota's tumor do not sustain injury during surgical resection, and that the less-than-ideal conditions under which Ms. Urizar-Mota's surgery was performed made it a difficult neurosurgical case and substantially contributed to her injuries.

80.     Ms. Urizar-Mota's tumor resection surgery had a higher risk of complication due to the conditions under which RIH personnel performed it. These less-than-ideal conditions—the blood in the brain and ventricular system because of the pre-operative hemorrhage—made her surgery much more difficult than it would have been without them.

81.     The following conditions, which made the surgery riskier and more complicated would not have existed if Ms. Urizar-Mota's tumor had been diagnosed and surgically resected at any time between November 2012 through 2018:

    a.    An external ventricular drain in her brain that was caused by obstructive hydrocephalus.

    b.    Blood in her ventricular system, including blood on the floor of the fourth ventricle, because of a hemorrhage.

    c.    The larger tumor in the roof of her fourth ventricle.

    d.    Down-and-out pupils and extensor posturing, both signs of brainstem injury.

    e.    Injury to the sixth cranial nerve/sixth nerve palsy, because of the severe increased intracranial pressure and downward herniation/uncal

herniation, after the external ventricular drain was placed and before the surgical resection.

82.     Because of the blood in Ms. Urizar-Mota's fourth ventricle, she was at risk for vasospasm (narrowing of the artery) and stroke.

        *b.*    *If Surgery Had Been Done Before Hydrocephalus—Less Damage*

83.     If Ms. Urizar-Mota's tumor resection surgery had been performed at any time prior to 2019, before she developed complete obstructive hydrocephalus, experienced hemorrhages, and/or blood in the ventricular system, and had an external ventricular drain placed, she would not have sustained permanent injury prior to, during, or because of the tumor resection surgery.

84.     Beginning in November 2012, and continuing until June 19, 2019, Ms. Urizar-Mota most likely experienced a partial obstruction of her cerebrospinal fluid caused by her tumor gradually growing in the fourth ventricle and partially obstructing the aqueduct of Sylvius, thereby preventing the complete flow of cerebrospinal fluid from the third ventricle, through the aqueduct of Sylvius, and into the fourth ventricle.

85.     Ms. Urizar-Mota more likely than not had increased intracranial pressure at times producing her headaches caused by this tumor affecting the flow of cerebrospinal fluid through the aqueduct and the egress of cerebrospinal fluid from the fourth ventricle into the subarachnoid space.

86.     Ms. Urizar-Mota's headaches and associated symptoms in 2012 and 2013 were most probably caused by hydrocephalus or raised intracranial pressure, which was the result of her tumor partially obstructing the aqueduct of Sylvius. The

# G.Add.29

symptoms were directly referable to the raised intracranial pressure, and she suffered because of the tumor partially obstructing the aqueduct of Sylvius.

87. This continuous production of cerebrospinal fluid coupled with the obstruction that prevented it from escaping into the fourth ventricle caused the cerebrospinal fluid to build up in the lateral and third ventricles in the top part of the brain. This buildup caused a significant increase in intracranial pressure.

88. The increased intracranial pressure, which was caused by the obstructive hydrocephalus, caused central downward herniation syndrome. This occurs when the pressure in the top part of the brain is so severe that the brain begins to push downward through the tentorium cerebelli, a hole in the fibrous structure separating the top half of the brain from the bottom half of the brain.

89. This type of severe intracranial pressure interrupts neurological brain function and can cause strokes, hemorrhages, and even death.

90. Ms. Urizar-Mota developed acute obstructive hydrocephalus within 72 hours of her presentation to RIH Emergency Department on June 19, 2019.

*c. Eye*

91. Ms. Urizar-Mota's obstructive hydrocephalus and downward herniation on June 19, 2019, caused injury to her brainstem before her June 24, 2019 tumor resection surgery, and her brainstem injury resulted in injuries to her third, fourth, and sixth cranial nerves (cranial nerve palsies), and internuclear ophthalmoplegia ("INO").

# G.Add.30

92.     Ms. Urizar-Mota's INO and third, fourth, and sixth nerve palsies manifest in eye movement abnormalities.

93.     Ms. Urizar-Mota's eye examination results and ocular deficits were consistent with brainstem injury caused by downward herniation.

94.     Ms. Urizar-Mota's obstructive hydrocephalus caused neurological injury before her tumor resection surgery.

95.     Ms. Urizar-Mota's cranial nerve injuries result from brainstem injuries, which are distinct from her cerebellar injuries that occurred during the surgical resection of her tumor.

96.     The sixth nerve, which is in the brainstem, controls the abducens muscle, which is one of the muscles responsible for eye movement.  If a patient's sixth nerve is injured, the patient cannot move their eyes outwards and/or laterally.

97.     Ms. Urizar-Mota sustained injury to her sixth nerve before her tumor resection surgery because of obstructive hydrocephalus.

98.     Ms. Urizar-Mota's sixth nerve palsy caused by obstructive hydrocephalus is a result of brainstem injury.  This was caused by the direct compression of the sixth nerve against the tentorium, the part of the brain that separates the top part of the brain from the bottom part of the brain, which occurred because of the downward herniation caused by Ms. Urizar-Mota's severe increased intracranial pressure and hydrocephalus.  No evidence suggests the brainstem injuries occurred during the surgery.

# G.Add.31

99.    Ms. Urizar-Mota's injuries to her sixth nerve and her sixth nerve palsy are permanent.

### d.  Cerebellum Injuries–Surgery, Stroke

100.    In addition to Ms. Urizar-Mota's brainstem injuries, she also sustained injuries to her cerebellum.

101.    Pre-operative brain MRI performed at RIH revealed a stroke in the splenium corpus callosum (the thickest part of the nerve fibers that connect the left and right side of the brain).

102.    Ms. Urizar-Mota's splenium corpus infarct (tissue death) to the top of the brain occurred before her tumor resection surgery and was the result of the acute obstructive hydrocephalus that caused her ventricular system to expand.

103.    The stroke in the splenium of the corpus callosum is evidence of brain injury and severe pressure in her brain before her tumor surgery.

104.    Blood in Ms. Urizar-Mota's brain, before the surgical resection of her tumor, was integral to the development of her brain lesions/strokes.

105.    If Ms. Urizar-Mota's brain resection surgery had been performed under conditions wherein she did not have blood in the fourth ventricle and was not at risk for vasospasm (sudden collapse of the artery restricting blood flow) due to the fourth ventricle blood, it would be less likely that she would have experienced the lesions/strokes.

### e.  MEK Inhibitors

106.    Ms. Urizar-Mota's tumor was Grade 1, slow growing, and non-invasive.

# G.Add.32

24

107.     The tumor would have been visible on neuroimaging at least a decade before the diagnosis.  If neuroimaging had been obtained in November 2012 or at any time after that, the tumor would have been discovered.

108.     As of 2017, there were non-surgical treatments for Ms. Urizar-Mota's tumor, including "MEK inhibitors" and "BRAF inhibitors."  These agents successfully shrink tumors in eighty percent of patients and would have allowed her tumor to be treated without surgery.

109.     If Ms. Urizar-Mota's tumor had been diagnosed in 2017 or 2018, it is more likely than not that she would have avoided surgery and doctors could have treated her tumor with medication that became available in 2017, such as MEK inhibitors and BRAF inhibitors.  She would more likely than not have avoided the damage she incurred after 2017.

F. **Damages**

110.     As a direct and proximate result of Defendant's negligence, Ms. Urizar-Mota suffered needlessly with debilitating headaches, nausea, vomiting, and dizziness for years before her surgery.

111.     Ms. Urizar-Mota needlessly endured pain and suffering for 2408 days; from when Defendant first should have ordered neurological testing on November 14, 2012 to when RIH finally diagnosed her tumor nearly seven years later on June 19, 2019.

112.     A suitable amount to fully compensate for the pain and suffering she incurred during this period is $100 per day for a total damage of $240,800.00.

# G.Add.33

113.   As a direct and proximate result of Defendant's negligence, Ms. Urizar-Mota suffered severe, permanent, and life-altering neurological damages.

114.   Ms. Urizar-Mota spent six months in the hospital and rehabilitation center before she could return home.

115.   Ms. Urizar-Mota incurred $662,194.62 in medical expenses that were directly and proximately caused by Defendant's negligence.

116.   Ms. Urizar-Mota had a feeding tube inserted for seven months.

117.   Ms. Urizar-Mota is unable to walk without a walker, without getting dizzy and falling.  She always feels unsteady and falls to one side when standing without help.  She suffers from weakness in both arms.  She is unable to drive, cook, clean, work, or take care of her family.  She cannot be left home alone.  She has tremors in her hand and continually drops objects.  She has frequent twitching of her hand and leg.  Dressing herself is difficult.

118.   Ms. Urizar-Mota has been experiencing left-hand tremors since her surgery in June 2019.  She described difficulty using her left upper extremity due to tremors when she uses her left hand.  The tremor is present when she tries to reach for objects.  She described difficulty using utensils and holding objects with her left hand.  The severity of her left-hand tremor is stable.  She also described difficulty ambulating and imbalance.  She currently uses a walker for stability.

119.   Ms. Urizar-Mota is often depressed and cries when she is alone because she feels like she is a burden to her family.

# G.Add.34

120.   Ms. Urizar-Mota's eyesight is blurry with double vision, mostly horizontal.  She also described sensation of "dust in her eyes" with occasional blurring of vision.

121.   According to the life table in evidence, Ms. Urizar-Mota's life expectancy from the date she was finally diagnosed (June 19, 2019) is about 50 years (18,250 days).

122.   A suitable amount to fully compensate Ms. Urizar-Mota for her pain and suffering and loss of enjoyment of life due to her permanent injuries and disability is $350 per day for a total damage for pain and suffering during this period of $6,387,500.00.

123.   Ms. Urizar-Mota was the family's homemaker, which encompassed duties such as manager of household tasks such as cleaning, cooking, organizing, and caring for her family members.  She ensured the smooth running of their home including such responsibilities like grocery shopping, childcare, and managing schedules.

124.   As a direct and proximate result of Defendant's negligence, Ms. Urizar-Mota can no longer perform those duties.  Those duties have economic value and represent economic loss to her.  For eight hours per day, at a minimum of $20/hour, for her life expectancy of 18,250 days, the total economic loss is $2,920,000.00.

125.   Each of Ms. Urizar-Mota's children—Delmy Reyes, Sergio Reyes, Wilmer Reyes, and Gerson Reyes—suffered for years and will continue to suffer a loss

# G.Add.35

of the care and companionship of their mother due to her disability and inability to care for them as she once did.

126. Ms. Urizar-Mota's oldest child Delmy Reyes suffered further because she had to perform household and parental duties for which her mother was otherwise responsible. Delmy lost large parts of her teenage years due to the burden she assumed upon her mother's disability.

127. A suitable amount to fully compensate Delmy Reyes for her extraordinary efforts caring for her month, taking care of family responsibilities, and for the loss of the care and companionship of her mother is $1,250,000.

128. A suitable amount to fully compensate Sergio Reyes, Wilmer Reyes, and Gerson Reyes for the loss of the care and companionship of their mother is $750,000 each.

## III. CONCLUSION OF LAW

129. A plaintiff pursing a medical malpractice claim must prove by a preponderance of the evidence that: (1) the defendant had a duty to the plaintiff to act or refrain from acting, (2) the defendant breached that duty, and (3) the defendant's breach proximately caused the plaintiff's injuries. *Schenck v. Roger Williams Gen. Hosp.*, 382 A.2d 514, 516-517 (R.I. 1977).

130. NP Brosofsky, Dr. Harris, and Dr. Thomas had a duty to exercise ordinary care in Ms. Urizar-Mota's diagnosis, treatment, and care, including the duty to promptly and accurately evaluate and diagnose the cause of her headaches.

# G.Add.36

131.     Each of the PCHC healthcare providers, beginning with NP Brosofsky, breached the standard of care by not ordering neuroimaging of Ms. Urizar-Mota's brain and/or referring her for a complete neurological consultation.

132.     As a direct and proximate result of each of the breaches of the standard of care, Ms. Urizar-Mota suffered severe and permanent injuries. The damages she suffered were reasonably foreseeable to Defendant.

133.     As a direct and proximate result of each of the breaches of standards of care, Ms. Urizar-Mota's children suffered damages. The damages they suffered were reasonably foreseeable to Defendant.

134.     Damages are awarded in tort cases to fully and adequately compensate an individual for injuries sustained. *Reilly v. United States*, 863 F.2d 149, 164 (1st Cir. 1988). "Compensatory damages are awarded to a person in satisfaction of or in response to a loss or injury sustained." *Murphy v. United Steelworkers of Am. Loc. No. 5705, AFL–CIO*, 507 A.2d 1342, 1346 (R.I. 1986).

135.     "[V]ictims of a negligent tortfeasor are ordinarily permitted to recover for all the injuries and damages that can be proven to have been reasonably foreseeable and proximately caused by the tortfeasor's negligence." *Flanagan v. Wesselhoeft*, 712 A.2d 365, 371–72 (R.I. 1998) (citing *Atl. Tubing & Rubber Co. v. Int'l Engraving Co.*, 528 F.2d 1272 (1st Cir.)), *cert. denied*, 429 U.S. 817, (1976); *Hueston v. Narragansett Tennis Club, Inc.*, 502 A.2d 827 (R.I. 1986); *Prue v. Goodrich Oil Co.*, 140 A. 665 (R.I. 1928).

# G.Add.37

136.  "As a general principle, 'the law is always concerned that an injured party shall be fully compensated for whatever injury he [or she] may have sustained.'" *Hernandez v. JS Pallet Co.*, 41 A.3d 978, 984 (R.I. 2012) (quoting *DeSpirito v. Bristol Cty. Water Co.*, 227 A.2d 782, 784 (R.I. 1967)).

137.  There is no formula for computation of damages for pain and suffering; a factfinder should "exercise [] [their] judgment and [] appl[y] [] [their] experience in the affairs of life and [their] own knowledge of social and economic matters." *Bruno v. Caianiello*, 404 A.2d 62, 65 (R.I. 1979) (quoting *Wood v. Paolino*, 315 A.2d 744, 746 (R.I. 1974)).

138.  Fact finders are allowed to consider a per diem method that is based on the evidence at trial in consideration of a value for pain and suffering.  *Worsley v. Corcelli*, 377 A.2d 215, 219 (R.I. 1977).

139.  "[U]nemancipated minors [may] recover damages for loss of consortium and for loss of parental society and companionship, respectively, caused by tortious injury to an impaired spouse or parent." *Desjarlais v. USAA Ins.*, 824 A.2d 1272, 1276–77 (R.I. 2003) (citing R.I. Gen. Laws § 9-1-41).[3]

## IV.  AWARD[4]

140.  Considering all the facts the Court has found based on the evidence, in particular the length of the injuries, the permanency of the damage, and the effect on

---

[3] Defendant did not press at trial or in its post-trial briefing, any of its affirmative defenses, and therefore the Court considers them waived.

[4] The Court reduced all award amounts where appropriate to present value.

the family life, the Court finds the following damages are fair and reasonable and so awards judgment to Plaintiff Lucia Urizar-Mota:

     a.  Medical Expenses          $662,194.62

     b.  Pain & Suffering–pre-diagnosis   $240,800.00

     c.  Pain & Suffering–post-diagnosis  $6,387,500.00

     d.  Economic Loss           $2,920,000.00

141.    Considering all the facts in evidence, the Court finds that Sergio Reyes, (Sr.) is not entitled to any damages for loss of consortium.

142.    Considering all the facts the Court has found based on the evidence, the following damages are fair and reasonable and so the Court awards judgment to Plaintiff Delmy Reyes, who assumed so many of the household duties and had the greatest damage from the loss of her mother's companionship and society, of $1,250,000.

143.    Considering all the facts the Court has found based on the evidence, the Court finds the following damages are fair and reasonable and so the Court awards judgment to Plaintiffs Sergio Reyes, (Jr.), Wilmer Reyes, and Gerson Reyes, (Minors) in Trust with Lucia Urizar-Mota as Trustee as follows:

     a.  Sergio Reyes, Jr.: $750,000.00

     b.  Wilmer Reyes: $750,000.00

     c.  Gerson Reyes: $750,000.00

144.    Therefore, judgment shall enter against Defendant United States of America as follows:

# G.Add.39

    a.  Lucia Urizar-Mota for $8,385,494.62

    b.  Delmy Reyes for $1,250,000.00

    c.  Sergio Reyes (Jr.) for $750,000.00, by and through Lucia Urizar-Mota

    d.  Wilmer Reyes for $750,000.00, by and through Lucia Urizar-Mota

    e.  Gerson Reyes for $750,000.00, by and through Lucia Urizar-Mota

Plaintiffs shall prepare a form of final judgment in consultation with Defendant.

IT IS SO ORDERED

_____

John J. McConnell, Jr.
Chief Judge
United States District Court

December 9, 2024

# G.Add.40

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

LUCIA URIZAR-MOTA;                    :
SERGIO REYES; Individually and p.p.a.  :
DELMY REYES;                          :
SERGIO REYES; WILMER REYES            :
and GERSON REYES, minors              :
          Plaintiffs,                 :
                                      :
     v.                               :          C.A. No.: 1:21-cv-00155-JJM-PAS
                                      :
UNITED STATES OF AMERICA;             :
JOHN and/or JANE DOE, M.D., Alias; and :
JOHN DOE CORPORATION, Alias,          :
          Defendants.                 :

## FINAL JUDGMENT

This matter came to be heard before The Honorable Chief Judge John J. McConnell, Jr. from January 8, 2024 through and including July 24, 2024. After trial thereon, and in consideration of the evidence presented therein by the parties, it is hereby:

### ORDERED, ADJUDGED AND DECREED

1. Judgement shall enter against Defendant United States of America in the amount of eleven million, eight hundred eighty-five thousand, four hundred ninety-four dollars, and sixty-two cents ($11,885,494.62).

2. The distribution of the eleven million, eight hundred eighty-five thousand, four hundred ninety-four dollars, and sixty-two cents ($11,885,494.62) in favor of the Plaintiffs is as follows:

   a. Lucia Urizar-Mota for eight million, three hundred eighty-five thousand, four hundred ninety-four dollars, and sixty-two cents ($8,385,494.62);

   b. Delmy Reyes for one million, two hundred fifty thousand dollars ($1,250,000.00);

   c. Sergio Reyes (Jr.) for seven hundred fifty thousand dollars ($750,000.00), by and through Lucia Urizar-Mota;

# G.Add.41

    d.   Wilmer Reyes for seven hundred fifty thousand dollars ($750,000.00), by and through

           Lucia Urizar-Mota; and

    e.   Gerson Reyes for seven hundred fifty thousand dollars ($750,000.00), by and through

           Lucia Urizar-Mota.

3.   All amounts herein have already been reduced by the Court to the present value.


ENTER:

_____
Chief Judge John J. McConnell, Jr.
Date: 12/12/2024


Presented by:

/s/ Amato A. DeLuca
Amato A. DeLuca (#0531)
Katelyn M. Revens (#9078)
**DeLuca, Weizenbaum, Barry & Revens, Ltd.**
199 North Main Street
Providence, RI 02903
(401) 453-1500

(401) 453-1501 Fax
bud@dwbrlaw.com
kate@dwbrlaw.com


# G.Add.42