No. 25-1131

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

LUCIA URIZAR-MOTA; SERGIO REYES, individually and p.p.a. of S.R., W.R.
and G.R.; DELMY REYES; S.R.; W.R.; G.R.,
Plaintiffs – Appellees,

v.

UNITED STATES,

Defendant – Appellant,

JOHN and/or JANE DOE, M.D.; JOHN DOE CORPORATION,

Defendants.

ON APPEAL FROM ENTRY OF JUDGMENT
BY THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

BRIEF OF APPELLEES

Amato A. DeLuca
Katelyn M. Revens
DeLuca, Weizenbaum, Barry & Revens, Ltd.
199 North Main Street
Providence, RI 02903
(401) 453-1500
bud@dwbrlaw.com
kate@dwbrlaw.com

November 25, 2025

TABLE OF CONTENTS

Page

TABLE OF CONTENTS            i

TABLE OF AUTHORITIES            vi

STATEMENT OF THE ISSUES            1

STATEMENT OF THE CASE AND PROCEDURAL HISTORY    1

SUMMARY OF ARGUMENT            4

STANDARDS OF REVIEW            11

ARGUMENT            14

I.    The District Court Properly Exercised Jurisdiction Over    14
All Claims Because the FTCA's Presentment Requirement
was Satisfied

    A. Section 2675(a) Requires Only Sufficient Information    14
       and a Sum Certain

    B. Ms. Urizar-Mota's Administrative Submission Provided    16
       HHS with All the Information Needed to Investigate
       and Evaluate the Claims

    C. Rhod Island Law Treats Loss of Consortium Claims    18
       as Derivative, Requiring No Separate Presentment

        1) Rhode Island Law Courts Have Consistently    18
           Classified Loss of Consortium Claims
           as Derivative

        2) Derivative Status Eliminates the Need    19
           for Separate Administrative Presentment

i

D. The Government's Approach Contravenes Precedent, Purpose, and Policy ......... 20

    1) The FTCA's Purpose is to Facilitate Settlement, Not Trap Claimants ......... 21

II. The District Court's Damages Award for Homemaker Services Did Not Violate Rule 54(c) ......... 22

A. Rhode Island Law Specifically Allows an Injured Homemaker to Recover Damages for Their Loss as a Homemaker ......... 22

B. Plaintiffs Adequately Plead and Sought Damages for Homemaker Services ......... 23

C. In the Alternative, Rule 54(c) Supports the District Court's Award of Damages for Ms. Urizar-Mota's Loss as a Homemaker ......... 24

D. The Trial Record Strongly Supports the Award for Damages for Ms. Urizar-Mota's Loss as a Homemaker ......... 26

E. Expert Testimony is Not Required to Prove the Value of Damages for Loss as a Homemaker ......... 27

III. The Record Contains Substantial Evidence to Support the District Court's Findings on Causation and Mrs. Urizar-Mota's Damages Award ......... 28

A. The District Court Correctly Concluded That Ms. Urizar-Mota May Have Avoided Surgery If Her Pilocytic Astrocytoma Brain Tumor Was Diagnosed Earlier in Time ......... 28

B. The District Court Correctly Found That Earlier 34
Diagnosis and Surgical Resection of Ms. Urizar-Mota's
Pilocytic Astrocytoma Brain Tumor Would Have
Prevented Ms. Urizar-Mota from Sustaining Permanent
Neurological Injuries

    1) Dr. David Ashley's Testimony Supports the 34
       District Court's Findings

    2) Dr. David Caplan's Testimony Supports the 39
       District Court's Findings

    3) Defense Witness Dr. Timothy Smith's Testimony 42
       Supports the District Court's Findings

    4) Defense Witness Dr. Timothy Smith's Ultimate 44
       Conclusion, That Ms. Urizar-Mota's Tumor
       Resection Surgery Would Have Resulted in
       Neurological Injuries Regardless of When in Time It
       Was Performed, Was Without Support, Contradicted
       by His Own Testimony, and Was Not Credible

C. The District Court Correctly Determined That 47
Ms. Urizar-Mota Was Entitled to Medical Expense to
Compensate Her for the Necessary Medical Treatment
She Required as a Proximate Result of the Government's
Negligence

1)  The Record Supports the District Court's Finding    50
    That Ms. Urizar-Mota Sustained Permanent
    Brainstem Injuries Prior to Her June 24, 2019
    Tumor Resection Surgery as a Proximate Result
    of the Government's Negligent Delay in
    Diagnosing and Treating Ms. Urizar-Mota's
    Pilocytic Astrocytoma Brain Tumor, and that
    those Brainstem Injuries Resulted in the Need
    for Post-Surgical Ophthalmology and
    Neuro-Ophthalmology Care and Treatment

2)  The Record Supports the District Court's Finding    54
    That Ms. Urizar-Mota Sustained Permanent
    Cerebellar Injuries During Her June 24, 2019
    Tumor Resection Surgery as a Proximate
    Result of the Government's Negligent Delay
    in Diagnosing and Treating Ms. Urizar-Mota's
    Pilocytic Astrocytoma Brain Tumor, and the
    Cerebellar Injuries Resulted in the Need for
    Extensive Post-Surgical Rehabilitation
    and Follow-Up Care

D.  The District Court's Award Was Well Supported by the    58
    Record and Consistent With Rhode Island Law

IV.  The District Court Applied the Correct Legal Standard    61
     and Made Factual Findings Supported by Primary Care
     Expert Testimony Grounded in Sufficient Facts and
     Data that PCHC Providers Breached the Applicable
     Standard of Care

A.  Dr. Russell Phillips Has the Requisite Knowledge,    62
    Training, Education, and Experience to Testify to the
    Applicable Standard of Care for a Primary Care Provider
    Treating a Patient Like Ms. Urizar-Mota

iv

B. The Government's Assertion of "Inconsistency" Misstates Both the Testimony and the Court's Finding    64

C. The District Court's Findings On "Red Flags" Are Grounded in Expert Consensus and Record Evidence    68

D. The Government Misstates Both the Medical Literature and the Record    69

E. Ms. Urizar-Mota's "Red Flags" Were Documented in the Medical Record, Not Invented After the Fact    70

F. The Patient's Documented History of Spousal Abuse Heightened—Not Diminished—the Duty to Obtain Imaging    72

G. The District Court Properly Found a Persistent and 715Progressive Headache Pattern; The Government's "Gaps in Symptoms" Claim Misstates the Record    74

CONCLUSION    77

# TABLE OF AUTHORITIES

**Cases**                                                                                                  **Pages**

*Addamax Corp. v. Open Software Found., Inc.,*
  152 F.3d 48, 55 ……………………………………………………  11

*Anderson v. City of Bessemer City, N.C.,*
470 U.S. 564, 573-74 (1985) ……………………… 12, 13, 14, 47, 60, 77

*Boyce v. United States*, 942 F.Supp. 1220,
1222-23 (E.D. Mo 1996) ………………………………………………… 21

*Bruno v. Caianiello*, 404 A.2d 62, 65 (R.I. 1979) ……………………. 27

*Carr v. PMS Fishing Corp.*, 191 F.3d 1, 6,
(1st Cir. 1999) …………………………………………………… 12

*Coska v. United States*, 114 F.3d 319, 323
(1st Cir. 1997) …………………………………… 5, 6, 12, 15, 17, 21

*Daubert v. Merell Dow Pharms., Inc.*, 509 U.S. 579, 589
(1993) …………………………………………………….. 28, 39, 62

*Desjarlais v. USAA Ins. Co*, 824 A.2d 1272
 (R.I. 2003) …………………………………………………… 19

*Durkert v. United States*, No. CV-14-506. J J/W PL 2016 WL
10721 258 (D.NM. Jan 5, 2016) ……………………………………… 21

*Flanagan v. Wesselhoeft*, 712 A.2d 365, 367–68
(R.I. 1998) …………………………………………………… 64

*Forcier v. Metropolitan Life Ins. Co*., 469 F.3d 178, 187
(1st Cir. 2006) …………………………………………………… 24

*GA Corp v. United States,* 818 F.2d 901, 919 (DC Cir. 1987) …….….. 21

vi

*Governor Wentworth Reg'l Sch. Dist. v. Hendrickson*, 201
Fed.Appx. 7, 9 (1st Cir. 2006) …………………………………….… 25

*Hardiman v. U.S.*, 752 F.Supp 52 (1989) …………………………… 21

*Ho-Rath v. Rhode Island Hospital*, 89 A.3d 806, 820-821
(R.I. 2015) ……………………………………………………………… 19

*Holloway v. United States*, 845 F.3d 487, 490
(1ˢᵗ Cir. 2017) ……………………………………………… 6, 12, 15, 21

*House of Flavors, Inc. v. TFG Mich.*, L.P., 643 F.3d 35, 39
(1st Cir. 2011) …………………………………………………… 24

*Jackson v. Choquette & Co., Inc.*, 80 A.2d
164, 1679 (1951) …………………………………………………… 61

*Keller v. United States*, 38 F.3d 16, 25 (1st Cir. 1994) …….……….. 14

*Kokaras v. United States*, 980 F.2d 20 (1ˢᵗ Cir. 1992) ………………… 16, 17

*Kurczy v. St. Joseph Veterans Ass'n, Inc.*, 713 A.2d
766, 771 (R.I. 1998) …………………………………………….. 49

*Ladouceur v. Hanover Insurance Co.*, 682 A.2d 467
(R.I. 1996) …………………………………………………….… 18

*Leahey v. State*, 397 A.2d 509, 510 (R.I. 1979) ……………………… 34

*Limone v. U.S.*, 579 F.3d 79, 103 (1st Cir. 2009) ………………….... 14

*Lopez v. U.S.*, 758 F.2d 806, 809-810 (1ˢᵗ Cir. 1985) ….……… 15, 16, 21

*McCoy v. Cataldo*, 148 A.2d 267, 330 (R.I. 1959) ……………………48

*Mitchell v. U.S.*, 141 F.3d 8, 17 (1st Cir. 1998) ……………………. 13, 14, 34

*N. Ins. Co. of New York v. Point Judith Marina, LLC*, 579 F.3d
61, 67 (1st Cir. 2009) …………………………………………… 12

*Nevor v. Moneypenny Holdings, LLC*, 842 F.3d 113, 119
(1st Cir. 2016) ………………………….…………..11, 12, 13, 14

*Payton v. Abbott Labs*, 780 F.2d 147, 155 (1st Cir. 1985) …………… 34

*Proffit v. Ricci*, 463 A.2d 514, 518 (R.I. 1983) ………………………..48

*Rangolan v. County of Nassau*, 370 F.3d 239 248 (2nd Cir 2004) ……..21

*Reilly v. U.S.*, 863 F.2d 149, 167 (1st Cir. 1988) ………………………13

*Riley v. Stone*, 900 A.2d. 1087, 1095 (R.I. 2006) ……………..…… 62

*Santiago-Ramirez v. Secretary of Department of Defense*,
984 F.2d 16, 20 (1st Cir. 1993) ……………………… 5, 12, 14, 15, 16, 17, 19

*Seven Words, LLC v. Network Solutions*, 260 F.2d 1089, 1096
(9th Cir. 2001) …………………………………………….. 7, 24

*Sheeley v. Memorial Hospital*, 710 A.2d 161, 167 (R.I. 1998) ……. 74

*Shepardson v. Consolidated Medical Equipment, Inc.* 714 A.2d
1181, 1183-1185 (1998) ……………………………………..… 61

*Smith v. F.W. Morse & Co.*, 76 F.3d 413, 420 (1st Cir. 1996) ………… 13

*Soma v. Cardi Corp*, 369 A.2d 432, 433 (R.I. 1990) ………………… 18

*State v. D'Alessio*, 848 A.2d 1118, 1123 (R.I. 2004) ………………… 34

*Town of Portsmouth v. Lewis*, 813 F.3d 54, 61 (1st Cir. 2016) ….. 7, 24, 25

*Trindade v. Spirvak*, 91 F.4th 486, 492-493 (1st Cir. 2024) …………… 77

*United States v. Martin*, 651 F.2d 24, 31 (1st Cir. 1981) ….…….…. 24, 25

*United States v. Yellow Cab Co*., 338 U.S. 338, 342 (1949) ….……... 13

*Wood v. Paolino*, 315 A.2d 744, 746 (R.I. 1974) ……………………... 27

*Worsley v. Corcelli*, 377 A.2d 215, 219 (R.I. 1997) …………………... 28

**Statutes**

28 U.S.C. § 1346(b)…………………………………………………...1

28 U.S.C. § 2675(a) …………………………………………………...12, 14

28. U.S.C. § 2401(b) …………………………………………………...15

R.I. Gen. Law § 9-1-47 …………………………………………… 8, 22

## STATEMENT OF THE ISSUES

1.     Did the district court err in denying the government's motion to dismiss the claims of Plaintiff Lucia Urizar-Mota's four children, Delmy Reyes, S.R., W.R., and G.R. (collectively, "the Reyes Plaintiffs") and in awarding them $3,500,000.00 in damages?

2.     Did the district court abuse its discretion in awarding Ms. Urizar-Mota $2,920,000.00 for her loss as a homemaker?

3.     Did the district court commit clear error in awarding Ms. Urizar-Mota $662,194.02 in medical expenses and $6,387,500.00 in post-diagnosis pain and suffering?

4.     Did the district court commit clear error in crediting the testimony of Plaintiffs' primary care expert concerning the standard of care for treating patients with headaches and the government's breach of that standard of care?

## STATEMENT OF THE CASE AND PROCEDURAL HISTORY

This appeal arises from a medical malpractice action brought under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), against the United States of America on behalf of Lucia Urizar-Mota and her four children, the Reyes Plaintiffs. Ms. Urizar-Mota sought damages for permanent catastrophic injuries caused by Providence Community Health Center's ("PCHC") negligent care and

treatment of Ms. Urizar-Mota between November 2012 through June of 2019 when they failed to perform the necessary evaluation of Ms. Urizar-Mota based on her signs and symptoms, including the failure to order and perform neuroimaging or refer her to a neurologist to investigate the cause of her headaches accompanied by a red flag(s), which would have resulted in an earlier diagnosis of her pilocytic astrocytoma brain tumor and prevented severe and permanent neurological injuries. As a result of PCHC's failure, Ms. Urizar-Mota suffered permanent eye movement and vision abnormalities, movement disorders abnormalities that impair motor function in her left arm, left hand, and left leg, and balance and gait issues that prevent her from walking without mobility aids. These injuries profoundly impact her activities of daily living and her ability to care for and interact with her family. In addition to Ms. Urizar-Mota's claims, the Reyes Plaintiffs brought derivative claims for loss of parental consortium under Rhode Island law.

Before filing suit, Ms. Urizar-Mota submitted a detailed six (6) page letter and completed Standard Form 95 ("SF-95") to the Department of Health and Human Services ("HHS"), describing the negligent care, her injuries, their profound effects on her family, and demanding $20,000,000.00 in damages. HHS denied the claim and the instant lawsuit was filed in the United States District Court for the District of Rhode Island.

The district court conducted a bench trial, during which the plaintiffs proved that the government breached the standard of care for a reasonably competent primary care provider treating a patient like Ms. Urizar-Mota numerous times during their seven years of treatment of Ms. Urizar-Mota, between November 2012 through June 2019, when they chose not to order neuroimaging or refer her to a neurologist to investigate the possible causes of her headaches and accompanying red flag(s).

Further, plaintiffs proved that as a result of PCHC's negligence between 2012 and 2019, Ms. Urizar-Mota's brain tumor went undiagnosed and untreated, during which time it grew larger and closer to the brainstem, caused a severe increase in intracranial pressure, and in June 2019, hemorrhaged and resulted in life-threatening acute obstructive hydrocephalus, brain swelling and edema, and cranial nerve injuries.

Plaintiffs proved that as a result of the delay in diagnosing and treating her tumor, and Ms. Urizar-Mota's resulting aforementioned condition and injuries in June 2019, the treatment for Ms. Urizar-Mota's tumor in June 2019—tumor resection surgery—was performed under conditions that significantly increased the risks of neurological injury and complication. Had surgery to resect her tumor been performed at an earlier date, between 2012 and 2018, prior to the growth of the tumor and development of the aforementioned conditions, it is more likely than not that

Ms. Urizar-Mota's tumor would have been resected successfully without causing permanent neurological injury or complication.

Based upon the evidence presented at trial, the United States District Court for the District of Rhode Island entered judgment in favor of the plaintiffs, awarding the following damages to Ms. Urizar-Mota:

| | |
|---|---|
| Medical Expenses | $662,194.62 |
| Pain & Suffering—pre-diagnosis | $240,800.00 |
| Pain & Suffering—post diagnosis | $6,387,500.00 |
| Homemaker Loss | $2,920,000.00 |

G.Add.38-39, ¶ 140. Additionally, the district court awarded $3,500,000.00 in loss of consortium damages to the Reyes Plaintiffs. G.Add. 39, ¶¶ 142-143.

The government appealed.

## SUMMARY OF ARGUMENT

1. **Loss of Consortium Claims:** The Government's jurisdictional challenge is inconsistent with the FTCA's text, this Court's precedent, Rhode Island law, and the well-reasoned findings of the district court. Section 2675(a) requires only that the claimant provide the government with sufficient information to investigate the claims and a demand for a sum certain. It does not require hyper-technical compliance, nor does it demand separate administrative filings for every derivative claim arising from the same alleged tort.

Lucia Urizar-Mota's administrative submission easily satisfied the presentment requirement. The information in the administrative submission, including the completed SF-95 and detailed six-page letter, described the negligent medical care, the nature of Ms. Urizar-Mota's injuries and their impact on her and her family, and a global sum certain of $20,000,000 in damages. It provided HHS with "sufficient information to investigate the claims" and "the amount of damages sought" which is all the statute demands. *Santiago-Ramirez v. Secretary of Department of Defense*, 984 F.2d 16, 20 (1st Cir. 1993); *Coska v. United States*, 114 F.3d 319, 323 (1st Cir. 1997). It allowed HHS to investigate the claim and consider settlement—the statute's core purpose. As the district court found, "[a] practical and reasonable read of the six-page detailed notice to the Government is that the medical negligence of PCHC injured Ms. Urizar-Mota and her family," and "it therefore fulfills the notice of claim requirement." G.Add.6.

Rhode Island law treats loss of consortium as a derivative claim—it "solely derive[s] from those of the injured family member." G.Add.5. Because these claims cannot exist independently of Ms. Urizar-Mota's claim, separate presentment was unnecessary and cumulative. The Government's contrary position elevates form over substance and undermines both congressional intent and the FTCA's remedial purpose.

This Court has long instructed that Section 2675(a) must be applied "leniently and flexibly in a pragmatic and not woodenly way." *Holloway v. United States*, 845 F.3d 487, 490 (1ˢᵗ Cir. 2017) (quoting *Coska*, 114 F.3d at 323). The district court correctly applied that standard here. Its decision should be affirmed.

2.     **Homemaker Services**: Despite the district court's clear decision to award Ms. Urizar-Mota damages for her loss as a homemaker, the government inaccurately characterizes Ms. Urizar-Mota's award as an award for lost wages. The government repeats this mischaracterization to suggest that it was prejudiced by the award because Ms. Urizar-Mota never sought damages for lost wages. Ms. Urizar-Mota did not seek damages for lost wages. She did, however, seek damages for her loss as a homemaker. Plaintiffs explicitly plead for relief for her loss as a homemaker in her complaint. *See* Plaintiffs' Complaint Doc. No. 1, at 4 ¶ 18 (As a result of the government's negligence, Ms. Urizar-Mota "is no longer able to manage her household and her activities of daily living."). The complaint undoubtedly put the government on notice that it was seeking damages for Ms. Urizar-Mota's inability to manage her household and daily activities—damages for her loss as a homemaker—and therefore the government's claim that they lacked notice or were otherwise prejudiced by the award is wholly unsupported by the record.

Furthermore, even if Ms. Urizar-Mota did not specifically demand damages for loss as a homemaker in her complaint, the district court's award for such damages

is supported by Rule 54(c) of the Federal Rules of Civil Procedure. Rule 54(c) provides that "[e]very other final judgment should grant the relief to which each party is entitled even if the party has not demanded that relief in its pleadings." The purpose of this Rule is to prevent procedural technicalities from defeating substantial justice: if the proof at trial supports a certain form of relief, the court may award it, even if the precise label or measure of damages was not specified in advance. *See Seven Words, LLC v. Network Solutions*, 260 F.2d 1089, 1096 (9th Cir. 2001). So long as the opposing party is on notice of the nature of the claims and has a fair opportunity to litigate it, the district court may grant any form of relief supported by the record. *See Town of Portsmouth v. Lewis*, 813 F.3d 54, 61 (1st Cir. 2016).

Here, Ms. Urizar-Mota consistently sought compensatory damages for the consequences of her catastrophic neurological injuries, including her loss of capacity as a homemaker. The government had notice throughout the proceedings that such damages were at issue, conducted discovery on them and contested them at trial. They cannot now claim prejudice.

Furthermore, this award is supported by the trial record. The testimony of Ms. Urizar-Mota, her daughter Delmy, and plaintiffs' neurologist expert Dr. David Caplan form a strong basis for this award in the trial record. Their testimony established that prior to Ms. Urizar-Mota's life-changing injuries, she was her family's homemaker, which encompassed duties such as cleaning, cooking,

organizing, grocery shopping, management schedules, and caring for her family members. The testimony also established that as a result of her severe and permanent neurological injuries, she can no longer care for her home and perform her usual household and other activities. Rhode Island law is clear that expert testimony is not required to prove the value of lost homemaker services. *See* R.I. Gen. Law § 9-1-47.

3. <u>**Causation:**</u> The district court's causation findings and resulting damages awards are supported by the record. Dr. David Ashley, plaintiffs' neuro-oncology expert, testified to his unique knowledge, training, and experience treating pilocytic astrocytoma brain tumors as the Director of the Preston Robert Trisch Brain Tumor Center at Duke University—the largest brain tumor center in the country. He testified to the successful use of adjuvant therapies to treat and shrink pilocytic astrocytoma brain tumors that are not amendable to safe surgical resection since 2017, and credibly opined that these therapies would have been available to treat Ms. Urizar-Mota's brain tumor had it been diagnosed in 2017, 2018, or prior the diagnosis of her tumor and life-threatening obstructive hydrocephalus in June 2019.

Furthermore, both Dr. Ashley and the government's neurosurgeon Dr. Timothy Smith testified to a reasonable degree of medical probability that more than ninety percent (90%) of patients who undergo surgical resection of a pilocytic astrocytoma brain tumor in the same region of the brain as Ms. Urizar-Mota's tumor

do not experience permanent neurological injuries during or after the surgery. The record supports that this type of tumor resection surgery, under stable conditions, has a high risk of success and low risk of injury.

Additionally, the record supports that Ms. Urizar-Mota's surgical resection was not performed under stable conditions. By the time she underwent surgery to resect her tumor, her tumor had grown in size and was closer to the floor of the fourth ventricle and brainstem, and it had caused severe intracranial pressure which resulted in significant brain swelling and edema and intraventricular hemorrhage. The hemorrhage and resulting blood in the ventricular system and surrounding the tumor increased Ms. Urizar-Mota's risk of stroke. Ultimately, the delay in the diagnosis of her tumor transformed what would have been a relatively routine surgery into a complex and high-risk operation.

Had the surgery to resect her tumor been performed at an earlier date when Ms. Urizar-Mota's tumor was smaller and further from the floor of the fourth ventricle and brainstem, before the hemorrhage and the onset of obstructive hydrocephalus, brain swelling, and cranial nerve injury, it is more likely than not that her tumor would have been resected successfully without causing any permanent neurological injury or complication. Therefore, if performed earlier, she would not have needed the extensive follow-up medical care and rehabilitation that she needed

to treat her permanent neurological injuries that resulted from the negligent delay in diagnosis and treatment.

4.    **<u>Standard of Care:</u>** The district court's standard of care findings are supported by the record. Dr. Russell Phillips, plaintiffs' primary care expert, testified to his nearly forty-year career as a primary care physician treating patients with headaches and teaching residents and fellows how to properly do the same pursuant to the applicable standard of care.

Contrary to the government's suggestion, Dr. Phillips' testimony on the applicable standard of care and the government's breaches of that standard of care were credible and consistent. Dr. Phillips' testimony that the standard of care for a primary care provider treating a patient presenting with a headache accompanied by any "red flag" requires the provider to order neuroimaging is supported not only by his own clinical training and experience, but by widely-accepted peer-reviewed medical literature. Furthermore, his testimony about what constitutes a "red flag," and thus what signs and symptoms warrant neuroimaging, was fully supported by the medical literature.

The government points to isolated lines in Dr. Phillips' testimony to suggest he was inconsistent or impeached, but when those isolated lines are read in the full context of his testimony, it is clear that Dr. Phillips applied the standard of care consistently and uniformly throughout Ms. Urizar-Mota's visits with the PCHC.

Dr. Phillips opinions, and the district court's related findings, also find support in the medical chart, where Ms. Urizar-Mota's history of progressive and atypical headaches that constantly change in pattern and evolve into neurological deficits between 2012 and 2016 are clearly documented by her providers. Additionally, Ms. Urizar-Mota's longstanding history of victim partner abuse, raising concern for posttraumatic onset of headache—a "red flag"—is also well-documented.

## STANDARDS OF REVIEW

Rule 52(a)(1) requires that the court "find facts specifically and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). This rule, however, has limits. After a bench trial, the "district court [is] not required to make findings on every detail, [is] not required to discuss all of the evidence that supports each of the findings made, and [is] not required to respond individually to each evidentiary or factual contention made by the losing side." *Nevor v. Moneypenny Holdings, LLC*, 842 F.3d 113, 119 (1st Cir. 2016) (quoting *Addamax Corp. v. Open Software Found., Inc*., 152 F.3d 48, 55 (1st Cir. 1988)).

## I. Legal Conclusions

This Court reviews a district court's legal conclusions *de novo*. *Villanueva v. United States*, 662 F.3d 124, 126 (1st Cir. 2011). Whether a plaintiff has satisfied the FTCA's presentment requirement is a question of law and is thus reviewed *de novo*.

*Holloway*, 843 F.3d at 490. In applying 28 U.S.C. §2675(a), however, this Court has long instructed district courts to adopt a "lenient and flexible" approach and to construe the statute "pragmatically and not woodenly." *Id. (*quoting *Coska*, 114 F.3d at 323). The only question is whether the agency received "sufficient information to investigate the claims and a sum certain of damages." *Santiago-Ramirez,* 984 F.2d at 20.

## II. Findings of Fact

This Court reviews findings of fact for "clear error." Fed. R. Civ. P. 52(a)(6); *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573-74 (1985). Proof of the elements of negligence and causation in a medical negligence case are issues of fact, and thus review of the district court's negligence and causation findings are for clear error. *See N. Ins. Co. of New York v. Point Judith Marina, LLC*, 579 F.3d 61, 67 (1st Cir. 2009) ("Where, as here, the district court conducts a bench trial and serves as the factfinder, its determinations of negligence, proximate cause, and similar issues are entitled to considerable deference…. Specifically, such a review is for clear error.").

Under this standard, the reviewing Court may set aside the district court's findings "only if, on the entire evidence, [they] are left with the definite and firm conviction that a mistake has been committed." *Nevor*, 842 F.3d at 117; *see also Carr v. PMS Fishing Corp.*, 191 F.3d 1, 6, (1st Cir. 1999) (reviewing court will

disturb factual findings of lower court during bench trial "only if, after reviewing the record as a whole, it comes away with an abiding conviction that the factfinder stumbled badly"). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson,* 470 U.S. at 574-75. Furthermore, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* (citing *United States v. Yellow Cab Co*., 338 U.S. 338, 342 (1949).

"This deferential standard extends not only to factual findings simpliciter but also to inferences drawn from the underlying facts." *Smith v. F.W. Morse & Co*., 76 F.3d 413, 420 (1st Cir. 1996). The "clear error" standard also extends to findings based in whole or in part on expert testimony. *Nevor*, 842 F.3d at 117. Trial judges acting as fact finders are given "considerable leeway in choosing among the views of experts and in determining the weight and value to be assigned to the opinions of each expert." *Id.* at 118 (quoting *Reilly v. U.S*., 863 F.2d 149, 167 (1st Cir. 1988)).

Additionally, it applies to findings based on the credibility of witnesses. *See* Fed. R. Civ. P. 52(a)(6) ("due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses"). "[A] credibility determination is clearly erroneous only when it is based on testimony that was inherently implausible,

internally inconsistent, or critically impeached." *Mitchell v. U.S.*, 141 F.3d 8, 17 (1st Cir. 1998) (citing *Keller v. United States*, 38 F.3d 16, 25 (1st Cir. 1994)). Therefore, "when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and factually plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Anderson,* 470 U.S. at 575.

## III.  Damages

As for damages, the district court's conclusions are reviewed for abuse of discretion. *Nevor*, 842 F.3d at 120. The damages award will stand unless it "shock[s] our collective conscious or raise[s] the specter of a miscarriage of justice." *Id.* (quoting *Limone v. U.S.*, 579 F.3d 79, 103 (1st Cir. 2009)).

## ARGUMENT

## I.  The District Court Properly Exercised Jurisdiction Over All Claims Because the FTCA's Presentment Requirement was Satisfied.

### A. Section 2675(a) Requires Only Sufficient Information and a Sum Certain

Congress enacted the FTCA to allow individuals injured by the negligence of federal employees to be able to seek redress, but conditioned that waiver of sovereign immunity on the presentation of claims to the appropriate federal agency before litigation could be commenced by a claimant. *See* 28 U.S.C. §2675(a). To satisfy the presentment requirement, a claimant must provide "(1) sufficient

information to the agency to investigate the claims, and (2) the amount of damages sought." *Santiago-Ramirez*, 984 F.2d at 20 (quoting *Lopez v. U.S.*, 758 F.2d 806, 809-810 (1st Cir. 1985)). Neither the statute nor the regulations impose additional requirements. *See* 28 C.F. R. §14.4(a).[1]

This Court has repeatedly rejected attempts to try to impose technical barriers to FTCA claims and has emphasized that Section 2675(a) must be construed pragmatically and not woodenly. Even unartfully drafted claims may survive if they give the government sufficient notice of the injury and claims to allow it to investigate the plaintiff's claims. *See Holloway*, 845 F.3d at 491; *Lopez*, 758 at 809-10 (1st Cir. 1985) (Because the administrative requirements are "not intended to put up a barrier of technicalities to defeat [the] claims" of individuals wishing to sue the government, the court must determine whether the submitted documentation by the claimant satisfies the purpose of the administrative requirement, rather than assess whether the claimant has strictly and uniformly adhered to every single administrative step.). The District Court adhered to this framework, citing *Coska* and *Holloway*, and emphasized that "the purpose of the FTCA's notice requirement is to

---

[1] "For purposes of the provisions of 28. U.S.C. 2401(b) … a claim shall be deemed to have been presented when a federal agency receives from a claimant… an executed Standard Form 95 or other written notification of an incident, accompanied by a claim for money damages in a sum certain for injury… alleged to have occurred by reason of the incident …" 28 C.F.R. See 14.2(a).

encourage administrative settlement of claims against the United States and to prevent unnecessary burdening of the courts," and that the requirement "is designed to give notice to the government sufficient to allow it to investigate the alleged negligent episode to determine if settlement would be in the best interests of all." G.add.4. This is precisely what occurred here.

### B. Ms. Urizar-Mota's Administrative Submission Provided HHS with All the Information Needed to Investigate and Evaluate the Claims

Lucia Urizar-Mota's administrative filings satisfied Section 2675(a) in every respect. Her six-page letter and SF-95 submission described:

1. The negligent failure of the PCHC to recognize and diagnose a pilocytic astrocytoma;

2. The severe neurological injuries she suffered as a result;

3. The impact of those injuries on her ability to care for and interact with her children; and

4. A demand for $20,000,000.00 in damages.

G.App.1. 75-82.

This information is more than sufficient to permit HHS to investigate the claims, assess liability, and evaluate settlement. As stated previously, "This circuit approaches the notice requirement leniently, recognizing that individuals wishing to sue the Government must comply with the details of the law, but also keeping in mind that the law was not intended to put up a barrier of technicalities to defeat their claims." *Santiago-Ramirez*, 984 F.2d at 485 (*Lopez,* 758 at 809); *see also Kokaras v.*

*United States*, 980 F.2d 20 (1ˢᵗ Cir. 1992) ("… saving a claim that is flawed when the government's investigatory needs are satisfied.")

In following this Court's admonitions for a liberal reading of Section 2675(a) required by *Santiago Ramirez* and other Federal case law, the district court found, "the language of the administrative claim served due notice that the government should investigate the possibility of specific conduct (the medical negligence of the PCHC) and it included a specification of the damages sought ($20 million); it therefore fulfills the notice of claim requirement." G.Add.6.

Moreover, the government does not and cannot argue that it lacked information necessary to investigate the claim or that it was prejudiced by the absence of separate SF-95s for the Reyes Plaintiffs. Under this Court's precedent, that is fatal to its argument. "The purpose of Section 2675(a) is to allow the government to investigate the claim … not to require the claimant to prove it at the administrative level." *Coska*, 114 F.3d at 323.

The record demonstrates that the agency was on notice of the nature and scope of the claims, including the derivative harm suffered by Ms. Urizar-Mota's family. The Government had every opportunity to investigate and resolve the matter administratively. That is all Section 2675(a) requires.

### C. Rhode Island Law Treats Loss of Consortium Claims as Derivative, Requiring No Separate Presentment

Even if Section 2675(a) required individualized presentment for independent claims, that principle would not apply here because, under settled Rhode Island law, loss of consortium claims are not independent torts. They are derivative causes of actions that "solely derive from those of the injured family member." G.Add.5. As such, they rise and fall with the underlying tort claim and do not require separate administrative filings.

### 1) Rhode Island Courts Have Consistently Classified Loss of Consortium Claims as Derivative

The Rhode Island Supreme Court has long held that claims for loss of consortium—whether brought by a spouse, a parent or a child—are wholly dependent on the underlying injury claim. In *Ladouceur v. Hanover Insurance Co.*, 682 A.2d 467 (R.I. 1996), the court addressed a wife and daughter's consortium claims arising from injuries to the husband/father. The court characterized those claims as "derivative," explaining that they were "contingent upon the viability of the injured party's cause of action." *Id.*at 468.

Likewise, in *Soma v. Cardi Corp*, 369 A.2d 432, 433 (R.I. 1990), the Rhode Island Supreme Court reaffirmed that "[a] spouse's cause of action for loss of consortium as derivative of the injured party's right to recover for personal injuries." If the injured party's claim fails, the derivative claim fails with it. *Id.* And in

*Desjarlais v. USAA Ins. Co*, 824 A.2d 1272 (R.I. 2003), the court reiterated that principle.

Indeed, the same principle applies to parental and child consortium claims. In *Ho-Rath v. Rhode Island Hospital*, 89 A.3d 806, 820-821 (R.I. 2015), the Rhode Island Supreme Court emphasized that parents' claims for loss of society and companionship are derivative of the child's underlying personal injury claim. The court rejected the mechanical application of the statute of limitations to parental consortium claim, reasoning that because those claims are "wholly derivative" of the injured party's cause of action, they must be treated consistently with that action. *Id*. at 823. This line of Rhode Island precedent leaves no doubt that consortium claims have no independent legal existence. They depend entirely on the success and viability of the underlying tort claim. If that claim is timely presented and properly before the court, the derivative consortium claims are as well.

### 2) Derivative Status Eliminates the Need for Separate Administrative Presentment

Because consortium claims are derivative, requiring separate administrative filings for each derivative claimant serves no purpose and contradicts the logic of Section 2675(a). This Court has held that the FTCA's notice requirement is satisfied when the agency receives "sufficient information" to investigate the claim and a sum certain of damages. *Santiago-Ramirez*, 984 F.2d at 20. That standard was met here. Ms. Urizar-Mota's SF-95 and detailed letter describes the negligent conduct, the

resulting injuries, their impact on her family and the damages sought. The derivative nature of the Reyes Plaintiffs' claims makes clear that this notice sufficed for them as well. Their claims are not based on separate events or independent legal theories. They are solely out of the same negligent failure to diagnose a polycystic astrocytoma – the same conduct that injured their mother. Requiring each child to file a separate SF-95 would do nothing to advance the FTCA's purpose of enabling the government to investigate and consider settlement. It would serve only as a technical trap for the unwary.

The district court correctly embraced this logic. It concluded that because "spouses and children's causes of action for loss of consortium solely derived from those of the injured family member," the presentment requirement must be applied with "leniency" and "flexibility," and the plaintiff's submission was sufficient to cover all claims. G.Add.5-6. That holding is fully consistent with the Rhode Island law and this Court's precedent.

### D. The Government's Approach Contravenes Precedent, Purpose, and Policy

The government's argument that each consortium claimant must independently comply with Section 2675(a) is inconsistent with Rhode Island law, but also with the FTCA's text and purpose. Courts across the country have repeatedly rejected similar attempts to impose hyper-technical barriers to relief under the Act.

"The cause of action for loss of consortium is designed to compensate for the injury to the marital (parent-child) relationship" and to "the interest of the injured party's spouse (child) in the continuance of a healthy and happy… life…." *Rangolan v. County of Nassau*, 370 F.3d 239 248 (2nd Cir 2004) (internal citations omitted). A spouse or child need not file a separate loss of consortium claim so long as the injured party's claim contains all of the requirements for the loss of consortium claim. *See Boyce v. United States*, 942 F.Supp. 1220, 1222-23 (E.D. Mo 1996); *see also Durkert v. United States*, No. CV-14-506. J J/W PL 2016 WL 10721 258 (D.NM. Jan 5, 2016); *Lopez v. United States*, 748 F.2d 806 (1st Cir 1985); *GA Corp v. United States,* 818 F.2d 901, 919 (DC Cir. 1987); *Hardiman v. U.S.*, 752 F.Supp 52 (1989); *Lopez v. U.S.*, 904 F.Supp 863 (1995).

### 1) The FTCA's Purpose is to Facilitate Settlement, Not Trap Claimants

As this court has repeatedly emphasized, "The purpose of the FTCA's notice requirement is to give the government sufficient notice to enable it to investigate and evaluate the claims and, if appropriate, settle it without the expense of litigation." *Coska*, 114 F.3d at 323. It is not to require "magic words" or rigid formalities. *Holloway,* 845 F.3d at 490. The government's rule would do precisely what *Coska* and *Holloway* warned against. It would transform Section 2675(a) into a jurisdictional snare, barring derivative claims even when the agency had all the

information necessary to investigate and resolve them. The FTCA's administrative process is intended to be informal, accessible, and focused on substance over form.

Here, the government had everything it needed to evaluate the case and decide whether to settle it. It suffered no prejudice from the absence of a separate SF-95s and its investigation would have been identical whether the Reyes Plaintiffs filed their own forms or not.

## II. The District Court's Damages Award for Homemaker Services Did Not Violate Rule 54(c)

### A. Rhode Island Law Specifically Allows an Injured Homemaker to Recover Damages for Their Loss as a Homemaker

Pursuant to Rhode Island General Law, damages for the loss as a homemaker are recoverable:

> In any suit for damages as a result of personal injuries, a homemaker may recover the fair value of homemaker services provided to the home and those living therein. **A "homemaker" as used herein is a person who has primary responsibility for the care of a home and a family and who receives no direct monetary compensation for those duties.** The fair value of homemaker services shall not be limited to money actually expended to replace the services usually provided by the homemaker. In such a suit, the value of the homemaker services may be shown by expert testimony, but such testimony is not required.

R.I. Gen. Laws § 9-1-47 (emphasis added). It is undisputed that Ms. Urizar-Mota was a "homemaker" as defined above. Prior to her injuries resulting from the government's negligence, Ms. Urizar-Mota had primary responsibility for her family's home, which included caring for her and her husband's four children and

performing all of the housework, cleaning, and cooking. Due to the government's negligence, and Ms. Urizar-Mota's resulting permanent neurological injuries, Ms. Urizar-Mota lost the ability to perform these homemaker services, and therefore, sought compensation for that loss in her action against the government. *See* G.App.1. 15-20.

### B. Plaintiffs Adequately Plead and Sought Damages for Homemaker Services

Plaintiffs' complaint in the instant action is clear—the plaintiffs brought claims of negligence against the government and demanded "judgment against defendant United States of America in an amount sufficient to establish the jurisdiction of this Court plus interest and costs and whatever further relief this Honorable Court deems appropriate." *Id.* at 5, 7-9. Furthermore, plaintiffs pled that as a result of the government's negligence, Ms. Urizar Mota "is no longer able to manage her household and her activities of daily living." *Id.* at 4 ¶ 18. Additionally, plaintiffs pled that Ms. Urizar-Mota "suffered severe and permanent injuries to her mind and body, … has endured and will in the future endure extreme mental pain and suffering and emotional distress, has been and will in the future be unable to perform her usual activities, and will suffer loss of enjoyment of life, …." Id. at 4, ¶ 5.

It is well-understood from the plaintiffs' complaint that plaintiffs sought damages for Ms. Urizar-Mota's catastrophic injuries, including the loss of her ability

to manage her household as a wife and mother of four children. The government was on notice at all times that such damages were part of the relief being sought by plaintiffs. Plaintiffs never amended its complaint or otherwise stipulated that it was not seeking damages for Ms. Urizar-Mota's inability to manage her household and perform her usual activities. The government cannot credibly claim prejudice over the district court's award of damages for Ms. Urizar-Mota's loss as a homemaker.

### C. In the Alternative, Rule 54(c) Supports the District Court's Award of Damages for Ms. Urizar-Mota's Loss as a Homemaker

Rule 54(c) of the Federal Rules of Civil Procedure provides: "A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings. **Every other final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings**." (emphasis added). "Pursuant to this Rule, a district court may grant relief not sought in the complaint." *Town of Portsmouth, R.I.*, 813 F.3d at 61 (citing *House of Flavors, Inc. v. TFG Mich.*, L.P., 643 F.3d 35, 39 (1st Cir. 2011)). The Rule "allows the district court to award damages if [the plaintiffs] prove[ ] facts entitling it to relief even though [plaintiffs] never requested damages." *Seven Words LLC*, 260 F.3d at 1096. In this Circuit, Rule 54(c) "has been liberally construed, leaving no question that it is the court's duty to grant whatever relief is appropriate in the case on the facts proved." *Forcier v. Metropolitan Life Ins. Co.*, 469 F.3d 178, 187 (1st Cir. 2006) (quoting *United States v. Martin*, 651 F.2d 24, 31 (1st Cir. 1981)).

The Rule, although liberal, has its limits. "A district court need not consider remedies based on a cause of action not pled in the complaint." *Town of Portsmouth, R.I.*, 813 F.3d at 61 (citing *Governor Wentworth Reg'l Sch. Dist. v. Hendrickson*, 201 Fed.Appx. 7, 9 (1st Cir. 2006) (per curiam)). Additionally, if the district court finds that a party's failure to request relief so prejudiced the other party that granting relief would be unjust, the district court need not grant such relief. *Id.* (citing *Martin*, 651 F.2d at 31).

Based upon the plaintiffs' complaint, it is undisputed that the damages awarded by the district court are based upon causes of action—namely negligence—pled in plaintiffs' complaint. Furthermore, as set forth above, the government cannot claim surprise or prejudice based on the information contained within plaintiffs' complaint, the discovery in this case, or the evidence presented at trial. In arguing prejudice, the government incorrectly conflates loss of earning capacity with homemaker services. Contrary to the government's suggestion, plaintiff never disclaimed or disavowed damages for Ms. Urizar-Mota's loss as a homemaker. Plaintiffs, did, however, forego a claim for loss of earning capacity. *See* G.App.1. 12-30; *see also* G.App.1.2363, ¶ 642. The two forms of relief are separate and distinct.

## D. The Trial Record Strongly Supports the Award for Damages for Ms. Urizar-Mota's Loss as a Homemaker

Ms. Urizar-Mota's loss of ability to manage her household, and the district court's award of damages for this loss, finds strong support in the trial record. Plaintiffs introduced a video of Ms. Urizar-Mota that depicts the impact her neurological injuries have on her ability, or lack thereof, to maintain her home and perform usual daily activities, as a full exhibit and with no objection from the government. G.App.1. 299:14-23. Plaintiffs' neurology expert Dr. David Caplan testified to watching this video as well as personally examining Ms. Urizar-Mota, and confirmed that the video accurately represents Ms. Urizar-Mota's significant neurological injuries and their impact on her life both as a homemaker and her activities of daily living. G.App.1. 670:2-677:23. Ms. Urizar-Mota's eldest child Delmy also confirmed the video accurately depicts the effects of her mother's injuries. G.App.1. 278:25-299:23.

Additionally, both Ms. Urizar-Mota and Delmy testified that prior to the government's negligence and resulting injuries, Ms. Urizar-Mota was a stay-at-home mother, caring for her four children and taking them to and from school, appointments, and activities, as well as performing all of the family's housework, cleaning, and cooking. G.App.1. 266:7-24, 273:20-274:6; 303:4-15, 319:2-24. But as a result of the government's negligence and her resulting injuries, both testified that Ms. Urizar-Mota was no longer able to care for the home and perform her usual

household and other activities.  G.App.1. 286:10-287:19, 289:13-18, 290:1-293:21, 294:24-295:7, 298:8-299:10; 318:22-319:24.

## E. Expert Testimony is Not Required to Prove the Value of Damages for Loss as a Homemaker

Section 9-1-47 explicitly provides that "the value of the homemaker services may be shown by expert testimony, but such testimony is not required." The value of Ms. Urizar-Mota's loss as a homemaker was proven through her own testimony and that of her daughter who had to assume the role as primary homemaker as a result of Ms. Urizar-Mota's injuries. The value of her homemaker damages was proven in the same way that the value of her pain and suffering was proven; namely by testimony and video evidence that addressed her pre-negligence condition with her post-negligence condition, and the way that drastic changes between the two impacted her ability to function on a day-to-day basis.

Just as with pain and suffering damages, there is no formula or computation of damages for the loss of a homemaker and a homemaker's services. The adequacy of such damages is to be determined by the factfinder through the "exercise of [their] judgment and an application of [their] experience in the affairs of life and [their] own knowledge of social and economic matters." *Bruno v. Caianiello*, 404 A.2d 62, 65 (R.I. 1979) (quoting *Wood v. Paolino*, 315 A.2d 744, 746 (R.I. 1974)). Furthermore, under Rhode Island law, factfinders are allowed to consider a per diem

method that is based on the evidence at trial in consideration of a value for these damages. *See Worsley v. Corcelli*, 377 A.2d 215, 219 (R.I. 1997).

The district court appropriately found that Ms. Urizar-Mota was the family's homemaker, and that as a result of the government's negligence and her resulting injuries, she was no longer able to perform as a homemaker. G.Add.35, ¶ 123-124. These findings cannot be said to be clear error. Additionally, the district court correctly found that Ms. Urizar-Mota's loss as a homemaker had a monetary or economic value, which based upon her life expectancy, warranted an award of $2,920,000.00 . *Id.*; *see also* G.App.1. 163:10-22, 1958-1959.  This award is not an abuse of discretion.

## III. The Record Contains Substantial Evidence to Support the District Court's Findings on Causation and Ms. Urizar-Mota's Damages Award.

### A. The District Court Correctly Concluded That Ms. Urizar-Mota May Have Avoided Surgery If Her Pilocytic Astrocytoma Brain Tumor Was Diagnosed Earlier in Time.

Plaintiffs' neuro-oncology expert, Dr. David Ashley, testified to the treatment of patients with pilocytic astrocytoma brain tumors, and his expertise in pilocytic astrocytoma brain tumors and the treatment of these tumors was and remains unchallenged.[2]

---

[2] The government never moved to exclude or otherwise challenge the testimony of Dr. David Ashley pursuant to Rule 702 of the Federal Rules of Evidence and/or *Daubert v. Merell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993) and its progeny.

Dr. Ashley is a board-certified neuro-oncologist with credentials in both pediatric oncology and medical oncology. G.App.1. 806:25-807:11. He is the Director of the Preston Robert Trisch Brain Tumor Center at Duke University and has held this position since 2017. G.App.1. 811:2-812:9. The Preston Robert Trisch Brain Tumor Center is the largest brain tumor center in the United States and treats more than one-thousand new patients with brain tumors each year. G.App.1. 821:18-822:5. Patients travel there from all over the United States to obtain brain tumor care and treatment. G.App.1. 824:9-15. It also houses the Central Brain Tumor Registry of the United States ("CBTRUS"), which is a national registry for all patients diagnosed with brain tumors in the United States. G.App.1. 822:6-823:23. Additionally, it has the largest brain tumor research program in the country. G.App.1. 824:16-25.

As the Director of the Preston Robert Trisch Brain Tumor Center, Dr. Ashley sees patients two days each week, one day devoted to pediatrics and the other day devoted to adults. G.App.1. 824:16-825:17. He is also responsible for coordinating and overseeing the activity in the brain tumor research program which includes forty-two (42) faculty members. *Id.*

Dr. Ashley testified that each brain tumor patient at the Preston Robert Trisch Brain Tumor Center is referred to the tumor board for a multidisciplinary approach prior to beginning any therapy. G.App.1. 826:10-8:28:12. The tumor board consists

of a surgeon, neuro-oncologist, radiation oncologist, and neuropathologist, and will meet to review and discuss each patient's brain tumor and decide on an appropriate treatment plan for each patient. *Id.* As the director of the largest brain tumor center in the country and a neuro-oncologist, Dr. Ashley collaborates and works closely with surgeons, radiation oncologists, and neuropathologists to determine the safest treatment plans for brain tumor patients, including patients with pilocytic astrocytoma brain tumors. *Id.*

Prior to becoming the Director of the Preston Robert Trisch Brain Tumor Center at Duke University, Dr. Ashley was an attending neuro-oncologist at the Royal Children's Hospital, where he was also the Director of the Children's cancer Program, and the Royal Melbourne Hospital, both in his home country of Australia. The Royal Melbourne Hospital is/was the largest referral center for brain tumors in Australia. G.App.1. 811:2-812:9. Dr. Ashley also ran a research laboratory that investigated the biology of brain tumors and new therapies for brain tumors. G.App.1. 813:8-22.

Dr. Ashley testified to his unique training, education, and experience treating pilocytic astrocytoma brain tumors. G.App.1. 807:14-810:24. Dr. Ashley began researching pilocytic astrocytoma tumors in 1993 during a research fellowship with the Preston Robert Trisch Brain Tumor Center at Duke University, and began treating patients with these tumors in 1995 when he became an attending at Duke

University's tumor center. G.App.1. 807:14-810:24. While Dr. Ashely treated a range of different types of tumors at Duke University in the 1990s, the dominant brain tumor he researched and treated was pilocytic astrocytoma. *Id.*

Dr. Ashley testified that in the "vast majority of cases," patients with a pilocytic astrocytoma brain tumor undergo surgery to resect the tumor without injury or complication and have no need for further therapy. G.App.1. 832:20-833:17. He further testified that when pilocytic astrocytoma tumors are not amendable to safe surgical resection, adjuvant therapies are used to treat the tumors. G.App.1. 833:18-834:4; 1018:17-1019:9. Dr. Ashley testified if surgical resection of the tumor would be accompanied with a high risk of injury or a complication after surgery, adjuvant therapies, also referred to as targeted agents, would be used to control and treat the tumor. *Id.*

Dr. Ashley testified to the "very, very effective targeted agents," G.App.1. 831:2-5, including MEK inhibitors and BRAF inhibitors, that are used to successfully treat pilocytic astrocytoma brain tumors and eliminate the need for surgical treatment, G.App.1. 840:8-17. Available in pill form, they work by targeting the pathway that drives tumor growth and effectively reduce the size of the tumor. G.App.1. 840:8-25. These targeted agents successfully reduce the size of the tumor and stabilize the tumor thereby avoiding the need for surgical resection in over eighty percent (80%) of patients. G.App.1. 840:8-842:22.

Further, Dr. Ashley testified that these agents became available in 2017, and would have been available to Ms. Urizar Mota if her pilocytic astrocytoma brain tumor had been diagnosed in 2017, 2018, or prior to her collapse in 2019.[3] G.App.1. 841:23-8:42:22, 969:18-970:21, 974:18-975:12. Dr. Ashely testified to successfully accessing theses adjuvant therapies from the pharmaceutical companies via compassionate release for several of his patients in 2019. G.App.1. 969:18-9:70:21.

The government mischaracterizes Dr. Ashley's testimony by suggesting that surgery to remove the tumor was inevitable regardless of when the tumor was diagnosed. *See* Defendant-Appellant's Brief at 34. Dr. Ashley testified that if Ms. Urizar-Mota's tumor had been diagnosed in 2012, the most likely treatment plan, after a multidisciplinary tumor board met to discuss the case, would be surgical removal due to it being the safest, most effective, long-term treatment. G.App.1. 859:22-861:7. This does not contradict Dr. Ashley's testimony that had the tumor been diagnosed in 2017 or 2018, adjuvant therapy may have been used to

---

[3] The government cites to Dr. Ashley's expert disclosure to suggest Dr. Ashley's testimony at trial was inconsistent with his disclosure. However, Dr. Ashley's expert disclosure is not part of the trial record and thus is not before this court for review. It was never admitted as a trial exhibit, nor did the government ever quote it or otherwise confront Dr. Ashley with its during his trial testimony. Even if it were an exhibit, or had been quoted or was otherwise part of the trial record, when the trial record is assessed in its entirety, it is clear that the district court's findings are properly supported and the district court did not commit clear error.

successfully treat Ms. Urizar-Mota's tumor and avoid surgical resection. G. App.1. 841:23-8:42:22, 969:18-970:21, 974:18-975:12.

Furthermore, Plaintiffs-Appellees' stipulation in its proposed findings of fact relating to the damages assessment that Ms. Urizar-Mota would have required surgical resection absent any negligence was for the purpose of calculating compensable medical expenses and does not mitigate the convincing evidence at trial that established Ms. Urizar-Mota could have avoided surgery had her tumor been diagnosed in 2017 or 2018. G.App.1. 2363.

Additionally, and consistent with Dr. Ashley's testimony, plaintiff's pathology expert, Dr. Knarik Arkun, testified that there are nonsurgical treatments for pilocytic astrocytoma, including "MEK inhibitors," and that these treatments have been available for the last five (5) years as of January 2023. G.App.1. 2018:14-2019:9.

The trial record supports the district court's finding that Ms. Urizar-Mota could have avoided surgery altogether and received adjuvant therapy for her brain tumor if her tumor been diagnosed earlier, in 2017 or 2018. There is no evidence the district court committed clear error. In the highly unlikely alternative that the district court committed clear error, such error was harmless pursuant to Rule 61 of the Federal Rules of Civil Procedure. The record is clear, as discussed below, that the district court would have reached the same conclusion, that the government's

negligence caused Ms. Urizar-Mota's permanent injuries, based upon the strong evidence supporting that surgical resection at an earlier time would have been performed under more favorable and far less risky conditions, and thus would have been completed without causing permanent neurological injury to Ms. Urizar-Mota.

### B. The District Court Correctly Found That Earlier Diagnosis and Surgical Resection of Ms. Urizar-Mota's Pilocytic Astrocytoma Brain Tumor Would Have Prevented Ms. Urizar-Mota from Sustaining Permanent Neurological Injuries.

#### 1) Dr. David Ashley's Testimony Supports the District Court's Findings.

As set forth above, plaintiffs' neuro-oncology expert, Dr. David Ashley, has extensive knowledge, experience, training, and education in the treatment of pilocytic astrocytoma brain tumors. He is qualified to assess the surgical risks of removing Ms. Urizar-Mota's pilocytic astrocytoma brain tumor. *See* Fed. R. Evid. 702 (requiring expert to be qualified by virtue of knowledge, skill, experience, training or education); *Mitchell v. U.S.*, 141 F.3d 8, 15 (1st Cir. 1998) (quoting *Payton v. Abbott Labs*, 780 F.2d 147, 155 (1st Cir. 1985)) ("The fact that the physician is not a specialist in the field in which he is giving his opinion affects not the admissibility of his opinion but the weight the jury may place on it."); *State v. D'Alessio*, 848 A.2d 1118, 1123 (R.I. 2004) (holding forensic pathologist could offer opinion on cause of death in brain injury case despite not being certified in neuropathology); *Leahey v. State*, 397 A.2d 509, 510 (R.I. 1979) (holding general

surgeon could offer expert opinion that there was no causal relationship between individual's injuries and his work-related duties despite not being certified in orthopedic surgery).

Dr. Ashley testified to a reasonable degree of medical probability that if Ms. Urizar-Mota's pilocytic astrocytoma brain tumor had been diagnosed and surgically resected at an earlier date, at any time between November 2012 through and including 2018, Ms. Urizar-Mota would not have suffered any permanent neurological injuries. G.App.1. 958:7-964:9, 965:20-966:10, 9:66:20-24. Had her tumor been diagnosed and surgically resected at an earlier date, she would not have sustained permanent brainstem injuries that resulted in abnormal eye movements, and permanent cerebellar injuries, movement abnormalities and impaired motor function in the left hand, arm, and leg; tremors to her mouth; and balance and gait issues that prevent her from ambulating without mobility aids. *Id.*

Based on his extensive experience treating patients with pilocytic astrocytoma and his research devoted to this class of tumor, Dr. Ashley testified to a reasonable degree of medical probability that more than ninety percent (90%) of patients who undergo surgical resection of a pilocytic astrocytoma brain tumor in this region of the brain do not experience permanent neurological injuries. G.App.1. 963:21-964:13, 966:25-967:11. He also testified that ninety percent (90%) of patients with pilocytic astrocytoma do not sustain permanent injuries after surgery to resect the

tumor. Furthermore, most patients who have tumors in the same region of the brain as Ms. Urizar-Mota's tumor do not sustain injury during surgical resection.

Dr. Ashley testified, to a reasonable degree of medical probability, that had Ms. Urizar-Mota's brain tumor been timely diagnosed – at any point between November 2012 and 2018, before she developed life-threatening obstructive hydrocephalus and downward/uncal herniation, he would have recommended surgical resection. He explained that during that period, surgery offered a "high likelihood of success and a low risk of injury." G.App.1. 974:18-975:12. According to Dr. Ashley, under stable conditions, a pilocytic astrocytoma such as Ms. Urizar-Mota's, would not have been difficult to remove, and the procedure would have been "very unlikely to cause any major complications or surgical morbidity to the patient." G.App.1. 859:22-861-17. In short, an earlier diagnosis would have allowed for a straightforward and low-risk surgical cure.

Dr. Ashly testified that by the time Ms. Urizar-Mota underwent surgery on June 29, 2019, her tumor had progressed and her overall condition was "less than ideal." G.App1. 957:10-24. The delay in diagnosis and treatment had transformed what would have been a relatively routine neurosurgical procedure into a complex and high-risk operation. As Dr. Ashley explained, the instability of Ms. Uriar-Mota's condition rendered the surgery far more difficult and exposed her to a substantially greater risk of injury or complications. G.App.1. 965:10-24. She had been in the

intensive care unit at Rhode Island Hospital since June 19, 2024, following the onset of obstructive hydrocephalus that required the placement of an external ventricular drain ("EVD") to relieve life-threatening intracranial pressure. G.App.1. 957:10-24; Supp.App. 84-85. As a result, she suffered significant brain swelling and edema, as well as intraventricular hemorrhage with blood in both the third and fourth ventricles, including along the floor of the fourth ventricle. G.App.1. 958:7-964:24, Supp.App. 91, 139, 144-145, 148-149, 159-160, 167-168, 170.

Her tumor was large relative to its location and positioned near the floor of the fourth ventricle and brainstem. She also had sustained injuries to the brain and brainstem as a result of the acute obstructive hydrocephalus and downward/uncal herniation, including cranial nerve palsies manifesting in abnormal eye movements and an acute infarction to the splenium of the corpus callosal. G.App.1. 958:7-964:24

Dr. Ashley testified to a reasonable degree of medical probability that these conditions made this tumor resection surgery on June 24, 2019 more difficult and put the patient at higher risk of sustaining neurological injury or complication than surgery absent these conditions. G.App.1. 957:10-24, 958:7-967:8. Had the tumor resection surgery been performed at an earlier date, between November 2012 through and including 2018, these conditions that increased the risk of severe neurological injury or complication and made the surgery more difficult would not have existed. G.App.1. 963:21-966:19.

Had the surgery been performed at an earlier date, anytime between November 2012 and 2018 when Ms. Urizar-Mota's tumor was smaller and farther from the floor of the fourth ventricle and brainstem, and before the onset of hemorrhage and resulting bleeding , obstructive hydrocephalus, brain swelling, edema and cranial nerve injury, it is more likely than not that Ms. Urizar-Mota's tumor would have been successfully resected without causing permanent neurological injury or complication.  G.App.1. 958:7-967:8.

Dr. Ashley emphasized that the absence of these complicating conditions would not only have made the surgery sustainably less complex, but also would have allowed for a more deliberate and multidisciplinary approach to treatment. G.App.1. 966:11-19. Had Ms. Urizar-Mota not been in extremis and facing a medical emergency caused by acute obstructive hydrocephalus, her care team would have first convened a multidisciplinary conference to determine the safest operation strategy and optimal timing for intervention. G.App.1. 859:22-861:17.

In sum, Dr. Ashley's testimony established that the delayed diagnosis and treatment transformed what would have been a low-risk, curative surgical procedure into a high-risk, emergent operation, substantially increasing the likelihood of neurological injury and post-operative complication.

## 2) Dr. David Caplan's Testimony Also Supports the District Court's Findings.

Plaintiffs' neurology expert, Dr. David Caplan provided support for the district court's findings that an earlier diagnosis and surgical resection of Ms. Urizar-Mota's pilocytic astrocytoma would have prevented her from sustaining permanent neurological injuries. His qualifications and testimony were unchallenged and stand as credible, substantive evidence of causation.[4]

Dr. Caplan has been a board-certified neurologist at Massachusetts General Hospital (MGH) since 1988 where he serves as the Director of Cognitive Behavioral Neurology and the Director of the Neurology Concussion Clinic, a position he has held since 2015. G.App.1. 625:12-626:23. He maintains a full-time clinical practice seeing outpatients five days a week, and also provides inpatient consultations and supervises neurology residents. G.App.1. 626:24-627:16.

Additionally, Dr. Caplan has been a lecturer at the Massachusetts Institute of Technology ("MIT") Department of Brain and Cognitive Science and has long held academic appointments as a Professor in the Department of Neurology at Harvard Medical School, and a lecturer at both MIT's Department of Brain and Cognitive

---

[4] The government never moved to exclude or otherwise challenge the testimony of Dr. David Caplan pursuant to Rule 702 of the Federal Rules of Evidence and/or *Daubert v. Merell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993) and its progeny.

Science and Boston University's Department of Neurology.  G.App.1. 625:3-11, 626:9-11.

As part of his neurology practice, Dr. Caplan evaluates patients for potential surgical interventions, discussing the risks and benefits of neurosurgery with both patients and neurosurgeons. His testimony reflected extensive clinical experience balancing diagnostic findings with surgical risks, particularly in cases involving brain abnormalities where the decision to operate requires careful risk assessment. G.App.1. 786:8-787:6.

Dr. Caplan testified to a reasonable degree of medical probability that the conditions under which Ms. Urizar-Mota underwent tumor resection in June 2019, after her tumor had hemorrhaged into the surrounding areas of the ventricle system, increased the risk of neurological injury. He explained that the presence of blood and blood by-products in the surgical field both obscured the surgeon's view and heightened the risk of vasoconstrictions (vasospasm in cerebral vessels) G.App.1. 792:5-793:1. Such vasospasm can temporarily or permanently occlude blood flow, deprive brain tissue of oxygen, and result in a stroke. G.App.1. 793:8-794:12.

Dr. Caplan testified to a reasonable degree of medical probability that these adverse conditions – blood in the brain and ventricles – materially elevated the surgical risk and directly contributed to Ms. Urizar-Mota's neurological

complications. G.App.1. 793:8-795:19. The presence of this blood in her brain and ventricular system increased her risk for vasospasm and stroke. *Id*. Furthermore, Dr. Caplan testified to a reasonable degree of medical probability that had Ms. Urizar-Mota's tumor resection surgery been performed at an earlier date, prior to Ms. Urizar-Mota's brain tumor hemorrhaging and bleeding into the surrounding areas of the brain and ventricular system, the risk of intraoperative stroke and other neurological injury would have been substantially reduced. G.App.1. 794:6-796:19. Dr. Caplan testified that an earlier diagnosis and surgical resection of Ms. Urizar-Mota's tumor would have likely prevented both the hemorrhage and the development of acute obstructive hydrocephalus, thereby avoiding the subsequent permanent neurological damage to Ms. Urizar-Mota. G.App.1. 654:16-659:19.

In sum, Dr. Caplan's testimony established that the delayed diagnosis and resulting hemorrhage altered the surgical landscape transforming what could have been a relatively safe and routine resection into a high-risk procedure with a greater potential for vasospasm, stroke and permanent neurological injury. His conclusions independently corroborated Dr. Ashly's opinions and were consistent with the district court's factual findings on causation.

### 3) Defense Witness Dr. Timothy Smith's Testimony Supports the District Court's Findings.

Dr. Timothy Smith, the government's neurosurgery witness, agreed with plaintiffs' expert Dr. Ashely, that in his experience as a neurosurgeon, ninety percent (90%) of his patients who undergo surgery to resect brain tumors in the posterior fossa and/or around the fourth ventricle, the same area where Ms. Urizar-Mota's tumor was located, do not experience permanent injury as a result of the surgery. G.App.1. 1517:14-1519:20.

Additionally, Dr. Smith agreed that the size of the tumor in June 2019 made the surgery riskier than it would have been at an earlier date when the tumor was smaller. G.App.1. 1587:7-22. He testified that the posterior fossa is a small and narrow area of the brain, and therefore, the larger the tumor in this area of the brain, the higher the risk of neurological consequence. *Id.* Further, Dr. Smith testified that a smaller tumor would take less time to resect, thereby minimizing the amount of time the surgeon is operating on the patient's brain once the tumor is located. G.App.1. 1531:14-1532:4.

This description aligns precisely with Dr. Ashley's and Dr. Caplan's testimony that by the time of surgery, Ms. Urizar-Mota's condition had become unstable and her tumor resection inherently dangerous.

Furthermore, Dr. Smith testified that the pre-operative hemorrhage and resulting blood in the area surrounding the tumor, including the third and fourth ventricles, made it "very difficult" for the neurosurgeon operating on Ms. Urizar-Mota to adequately plan for and determine the correct surgical approach for removing her tumor. G.App.1. 1505:5-1506:7. Dr. Smith testified that pre-operative neuroimaging is critical to a surgeon's pre-operative planning, and surgeons rely on this neuroimaging to see as much of the tumor as possible and identify the tumor's precise location, origin, and blood supply. G.App.1. 1502:5-1507:7. The pre-operative neuroimaging allows the surgeon to prepare for the surgery and determine the safest surgical approach for the patient, thereby minimizing any surgical injuries or complications. *Id.* In this case, the blood resulting from the hemorrhage prevented the surgeon from being able to pre-operatively identify the tumor's true location and origin, which in turn prevented him from preparing for the correct and safest surgical approach. *Id.* He explained that tumors located near the brainstem, like Ms. Urizar-Mota's, often share blood supply with surrounding structures, such that surgical manipulation in that region carries a risk of infarction and post-operative neurological deficit. G.App.1. 1502:5-1503:1.

Credibly, Dr. Smith conceded that had the tumor been discovered years earlier, its much smaller size and more favorable anatomic position would have permitted observation or safe surgical removal before it compressed the brainstem

or caused hemorrhage.  Taken as a whole, Dr. Smith's testimony corroborates the district court's factual determination:

- That Ms. Urizar-Mota's tumor evolved into a surgical emergency only because of the delayed diagnosis;

- That the emergent condition of June 2019 created a high-risk surgical environment; and

- That earlier detection and resection would have avoided the cascade of complications resulting in permanent neurological harm.

Although Dr. Smith was called by the government, his testimony, when read in context, substantiates the district court's findings that timely diagnosis and treatment would have prevented Ms. Urizar-Mota's devasting injuries.

### 4) Defense Witness Dr. Timothy Smith's Ultimate Conclusion, That Ms. Urizar-Mota's Tumor Resection Surgery Would Have Resulted in Neurological Injuries Regardless of When in Time It Was Performed, Was Without Support, Contradicted by His Own Testimony, and Was Not Credible.

The district court correctly discounted the government's expert, Dr. Timothy Smith, because his conclusion – that Ms. Urizar-Mota's tumor resection would have resulted in permanent neurological injuries regardless of when it was performed – was unsupported by medical evidence, contradicted by his own admissions, and inconsistent with the record as a whole.

The government argues that Dr. Smith testified that Ms. Urizar-Mota's neurological injuries were "to be expected," regardless of the tumor's size or when it was diagnosed and resected, and notwithstanding the hemorrhage and resulting blood in the surgical field and ventricular system. Defendant's-Appellant's Brief at 36. However, the government fails to reconcile Dr. Smith's testimony discussed above, wherein he testifies unequivocally that ninety percent (90%) of patients who undergo earlier surgery to resect brain tumors in the posterior fossa and/or around the fourth ventricle, the same area where Ms. Urizar-Mota's tumor was located, do not experience permanent injury as a result of surgery. G.App.1. 1517:14-1519:20. Ms. Urizar-Mota's neurological injuries were not "to be expected," but rather, were a result of the delay in diagnosis and the challenging circumstances under which the surgery was performed.

Additionally, the government disregards Dr. Smith's admissions that tumor size does matter, and the larger the tumor, the higher the risk of neurological complication during surgery. G.App.1. 1531:14-1532:4, 1587:7-22. Similarly, the government ignores Dr. Smith's testimony that the tumor's late-stage hemorrhage and resulting blood made it difficult for the surgeon to identify the tumor's precise location and origin on pre-operative neuroimaging, and thus made it difficult to determine the safest surgical approach which is critical to minimizing surgical injuries and complications. G.App.1. 1496:15-23, 1502:5-1507:7, 1508:24-1510:3.

Yet that explanation necessarily implies that the risk of such injury was a function of the tumor's size, distortions of local anatomy and the presence of the hemorrhage and swelling – all conditions which would not have existed had the tumor been diagnosed earlier. This testimony, therefore, supports, rather than refutes, the district court's conclusion that timely diagnosis and treatment would have prevented Ms. Urizar-Mota's permanent neurological injuries.

Further, Dr. Smith's credibility was challenged when he testified on direct examination that each of Ms. Urizar-Mota's primary care providers met the standard of care for a reasonably competent primary care nurse practitioner and/or physician when caring for Ms. Urizar-Mota from 2012 through 2019, and then on cross examination recanted his earlier testimony, explaining that he was a neurosurgeon, not a primary care physician, and was not qualified to opine on the standard of care for primary care providers. G.App.1. 1362:14-1364:13, 1374:24-1375:4, 1483:2-1485:17.

Dr. Smith also testified on direct examination that as a neurosurgeon he also uses red flags when treating patients. G.App.1. 1369:21-1370:15, 1373:21-1374:23, 1476:13-16. This was consistent with his deposition testimony. G.App.1. 1476:17-1477:17. However, when confronted about his use of red flags on cross examination, Dr. Smith changed his testimony, stating he does not use red flags as a neurosurgeon. G.App.1. 1479:24-1480:5.

Dr. Smith's ultimate conclusion that surgery at an earlier date would have carried the same level of risk of neurological injury as the June 2019 surgery, and thus would have resulted in the same neurological injuries as the surgery performed in June 2019, is not supported by his own testimony, nor is it supported by any other evidence, testimonial or otherwise. His own testimony contradicts his ultimate conclusion, and thus his ultimate conclusion is not credible. To find otherwise would be clear error.

Under the differential clear error standard of review, the district court's credibility determination and findings of causation must stand. *See Anderson,* 470 U.S. at 575 ([W]hen a trial judge's finding is based on his decision to credit testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible store that is not contradicted by extrinsic evidence, that finding … can virtually never be clear error.). On this record, the district court's finding that earlier diagnosis and surgical resection would have prevented Ms. Urizar-Mota's permanent neurological injury is well supported and should be affirmed.

## C. The District Court Correctly Determined That Ms. Urizar-Mota Was Entitled to Medical Expense to Compensate Her for the Necessary Medical Treatment She Required as a Proximate Result of the Government's Negligence.

The district court properly concluded that Ms. Urizar-Mota is entitled to recover medical expenses incurred as a direct and proximate results of the

government's negligence. The court's award of medical damages was supported by the evidence and fully consistent with Rhode Island law, which permits recovery for all reasonable and necessary medical care made necessary by the tortfeasor's conduct. *McCoy v. Cataldo*, 148 A.2d 267, 330 (R.I. 1959); *Proffit v. Ricci*, 463 A.2d 514, 518 (R.I. 1983).

During the trial, plaintiffs moved for the medical records and the accompanying medical bills to be full exhibits, including those relating to Ms. Urizar-Mota's care and treatment following her June 24, 2019 tumor resection surgery. G.App.1. 162:22-163:22, 982:1-984:18, 1339:11-16, 1340:7-10, 1872-1879; Supp.App. 1-21. Plaintiffs also moved for the summary of Ms. Urizar-Mota's medical expenses to be a full exhibit pursuant to Rule 1006 of the Federal Rules of Civil Procedure. *Id.*; *see also* G.App.1. 146-148. The government maintained its objection related to the records and bills for Ms. Urizar-Mota's post-surgical care and treatment as well as the summary of medical expenses as set forth in their motion in limine that the district court denied. G.App.1. 982:1-984:18, 1339:17-1340:4; 117-132; G.Add.8. Notably, the government did not object to the authenticity or accuracy of these records, bills, and summary, but instead, objected on relevance grounds. *Id.*; Supp.App. 2.

The district court correctly admitted these medical records and medical bills, and the summary of Ms. Urizar-Mota's medical expenses, trial exhibit no. 70, and

based upon these records and the testimony provided at trial, correctly found that Ms. Urizar-Mota was entitled to $662,194.62 in medical expenses. G.Add.38-39, ¶ 140a.

Contrary to the government's accusation that Plaintiffs did not call any witnesses at trial to testify about Ms. Urizar-Mota's medical expenses, *see* Defendant's-Appellant's Brief at 34-35[5], Plaintiffs' experts testified to and established the causal connection between Ms. Urizar-Mota's medical treatments and related expenses and the government's negligence.

Rhode Island law imposes no requirement that the plaintiff prove with mathematical precision which portions of her medical expenses flowed from each injury; it is sufficient that the evidence establishes the expenses were reasonably necessary and proximately caused by the appellant's negligence. *Kurczy v. St. Joseph Veterans Ass'n, Inc.*, 713 A.2d 766, 771 (R.I. 1998). Here, the district court correctly found that Ms. Urizar-Mota's medical expenses were the natural and foreseeable result of the government's failure to timely diagnose her condition.

---

[5] All of the cases cited by the government are vastly different from the record in the instant case. The plaintiffs in the cases cited by the government did not have any experts to testify to the medical records and bills they sought to introduce or otherwise connect the expenses to the alleged negligence.

The district court's finding on medical damages was not clearly erroneous. It was based on extensive medical evidence, consistent expert testimony and well-established Rhode Island precedent allowing full compensation for all reasonably necessary medical treatment caused by the government's negligence. The award restores Ms. Urizar-Mota to the position she would have occupied had the government exercised due care – free from the permanent neurological injury and the life-long medical expenses that negligence made unavoidable.

1) **The Record Supports the District Court's Finding That Ms. Urizar-Mota Sustained Permanent <u>Brainstem</u> Injuries[6] Prior to Her June 24, 2019 Tumor Resection Surgery as a Proximate Result of the Government's Negligent Delay in Diagnosing and Treating Ms. Urizar-Mota's Pilocytic Astrocytoma Brain Tumor, and that those Brainstem Injuries Resulted in the Need for Post-Surgical Ophthalmology and Neuro-Ophthalmology Care and Treatment.**

Both Dr. Ashely and Dr. Caplan testified that Ms. Urizar-Mota's acute obstructive hydrocephalus diagnosed on June 19, 2019 at Rhode Island Hospital was caused by both the growth of her tumor in the fourth ventricle over time and the blood in the ventricular system resulting from the hemorrhage. G.App.1. 651:10-652:20, 654:16-655:12, 656:11-657:20, 849:3-851:16, 884:2-886:4, 952:3-954:1. Together, the size of the tumor and the blood caused a complete obstruction, which

---

[6] The government mistakenly conflates the brainstem injuries and cerebellar injuries. *See* Defendant-Appellant's Brief at 37-38. As set forth herein, these injuries are distinct and occurred at different times.

prevented the cerebrospinal fluid from flowing through the ventricular system and resulted in a buildup of fluid that caused a significant increase in intracranial pressure. *Id.*

Further, Dr. Ashley testified—and defense witness Dr. Timothy Smith agreed—that the increased intracranial pressure caused by the obstructive hydrocephalus caused downward/uncal herniation of Ms. Urizar-Mota's brain, whereby the pressure in the top part of the brain was so severe that it pushed the brain down through the tentorium cerebelli, a hole in the structure separating the top half of the brain from the bottom half of the brain. G.App.1. 884:2-886:4, 1409:18-1410:21. Experts of both parties agreed that downward/uncal herniation put severe pressure on Ms. Urizar-Mota's brainstem and other midline structures of her brain and was a life-threatening emergency because it could cause strokes, hemorrhages, and death. G.App.1. 637:21-638:18, 657:21-659:19, 884:2-886:4, 908:20-909:8; 1487:21-1488:4, 1493:16-1494:4.

Dr. Ashley testified to a reasonable degree of medical probability that Ms. Urizar-Mota's obstructive hydrocephalus and downward/uncal herniation on June 19, 2019 caused injury to her brainstem prior to her June 24, 2019 tumor resection surgery, and that her brainstem injury resulted in injuries to her third, fourth, and sixth cranial nerves (cranial nerve palsies), and internuclear ophthalmoplegia ("INO"). G.App.1. 884:2-886:4, 890:5-896:7, 904:9-906:14, 908:21-909:8, 916:5-

22, 922:3-16, 923:17-924:10, 926:22-929:10, 932:14-934:18, 940:24-942:25, 952:3-954:1, 975:18-978:15; Supp.App. 179, 187.

Dr. Smith agreed, testifying that Ms. Urizar-Mota's obstructive hydrocephalus and downward/uncal herniation caused permanent injury to her sixth cranial nerve prior to her tumor resection surgery. G.App.1. 1365:7-18, 1389:4-8, 1401:24-1402:5, 1410:22-1411:4, 1592:12-1593:11.

Dr. Ashley further testified that these injuries manifest in eye movement abnormalities and are the cause of Ms. Uriar-Mota's eye movement abnormalities. G.App.1. 884:2-886:4, 890:5-896:7, 904:9-906:14, 908:21-909:8, 916:5-22, 922:3-16, 923:17-924:10, 926:22-929:10, 932:14-934:18, 940:24-942:25, 952:3-954:1, 975:18-978:15.

Additionally, Dr. Ashley refuted that the brainstem injuries occurred during surgical resection on June 24, 2019, testifying that patients undergoing resection of tumors in this region of the brain do not sustain brainstem injury or injury to cranial nerves resulting in abnormal eye movements that require follow-up care and surgery with ophthalmologists and neuro-ophthalmologists. G.App.1. 970:22-971:16. Furthermore, Dr. Ashley testified that there is no evidence to suggest the brainstem injuries occurred during the tumor resection surgery, noting that not only did the surgeon document in his operative report that he was able to visualize the floor of

the fourth ventricle (brainstem) and drape gauze over it to prevent injury to the brainstem, there was also no evidence of brainstem instability during the surgery that would have occurred if the surgeon came into contact with the floor of the fourth ventricle (brainstem). G.App.1. 976:3-978:15.

Dr. Ashley explained that Ms. Urizar-Mota's post-operative neuro-ophthalmology records with Dr. Julie Roth and ophthalmology records with Dr. Melissa Simon, in the months and years after her June 2019 diagnosis and surgical resection, document that Ms. Urizar-Mota's eye examination results and ocular deficits are consistent with brainstem injury caused by downward/uncal herniation. G.App.1. 894:23-896:7, 897:3-901:4, 905:5-906:14, 916:5-22, 926:22-929:10; Supp.App. 179 ("Sixth nerve palsy of both eyes, likely due to elevated intracranial pressure on presentation in 2019"); Supp.App. 187.

Had Ms. Urizar-Mota's pilocytic astrocytoma brain tumor been diagnosed at an earlier date, prior to her developing obstructive hydrocephalus and downward/uncal herniation, she would not have sustained permanent brainstem injuries to her third, fourth, and sixth cranial nerves, and INO. G.App.1. 884:2-886:4, 890:5-896:7, 897:3-901:4, 904:9-906:14, 908:21-909:8, 916:5-22, 922:3-16, 923:17-924:10, 926:22-929:10, 932:14-934:18, 940:24-942:25, 952:3-954:1, 975:18-978:15. Supp.App. 179, 187. Absent the government's negligent delay in diagnosing this tumor, Ms. Urizar-Mota would not have needed the ophthalmology

and neuro-ophthalmology follow-up care and surgeries that were occasioned as a result of the government's negligence.  *Id.* As a result, the medical expenses associated with Ms. Urizar-Mota's post-surgical ophthalmology and neuro-ophthalmology care and treatment are compensable damages in the instant case.

> 2) **The Record Supports the District Court's Finding That Ms. Urizar-Mota Sustained Permanent <u>Cerebellar</u> Injuries During Her June 24, 2019 Tumor Resection Surgery as a Proximate Result of the Government's Negligent Delay in Diagnosing and Treating Ms. Urizar-Mota's Pilocytic Astrocytoma Brain Tumor, and the Cerebellar Injuries Resulted in the Need for Extensive Post-Surgical Rehabilitation and Follow-Up Care.**

It is undisputed that Ms. Urizar-Mota's cerebellar injuries, distinct from her brainstem injuries, were a result of cerebellar infarcts that most probably occurred as a result of Ms. Urizar-Mota's brain tumor resection surgery on June 24, 2019. G.App.1. 750:12-20, 902:5-903:2, 1365:7-18, 1551:13-1552:7.  Ms. Urizar-Mota's cerebellar injuries caused by the cerebellar infarcts include tremulousness in her face, around her mouth and lips, movement disorder in her left hand, arm, and leg that manifest in tremors and shakiness (also called dysmetria and dysdiadochokinesia), and gait problems and weakness. G.App.1. 662:11-663:20, 903:23-11, 944:17-945:13, 975:18-979:15.

As set forth herein, the plaintiffs presented competent and credible evidence at trial to prove by a preponderance of the evidence that had Ms. Urizar-Mota's brain tumor been diagnosed and resected at an earlier date, before she developed acute

obstructive hydrocephalus and suffered downward/uncal herniation and resulting brainstem injury on June 19, 2019, she would not have sustained permanent neurological injuries. Absent the government's negligent delay in diagnosing Ms. Urizar-Mota's pilocytic astrocytoma brain tumor, the tumor would have been surgically removed before she sustained any neurological injury; the surgery itself would not cause any permanent neurological injury; and she would not have needed extensive post-operative care and treatment for her neurological injuries.

Both Dr. David Ashley, plaintiffs' neuro-oncologist expert, and Dr. Timothy Smith, the government's neurosurgeon, testified at trial that ninety percent (90%) of patients with a pilocytic astrocytoma brain tumor in the same location as Ms. Urizar-Mota's brain tumor do not suffer permanent injury during the surgical resection of the tumor. G.App.1. 963:21-964:13, 966:25-967:11, 1517:14-1519:20.

Consistent with that high success rate of surgical removal, Dr. Ashley testified to a reasonable degree of medical probability that the post-operative care for patients undergoing this type of surgical resection includes two to three days post-operative in the hospital, which is sometimes, but not always, followed by a short period of outpatient physical therapy. G.App.1. 967:22-969:17. The only other follow-up care needed for a patient undergoing this type of surgical resection would be MRI scans once every three months for the first two years, followed by once every six months for another two years, and then once per year until the patient is five-years post-

operative. G.App.1. 992:25-993:19. Additionally, Dr. Ashley testified that these patients do not require long-term follow-up with their neurosurgeon, and are often discharged from the neurosurgical care six to twelve months post-operatively. G.App.1. 993:22-994:8.

Consistent with this testimony, plaintiffs stipulated that the following medical expenses would have been incurred by Ms. Urizar-Mota to treat her pilocytic astrocytoma brain tumor absent any negligence and thus were not compensable in the instant action: $13,796.00 for surgery to resect the tumor, $22,365.40 for post-operative MRIs, and $490.00 for outpatient physical therapy. G.App.1. 2363, ¶ 645; G.App.1. 1872-1878. Consistent with the evidence before the district court, the district court appropriately deducted these expenses from Ms. Urizar-Mota's damages award for medical expenses.

The government criticizes the district court's award of $658.00 for the removal of a "skin tag" on Ms. Urizar-Mota's eyelid, $3,600.00 for a spine MRI, and an unspecified amount for services provided on the day of Ms. Urizar-Mota's surgical resection, claiming that these expenses are unrelated to the government's negligence.[7] *See* Defendant's-Appellant's Brief at 39. The cost of services provided

---

[7] This is the first time the government has gone through the itemized summary of medical expenses and identified specific expenses it challenges; they never did so at trial.

on the day of surgery, minus the surgery itself ($13,796.00), result in a total of $5,350.50.  When that total is combined with the above skin tag removal and spine MRI, the government claims the district court awarded plaintiffs $9,608.50 more than it should have for past medical expenses.

Contrary to the government's argument, the skin tag removal performed by neuro-ophthalmology was related to Ms. Urizar-Mota's eye discomfort, dryness, and burning, all of which were caused by her cranial nerve injuries and the necessary treatment for such injuries, caused by the government's negligence. Supp.App. 198-248. Similarly, the charges on the day of Ms. Urizar-Mota's surgical resection for care in the neuro intensive care unit would not have been incurred had Ms. Urizar-Mota not sustained permanent neurological injuries before and during surgery, all of which were caused by the government's delay in diagnosing her pilocytic astrocytoma brain tumor. G.App.1. 957:10-964:24, 965:20-966:10-967:11, 967:22-969:17.

It is clear from Dr. Ashley's testimony that had Ms. Urizar-Mota's tumor been diagnosed and resected earlier, Ms. Urizar-Mota would not have needed the extensive post-operative care and treatment she needed due to the government's negligence.  *Id.*  She would not have needed four months of inpatient nursing care, physical, and occupational therapy at Elmwood Nursing & Rehabilitation Center, multiple post-operative hospitalizations to assess and stabilize her neurological

injuries, and years of follow-up care and surgical treatment from ophthalmologists and neuro-ophthalmologists. G.App.1. 884:2-886:4, 890:5-896:7, 897:3-901:4, 904:9-906:14, 908:21-909:8, 916:5-22, 922:3-16, 923:17-924:10, 926:22-929:10; 932:14-934:18, 940:24-942:25, 952:3-954:1, 975:18-978:15, 992:25-994:8. As a result, the medical expenses associated with this follow-up rehabilitation and care were unquestionably caused by and due to the government's negligence, and are, therefore, compensable damages.

The district court's damages award is not only supported by ample evidence in the record, but it is proportional to the weight of the evidence and is neither conscience-shocking nor a harbinger of a miscarriage of justice. Consequently, this Court should uphold the district court's award.

### D. The District Court's Award Was Well Supported by the Record and Consistent With Rhode Island Law.

The district court's comprehensive damages award, encompassing both medical and non-economic losses was carefully reasoned, supported by substantial evidence, and fully consistent with Rhode Island law and the remedial purposes of the Federal Tort Claims Act. The court's findings reflect a disciplined, evidence-based evaluation of Ms. Urizar-Mota's lifelong medical needs, the permanent neurological and ophthalmologic injuries she sustained and the devasting impact those injuries have had on her independence and quality of life.

Contrary to the government's assertions, the district court's finding were neither excessive or speculative. Rather, they were rooted in specific credible medical testimony and documentary evidence showing that Ms. Urizar-Mota's injuries were catastrophic, permanent and directly caused by the government's negligence.

Plaintiffs introduced a video of Ms. Urizar-Mota, see Plaintiffs' Exhibit 87, to demonstrate the impact Ms. Urizar-Mota's neurological injuries have on her daily activities. G.App.1. 299:14-23. Both Dr. Caplan, who examined Ms. Urizar-Mota, and Delmy Reyes, Ms. Urizar-Mota's daughter, testified that the video accurately reflects Ms. Urizar-Mota's neurological injuries and the impact they have on her daily activities. G.App.1. 278:25-296:7, 670:6-677:15.

Through the testimony of Dr. Caplan, Delmy, and Ms. Urizar-Mota, the record contains ample evidence of Ms. Urizar-Mota's significant neurological injuries and their impact on her daily life, including, but not limited to, her inability to walk without a mobility aid, inability to perform standard ballistic movements smoothly (i.e., dressing herself, buttoning shirt, tying shoes, zipping coat, removing eyeglasses), and her inability to cook, clean the home, and drive. G.App.1. 286:10-295:7, 319:2-320:20, 671:8-23, 672:14-677:1. The record is replete with evidence demonstrating that Ms. Urizar-Mota's quality of life was and will forever remain reduced, and that she has and will continue to experience pain and suffering and

mental anguish due to her injuries and the impact they have on her life. *Id.* Ms. Urizar-Mota has lost her independence and will require constant support from her family for activities of daily living for the remainder of her life. *Id.*; *see also* G.App.1. 291:13-15, 298:8-299:10; 677:16-23; 971:17-21.

Dr. Caplan and Dr. Ashley testified to a reasonable degree of medical probability that Ms. Urizar-Mota's neurological injuries and deficits are permanent. G.App.1. 677:16-23; 971:17-21. Additionally, Dr. Caplan testified that as Ms. Urizar-Mota ages, her neurological injuries will worsen and she will experience further neurological deterioration involving her movement deficits and motor control. G.App.1. 677:24-678:16.

The government's effort to recharacterize these findings as an overcompensation disregard the controlling standard of review. Under Rule 52(a), the Court must defer to the district court's factual determination unless they are clearly erroneous. *Anderson*, 470 U.S. at 573-575. The district court heard live testimony, evaluated credibility of each witness and reviewed hundreds of pages of medical evidence and issued detailed findings explaining its reasoning. Its damages award reflects not passion or sympathy, but careful evidence-based assessment of Ms. Urizar-Mota's losses.

Rhode Island law permits full compensation for the foreseeable consequences of the defendant's negligence, including lifelong medical care, rehabilitative needs, pain and suffering and loss of enjoyment of life. *See Jackson v. Choquette & Co., Inc.*, 80 A.2d 164, 1679 (1951); *Shepardson v. Consolidated Medical Equipment, Inc.* 714 A.2d 1181, 1183-1185 (1998). The district court properly applied those principals here, tailoring its award to the evidence and excluding speculative or duplicative expenses.

Given what Ms. Urizar-Mota has experienced and will experience in her future, the district court's award is proportional to the weight of the evidence and is neither conscience-shocking nor a harbinger of a miscarriage of justice. The court's finding are therefore entitled to full deference and should be affirmed.

## IV. The District Court Applied the Correct Legal Standard and Made Factual Findings Supported by Expert Testimony Grounded in Sufficient Facts and Data that PCHC Providers Breached the Applicable Standard of Care.

The government contends that the district court's findings on the standard of care were "clearly erroneous" because they rested on the testimony of Dr. Russell Phillips, whom the government called "inconsistent" and "implausible." Defendant-Appellant's Brief at 41-42. This argument collapses under the weight of the trial record and the district court's reasoned findings. The district court conducted a bench trial, reviewed extensive expert testimony, and issued a 32-page decision with the

explicit findings on credibility, standard of care, breach, causation, and damages. *See* G.Add.9-42. The court's ruling reflects careful weighing of expert opinions and documentary evidence, not clear error.

Under Rhode Island law, medical negligence is proven where the provider fails to exercise "the degree of care and skill ordinarily exercised by physicians in like cases." *Riley v. Stone*, 900 A.2d. 1087, 1095 (R.I. 2006). The district court applied that exact test concluding that a reasonably prudent primary care provider must order neuroimaging or refer to a neurologist when a patient presents with persistent or worsening headaches accompanied by red flags, including, but not limited to, post-traumatic onset of headaches. The court's conclusion rested not on "bright-line rules," but on a record showing multiple missed opportunities where Ms. Urizar-Mota's symptoms clearly signaled intracranial pathology or, at the very least, a secondary cause for her headaches.

### A. Dr. Russell Phillips Has the Requisite Knowledge, Training, Education, and Experience to Testify to the Applicable Standard of Care for a Primary Care Provider Treating a Patient Like Ms. Urizar-Mota.

Dr. Phillips testified to his extensive knowledge, experience, training, and education as a primary care physician.[8] G.App.1. 331:19-348:8. Dr. Phillips is the

---

[8] The government never moved to exclude or otherwise challenge the testimony of Dr. Russel Phillips pursuant to Rule 702 of the Federal Rules of Evidence and/or *Daubert v. Merell Dow Pharms., Inc*., 509 U.S. 579, 589 (1993) and its progeny.

Director for the Center for Primary Care at Harvard Medical School, a position he has held since 2012, where he is overseeing the development of a primary care track at Harvard Medical School as well as a primary care focused research program. G.App.1. 336:15-338:6, 340:1-22. Additionally, he has been an attending primary care physician at Beth Israel Deaconess Medical Center ("Beth Israel") since 1985, and he continues to serve in that role today. G.App.1. 331:19-332:1. Dr. Phillips previously served as Chief of the Division of General Medicine and Primary Care at Beth Isreal from 2002 to 2012, and led the Research Department and several general medicine fellowships for twenty (20) years. G.App.1. 332:2-336:14. Over the course of his career, he has published approximately three-hundred (300) peer-reviewed publications and his work has been cited approximately forty-five thousand (45,000) times by other researchers and publishers. G.App.1. 342:6-14.

The Division of General Medicine and Primary Care at his institution sees approximately forty-thousand (40,000) patients per year, totaling around one-hundred thousand (100,000) visits per year. G.App.1.332:21-334:6. Dr. Phillips sees patients in the office one-day per week, and speaks with patients via telemedicine or telephone every day of the week. G.App.1. 338:22-339:12. Additionally, the Division of General Medicine and Primary Care at Beth Israel is responsible for training 160 residents each year, and Dr. Phillips continues to teach, train and supervise these residents. G.App.1. 332:21-335:1.

Based upon Dr. Phillips' extensive knowledge, experience, training, and education as a primary care physician, the district court correctly found "Dr. Phillips to be a highly qualified expert in Internal Medicine, found his testimony to be the most credible, and relie[d] in large part on his expert testimony to support [its] findings." G.Add.20 ¶ 45. Dr. Phillips clearly has the requisite knowledge, skill, experience, training, or education pursuant to Rule 702 of the Federal Rules of Evidence, and as the record reflects, his testimony was based on scientific and specialized knowledge, sufficient facts and data, and was the product of reliable principles and methods. Fed. R. Evid. 702; *see also Owens v. Silvia*, 838 A.2d 881, 894 (R.I. 2003) (citing *Flanagan v. Wesselhoeft*, 712 A.2d 365, 367–68 (R.I. 1998) (the standard for qualifying an expert's ability to opine on a professional standard of care in Rhode Island requires that the expert have "substantial credentials in the same or a closely related field as that of the defendant[.]").

Additionally, the record supports a strong link between Dr. Phillips' testimony, the evidence in the case, and the applicable medical literature. G.Add.20-21, ¶ 45-46.

### B. The Government's Assertion of "Inconsistency" Misstates Both the Testimony and the Court's Findings.

The government claims that Dr. Phillips applied the standard of care "inconsistently," pointing to isolated lines from his pretrial deposition about whether certain visits reflected migraine headaches. However, as the district court

recognized, those excerpts omit the full context of Dr. Phillips testimony and opinions. When confronted with these purported inconsistencies at trial, Dr. Phillips repeatedly explained that he was distinguishing <u>possible</u> migraine features from a <u>definitive</u> migraine diagnosis, and while he agreed that the providers characterized Ms. Urizar-Mota's headaches as migraines, he did not agree with that characterization or that her signs and symptoms as documented were diagnostic of a migraine. G.App.1. 360:6-361:19, 363:12-365:23, 414:16-415:20, 417:13-418:17, 425:24-427:9, 459:1-461:8, 496:19-20, 502:21-504:22, 537:10-538:1, 1069:4-1073:13, 1117:20-1118:10. Dr. Phillips repeatedly explained his ultimate conclusion that imaging was required because Ms. Urizar-Mota presented with headaches and several red flags, and that her headaches were not of a stable pattern or consistent with migraine headaches. *Id.*

Furthermore, Dr. Phillips clarified that his deposition answers were responsive to narrow, hypothetical questions about a <u>single visit</u>, whereas his final opinions considered the entire clinical progression and the cumulative red-flag features:

> So again, it would be the general context, which I was not addressing at my deposition. I was trying to address just simply your questions about whether this could be consistent with a migraine and would I image, based on this particular single episode. But I can't really separate that, realistically, from what the context is.

G.App.1. 1073:6-13; *see also* G.App.1. 1149:23-1151:8, 1069:4-1073:13, 1098:22-1100:4. That contextual approach—considering Ms. Urizar-Mota's prior visits and

the pattern of worsening headaches, versus considering isolated encounters—is precisely how the standard of care is applied in primary care medicine.

Additionally, as it relates to the government's argument that Ms. Urizar-Mota had migraine headaches, even the government's own primary care witness, Dr. Amy Ship, testified that the medical records did not contain sufficient documentation to support a diagnosis or differential diagnosis of migraine headaches. G.App.1. 1773:14-1774:13, 1782:7-1784:3.

The government also suggests that Dr. Phillips applied the standard of care inconsistently by opining that imaging was not required when Ms. Urizar-Mota presented with headaches prior to 2012. In doing so, the government ignored the reasonable explanation for Ms. Urizar-Mota's symptoms at the time, and ignored Dr. Phillips testimony on how the pre-2012 visits and corresponding symptoms were distinguishable Ms. Urizar-Mota's 2012 and forward visits and corresponding red flags that required neuroimaging.

As documented in the medical record and explained by Dr. Phillips at trial, Ms. Urizar-Mota's August 2, 2007 presentation with headaches and dizziness was in the context of "missed Depo shot last month," which are known side effects of Depo Provera withdrawal. G. App.2 31-32; G.App.1. 1185:10-1187:22. Similarly, Ms. Urizar-Mota's January 20, 2010 presentation for vomiting, blurry vision, and headache, and February 10, 2010 visit for headaches, nausea, and vomiting, were

both during the first trimester of her pregnancy with her fourth child, and reasonably attributed to her pregnancy. G. App.2 47, 339-340; G.App.1. 1197:1-1201:18. When evaluated in the full context of Ms. Urizar-Mota's known medical history, signs, and symptoms at the time of these pre-2012 visits, it is clear that Ms. Urizar-Mota's presentations were attributed to medication withdrawal and pregnancy, and thus were not red flags that warranted imaging. G. App.2 31-32, 47, 339-340; G.App.1. 1185:10-1187:22, 1197:1-1201:18.

Indeed, the government's assertion that Dr. Phillips applied the standard of care inconsistently misreads both the testimony and the district court's findings. In context, Dr. Phillips employed one consistent cumulative decision rule: once Ms. Urizar-Mota's recurring headaches progressed to change in pattern and include neurological deficits such as dizziness and visual changes that were not reasonably attributed to a benign cause, a prudent primary care physician was required to order neuroimaging or a neurology referral. His analysis evolved with the Ms. Urizar-Mota's symptoms but did not change its governing standard—precisely as competent clinical reasoning demands. As set forth herein, and highlighted in the chart on pages 71-72, Dr. Phillips applied a single, cumulative standard of care across all visits: ordering neuroimaging when Ms. Urizar-Mota's recurring headaches were accompanied by red flags. His analysis remained uniform through Ms. Urizar-Mota's visits from 2012 through 2016, and the district court expressly, and correctly,

found that framework consistent with accepted primary care standards. G.Add.21-26, ¶¶ 47-72.

### C. The District Court's Findings On "Red Flags" Are Grounded in Expert Consensus and Record Evidence.

Contrary to the government's mischaracterization, the district court did not apply Dr. Phillips's testimony uncritically or out of context. Rather, the court evaluated both parties' experts and the documented progression of Ms. Urizar-Mota's symptoms. The district court found the government's primary care expert Amy Ship, M.D. downplayed multiple well-recognized red flags, including progressive headache in atypical presentations, pattern change or recent onset of headache, neurological deficit or dysfunction, and posttraumatic onset of headaches, and that her "wait and see" approach departed from established standard of care for primary care providers treating a patient like Ms. Urizar-Mota. G.Add.20-26, ¶¶ 46-72.

The district court's findings track the established standard of care between 2012 and 2019, which is supported by credible peer-reviewed medical literature, whereby headaches accompanied by or associated with any red flag warrants neuroimaging. *Id.* Further, the government's argument that "any red flag" does not compel imaging ignores that Ms. Urizar-Mota presented not with an isolated red flag, but with a pattern of changing and escalating neurological dysfunction over many years. The district court correctly concluded that no reasonable provider could

have deferred imaging by 2016—a finding squarely within its fact-finding prerogative. G.Add.20-26, ¶¶ 46-72.

### D. The Government Misstates Both the Medical Literature and the Record.

The government's assertion that Dr. Phillips "invented" red flags not recognized in the medical literature mispresents his testimony and the court's findings. At trial, Dr. Phillips expressly identified the published frameworks he applied, principally American Academy of Neurology's peer-reviewed article, "Red and orange flags for secondary headaches in clinical practice," which discusses the SNNOOP10 criteria that is also discussed in UpToDate and other standard medical references. G.App.1. 369:9-373:17. These frameworks, he explained, list posttraumatic onset of headache, pattern change or recent onset of headache, neurological deficit or dysfunction, and progressive headache in atypical presentations among the established indicators—also known as "red flags"— requiring neuroimaging.[9] G.App.1. 378:15-379:16.

---

[9] The government's suggestion that only one red flag, neoplasm in history, requires neuroimaging is wholly unsupported and contradicts the expert testimony presented at trial. Dr. Phillips rejected this hyper technical reading of the literature, explaining that all of the red flags identified by SNNOOP10 require neuroimaging to evaluate the underlying cause of a patients' headache. G.App.1. 1135:3-1136:24. Dr. Phillips cited not only to the language in the medical literature, but also the data supporting the literature and his own four-plus decades of clinical experience, testifying that all SNNOOP10 criteria are considered "equal red flags" and no one red flag is more important than the other. G.App.1. 1138:9-1140:23.

Dr. Phillips testified this list of "red flags" is authoritative for primary care providers treating patients with headaches, and that the standard of care for reasonably competent primary care providers requires the providers to follow this framework and these "red flags" when assessing patients with headaches. G.App.1.373:3-17, 381:1-382:13, 383:11-384:1. Further, Dr. Phillips testified that the SNNOOP10 criteria are "time honored," and that he has been using these criteria to determine when a patient with a headache requires neuroimaging in his own practice since medical school in 1979. G. App. 1. 379:14-16, 382:13-383:2.

The district court correctly found Dr. Phillips' testimony internally consistent and grounded in accepted primary care practice, concluding that Dr. Phillip's use of red flag criteria aligned with recognized and credible national guidelines versus a novel theory. G.Add.21-22, ¶¶ 48-54.

### E. Ms. Urizar-Mota's "Red Flags" Were Documented in the Medical Record, Not Invented After the Fact.

The government's claim that the record did not support any red flag findings ignores the documentary evidence—the medical records—that Dr. Phillips and the district court relied upon. Those records show the following documented symptoms which correspond to red flags that require imaging:

| Years | Documented Symptoms | Corresponding Recognized Red Flag |
|---|---|---|
| 2012 | Headaches, nausea, and vomiting for 15 days, and victim of partner abuse[10] | Change in pattern of headaches, posttraumatic onset of headache[11] |
| 2013 | Frontal headache and over right side of the head with pulling sensation upon awakening from sleep, which is throbbing or pounding, accompanied by nausea and vomiting, victim partner abuse[12]<br><br>Chronic daily headaches, temporal headache with pulling sensation on sides, proceeded by seeing dark spot with bright jagged outline, accompanied by nausea, reveals she is being emotionally and physically abused at home[13] | Change in pattern of headaches, posttraumatic onset of headache, progressive headache in atypical presentations[14] [15] |
| 2014 | Daily headaches, facial sweating, chest tightness, victim partner abuse[16]<br><br>Daily headaches, especially arising in the morning, palpations and weakness with headaches, nausea[17] | Change in pattern of headaches, posttraumatic onset of headache[18] [19] |

---

[10] G.App.2 100-103.

[11] G.App.1. 392:2-397:18.

[12] G.App.2 108-110.

[13] G.App.2 111-113.

[14] G.App.1. 412:19-417:12.

[15] G.App.1. 424:10-427:9.

[16] G.App.2 126-129.

[17] G.App.2 130-133.

[18] G.App.1. 437:7-440:14, 454:15-457:8.

[19] G.App.1. 457:9-458:24, 461:19-462:23.

| 2016 | Headache, dizziness, lightheadedness, victim partner abuse[20] | Neurological deficit or dysfunction, change in pattern of headache, posttraumatic onset of headache[21] |
|---|---|---|
| 2012-2016 | Documented active problem of victim partner abuse[22] | Posttraumatic onset of headache |

Each of these entries appears in the contemporaneous records that the district court reviewed. G.Add.23-26, ¶¶ 55-72. Far from inventing red flags, Dr. Phillips mapped existing documentation from Ms. Urizar-Mota's medical records with the government onto recognized diagnostic criteria.

### F. The Patient's Documented History of Spousal Abuse Heightened—Not Diminished—the Duty to Obtain Imaging

The government argues that because Mr. Urizar-Mota's husband subsequently denied striking her in the head and the couple may have reconciled, trauma could not have contributed to her headache and accompanying symptoms. That contention misconstrues the medical significance of Ms. Urizar-Mota's history of trauma and abuse and the district court's reasoning.

As Dr. Phillips testified, the documented incidents of physical abuse—whether or not ultimately corroborated—were clinically relevant because they introduced the possibility of head injury as a cause of Ms. Urizar-Mota's headaches.

---

[20] G.App.2 249-251.
[21] G.App.1. 465:3-466:17, 468:5-471:3, 473:4-18.
[22] G.App.2 100-103, 108-117, 123-133, 136-138, 144-148, 154-244, 249-251.

G.App.1. 365:24-368:5, 394:24-396:14, 432:10-433:22, 604:21-606:11. In the presence of chronic headaches that changed in pattern, became progressively worse over time, and were associated with neurological deficits such as dizziness and lightheadedness, that history imposed a heightened obligation on the treating providers to perform neuroimaging. *Id.*

When there is any suggestion of abuse or trauma, particularly to the head, and the patient has headaches or neurologic deficits or dysfunction, the standard of care for a primary care provider is to obtain neuroimaging. G.App.1 378:15-379:16, 380:21-24, 383:11-384:1, 394:24-396:14. Dr. Phillips explained that, under accepted primary care guidelines, head trauma is itself a "red flag" that warrants imaging to rule out subdural hematoma or other intracranial pathology. *Id.* A physical exam cannot determine what neuroimaging can, which is whether or not the patient has structural injury to the brain.

The district court explicitly recognized the trauma evidence as one of several factors that made neuroimaging imperative. G.Add.21-23, ¶¶ 50-55. Based upon the medical records admitted into evidence at trial and the expert testimony of Dr. Phillips, the district court correctly found that Ms. Urizar-Mota's medical records document episodes of victim partner abuse, and when viewed in conjunction with her persistent, worsening headaches and neurological symptoms, those episodes heightened the need for diagnostic imaging to exclude traumatic or structural causes

of her headaches. G.Add.21-26, ¶¶ 50-72. Consistent with the evidence presented at trial, the district court did not find that trauma caused her tumor; it found that the providers breached the standard of care by failing to exclude a traumatic etiology before attributing her symptoms to benign causes or stress. *Id.*

The government's reliance on the husband's later denial is legally and medically irrelevant. Any purported denial was not part of the information available to the providers treating Ms. Urizar-Mota for headaches between 2012 and 2019. G. App.2 100-308. Further, the standard of care is determined by what a reasonable clinician would do at the time of presentation given the information available, not by later marital developments. *Sheeley v. Memorial Hospital*, 710 A.2d 161, 167 (R.I. 1998). Dr. Phillips credibly explained that once trauma was documented in the chart, it cannot be ignored because the patient subsequently, years later, reconciles or says the situation at home have improved; the medical obligation to rule out head injury remains. G. App.1 394:24-396:14, 429:6-433:22, 604:18-606:11.

### G. The District Court Properly Found a Persistent and Progressive Headache Pattern; The Government's "Gaps in Symptoms" Claim Misstates the Record.

The government asserts that the district court "failed to account for years-long gaps" in Ms. Urizar-Mota's reports of headaches and therefore erred in describing the symptoms as constant. Defendant-Appellant's Brief, 50-51. The record, however, clearly demonstrates the opposite. The district court explicitly

74

acknowledged that the PCHC records contained intervals with no treatment entries but found those breaks did not suggest that Ms. Urizar-Mota's headaches had resolved. G.Add.13-16, ¶¶ 13, 17, 21. The district court found that the evidence showed a longstanding, progressive pattern of headaches, with periods of missing documentation reflecting limited access to care rather than remission of symptoms. *Id.*

The district court's findings are supported by the trial record. Ms. Urizar-Mota testified that she continued to have headaches all through 2013 and 2014, during which time she took Tylenol for her headaches. G.App.1. 310:19-311:4. Additionally, she testified that her headaches continued in 2016, 2017, and 2018, but that she did not seek treatment for these headaches at PCHC because "they wouldn't give me anything else but Tylenol, I just continued to take Tylenol." G.App.1. 312:9-313:18. Delmy confirmed this, testifying that her mother complained about headaches beginning in 2012 and that her mother's headaches worsened as the years progressed. G.App.1. 271:13-23, 273:5-12.

Dr. Phillips testified that it is common for patients with chronic conditions, particularly headaches, to go long periods of time without returning for care when they have been reassured that their condition is benign or when medications appear ineffective. G.App.1. 440:15-441:16, 1093:21-1094:16. He explained that such intervals do not indicate remission or resolution, but is rather typical behavior among

patients who perceive little benefit for further visits. *Id.* Additionally, Dr. Phillips referred to Ms. Urizar-Mota's medical records at PCHC that showed a consistent clinical picture of continuous headaches that changed in pattern and severity, were progressive and atypical in nature, and ultimately disabling. Furthermore, Dr. Phillips testified that the medical records documented an active problem of "chronic daily headaches" from 2012 through 2016, including during her OBGYN visits while pregnant between 2014 and 2015, wherein providers documented that she was taking Tylenol for headaches. G.App.1. 467:8-468:4.

As set forth herein, the contemporaneous medical records corroborate Dr. Phillips' opinions and the district court's finding that Ms. Urizar-Mota's headaches were chronic and progressive during her treatment at PCHC. G.App.2 100-117, 123-133, 139-232, 249-251, 265-282, 292-295, 301-303, 307-308. Severe headaches with nausea and vomiting first appeared in 2012, continued into 2013 while changing in pattern, progressed to daily and refractory by 2014, and by 2016, the headaches continued to progress in atypical fashion and change in pattern while also being accompanied by dizziness and lightheadedness. *Id.* Taken together, Ms. Urizar-Mota's visits depict a progressive, chronic course, not isolated episodes. As Dr. Phillips explained, and Ms. Urizar-Mota confirmed, a patient's intermittent presentation does not mean the disease abated; it simply reflects when the patient sought help.

The district court's finding was a credibility determination entitled to deference. The court's assessment rested on its evaluation of witness credibility and the weight of the medical evidence, which are classic factual determinations reviewed only for clear error. *See Anderson*, 470 U.S. at 573-74; *Trindade v. Spirvak*, 91 F.4th 486, 492-493 (1st Cir. 2024). The government's reliance on temporal spacing in the medical chart merely proposes an alternative inference, which is not a basis for reversal after a bench trial.

## <u>CONCLUSION</u>

For the reasons stated above, the Plaintiffs-Appellees respectfully request that this Honorable Court AFFIRM the District Court's Judgment.

Plaintiffs-Appellees,
By their Attorneys,

/s/ Amato A. DeLuca
Amato A. DeLuca (#37349)
Katelyn M. Revens (#1215667)
DeLuca, Weizenbaum, Barry &
Revens, Ltd.
199 North Main Street
Providence, RI 02903
(401) 453-1500
bud@dwbrlaw.com
kate@dwbrlaw.com

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation in Fed. R. App. P. 32(a)(7)(B) because it comprises of 16,880 words excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and the Court, on November 17, 2025, issued an order granting Plaintiffs'-Appellees' motion for leave to file an oversized brief containing no more than 18,000 words. This brief also complies with the typeface size and style rules in Fed. R. App. P. 32(a)(5) and (a)(6) by using a proportionally spaced, serif, 14-point typeface (i.e., Times New Roman). As permitted by Fed. R. App. 32(a)(5)(B), the undersigned as relied upon the word count feature of this word processing system in preparing this certificate.

Signed this 25th day of November 2025.

/s/ Amato A. DeLuca

# CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing Brief for Plaintiffs-Appellees with the Clerk of the United States Court of Appeals for the First Circuit via the CM/ECF System on this 25th day of November, 2025 to be served on the following: Kevin Bolan, U.S. Attorney's Office, One Financial Plaza, 17th Floor, Providence, RI 02903.

Signed this 25th day of November 2025.

/s/ Amato A. DeLuca